**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES COMMODITY FUTURES TRADING COMMISSION, | ‖ | |
| Plaintiff, | ‖ | 13-CV-2041-LRR |
| vs. | ‖ | **ORDER** |
| U.S. BANK, N.A., | ‖ | |
| Defendant. | ‖ | |

_____

**TABLE OF CONTENTS**

I.    *INTRODUCTION.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

II.   *PROCEDURAL HISTORY.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

III.  *SUBJECT MATTER JURISDICTION.* . . . . . . . . . . . . . . . . . . . . . . . **3**

IV.   *STANDARD OF REVIEW.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

V.    *FACTUAL BACKGROUND.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**

    *A.*  *Parties.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**
    *B.*  *Overview of the Dispute* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**
        *1.*  *The 1845 Account* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .*4*
        *2.*  *Loans to the Wasendorfs and Wasendorf Construction, L.L.C.* . . .*7*
        *3.*  *Transfers from the 1845 Account* . . . . . . . . . . . . . . . . . . . . .*9*
        *4.*  *Relief requested.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**

VI.   *ANALYSIS.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **10**

    *A.*  *Written Acknowledgment* . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**
        *1.*  *Parties' arguments* . . . . . . . . . . . . . . . . . . . . . . . . . . . . .*11*
        *2.*  *Applicable law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .*12*
        *3.*  *Application* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .*12*
    *B.*  *Applicability of the 2008 and 2011 Guaranties to the 1845 Account* . . . **14**
        *1.*  *Parties' arguments* . . . . . . . . . . . . . . . . . . . . . . . . . . . . .*14*
        *2.*  *Applicable law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .*15*
        *3.*  *Application* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .*16*
    *C.*  *Alleged Improper Use and Holding of the 1845 Account* . . . . . . . . . . **18**
        *1.*  *Applicable law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .*18*

        **2.**       **Alleged improper use of the 1845 Account** . . . . . . . . . . . . . . . . *19*
               **a.**     **Parties' arguments** . . . . . . . . . . . . . . . . . . . . . . . . . . *19*
               **b.**     **Application** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *21*
        **3.**       **Alleged improper holding of the 1845 Account** . . . . . . . . . . . . *23*
               **a.**     **Parties' arguments** . . . . . . . . . . . . . . . . . . . . . . . . . . *23*
               **b.**     **Application** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *25*
    **D.**    **Restitution** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *27*
        **1.**       **Parties' arguments** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *27*
        **2.**       **Applicable law** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *28*
        **3.**       **Application** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *29*
    **E.**    **Disgorgement** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *31*
        **1.**       **Parties' arguments** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *31*
        **2.**       **Applicable law** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *32*
        **3.**       **Application** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *33*

**VII.**   **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *34*

## I. INTRODUCTION

The matter before the court is Defendant U.S. Bank, N.A.'s ("U.S. Bank") Motion to Dismiss ("Motion") (docket no. 10).

## II. PROCEDURAL HISTORY

On June 5, 2013, Plaintiff United States Commodity Futures Trading Commission ("Commission") filed a Complaint (docket no. 2) alleging that U.S. Bank improperly used (Count I) and held (Count II) customer funds in violation of: (1) Section 4d(b) of the Commodity Exchange Act ("Act") (codified as amended at 7 U.S.C. § 6d(b)); and (2) 17 C.F.R. § 1.20(a). On August 5, 2013, U.S. Bank filed the Motion. On August 15, 2013, the Commission filed its Resistance (docket no. 13). On August 28, 2013, U.S. Bank filed its Reply (docket no. 14). On August 26, 2013, the Commission filed a Supplement to the Resistance (docket no. 15).

In the Motion, U.S. Bank requests the opportunity to present oral argument. The court finds that oral argument is unnecessary. The Motion is fully submitted and ready for decision.

## III.  SUBJECT MATTER JURISDICTION

The court has federal question jurisdiction over the Commission's claims against U.S. Bank, which arise under 7 U.S.C. § 6d(b) and 17 C.F.R. § 1.20(a).  *See* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").

## IV.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal on the basis of a "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *accord B & B Hardware, Inc. v. Hargis Indus., Inc.*, 569 F.3d 383, 387 (8th Cir. 2009).  A claim satisfies the plausibility standard "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting *Twombly*, 550 U.S. at 556).

Although a plaintiff need not provide "detailed" facts in support of its allegations, *id.* (quoting *Twombly*, 550 U.S. at 555), the "short and plain statement" requirement of Federal Rule of Civil Procedure 8(a)(2) "demands more than an unadorned" accusation of harm, *id.*; *see also Erickson v. Pardus*, 551 U.S. 89, 93 (2007) ("Specific facts are not necessary [under Rule 8(a)(2)].").  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  "Where the allegations show on the face of the complaint [that] there is some insuperable bar to relief, dismissal under Rule 12(b)(6) is appropriate."  *Benton v. Merrill Lynch & Co.*, 524 F.3d 866, 870 (8th Cir. 2008).

## V. FACTUAL BACKGROUND

Viewed in the light most favorable to the Commission, the facts are as follows:

### A. Parties

The Commission is "an independent federal regulatory agency charged by Congress with the administration and enforcement of the Act and the Regulations thereunder." Complaint ¶ 7.

U.S. Bank "is a nationally chartered bank with its principal place of business in Minneapolis, Minnesota." *Id.* ¶ 8. U.S. Bank has several branches in the Northern District of Iowa, including in Cedar Falls, Iowa. U.S. Bank is a wholly-owned subsidiary of U.S. Bancorp.

### B. Overview of the Dispute

#### 1. The 1845 Account

Russell Wasendorf, Sr.[1] incorporated Peregrine Financial Group, Inc. ("Peregrine") in 1990. In January 1992, Peregrine registered as a futures commission merchant ("FCM") with the Commission. Wasendorf, who was the Chief Executive Officer of Peregrine from its inception, registered with the Commission as an associated person ("AP") of Peregrine in 1992.

An FCM is an entity "that . . . is . . . engaged in soliciting or in accepting orders for . . . the purchase or sale of a commodity for future delivery . . . [and] in connection with [such activities], accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom . . . or . . . that is registered with the Commission as a [FCM]." 7 U.S.C. § 1a(28). As an FCM, Peregrine was required to keep its customers' funds in a customer

---

[1] For ease of reading, the court will refer to Russell Wasendorf, Sr. as "Wasendorf." The court will retain the full names of other members of Wasendorf's family.

segregated account ("CSA"), which "[is] designed to ensure that customer funds are protected and available for immediate withdrawal or transfer, even if [Peregrine] experiences financial distress or enters into bankruptcy." Complaint ¶ 15.

In August 1992, Wasendorf, as Peregrine's AP, placed one of Peregrine's CSAs, the 1845 Account,[2] with a depository bank, Firstar Corporation ("Firstar"). Firstar acted as the depository for the 1845 Account until it merged with U.S. Bancorp in 2001, after which U.S. Bank acted as the depository for the 1845 Account. When U.S. Bank took control of the 1845 Account, Peregrine notified U.S. Bank that the 1845 Account was a Commodity Exchange Act CSA. In addition, bank records and related documents referred to the 1845 Account as Customer Segregated Funds or something similar.[3] While U.S. Bank was the depository of the 1845 Account, Banker A, an Assistant Relationship Manager, was the employee with primary responsibility of managing U.S. Bank's relationship with Wasendorf and Peregrine.

In the course of its business, Peregrine instructed its customers to send checks to fund CSAs to an Iowa or Illinois address. The checks that customers sent to Peregrine in Iowa were usually deposited in U.S. Bank's Cedar Falls branch and personally processed by Banker A. Such checks were labeled "Peregrine Financial Group, Inc. Customer Segregated Account." *Id*. ¶ 27.

Among Peregrine employees, Wasendorf made certain he alone had access to and information about the 1845 Account. In fact, Wasendorf told U.S. Bank that he alone

_____

[2] The account number ended with 1845 and, therefore, the court shall refer to it as the "1845 Account" for ease of reading.

[3] For example, the account was titled: "CEA Customer Segregated Accounts" on the bank's internal computer systems; "Peregrine Financial Group, Inc. Segregated Funds Account" on a August 2000 bank statement; "Firstar/U.S. Bank Customer Seg Account" on a August 2004 financial statement; and "PFG Customer Segregated Funds Account" in bank correspondence in August 1999. *See* Complaint ¶¶ 37-40.

should receive communications regarding the 1845 Account. To fulfill Wasendorf's request, U.S. Bank noted in its internal computer system that no account balance confirmations on the 1845 Account were allowed and that any inquiries about the 1845 Account had to be directed to Banker A or the Relationship Manager.

Over the course of two decades, Wasendorf defrauded over 24,000 of Peregrine's customers by misappropriating over $215 million in customer funds from the 1845 Account. He accomplished this by renting a post office box in Cedar Falls, which he set up to appear to be a U.S. Bank address. At the post office, Wasendorf intercepted mail that the National Futures Association ("NFA")[4] and Peregrine's auditor intended to send to U.S. Bank. After receiving the mail, Wasendorf used Photoshop and inkjet printers to alter the bank statements for the 1845 Account, and then sent the altered bank statements to the NFA and Peregrine's auditor. In so doing, Wasendorf was able to conceal his fraud from the NFA, Peregrine's auditor and federal regulators.

Aside from the 1845 Account, U.S. Bank maintained over thirty additional accounts with entities and individuals affiliated with Wasendorf and Peregrine. Among these accounts were accounts for Wasendorf's other companies, including: Wasendorf Air, L.L.C. (company created to hold title to Wasendorf's private airplane), Wasendorf & Associates, Inc. (research and publishing firm), My Verona, L.L.C. (Cedar Falls restaurant) and Traders Press, Inc. (publishing company).

In May 2011, U.S. Bank received a balance confirmation request from the NFA and confirmed that the 1845 Account only held $7.1 million. After returning the form to the NFA, Banker A informed Wasendorf of the confirmation form and provided Wasendorf with a copy of the form. Wasendorf then sent a falsified form to the NFA that stated that the balance of the 1845 Account was $218,650,550. On July 9, 2012, as federal

---

[4] The NFA is the self-regulatory agency for the United States' derivatives industry.

authorities were about to discover his fraud, Wasendorf attempted suicide and left a note admitting his fraudulent behavior.

On September 14, 2012, the government filed an Information charging Wasendorf with mail fraud (Count I), embezzlement of customer funds (Count II), making false statements to the Commission (Count III) and making false statements to the NFA (Count IV). *See United States v. Wasendorf*, No. 12-CR-2021-LRR (N.D. Iowa Sept. 14, 2012), Information (docket no. 18). On September 17, 2012, Wasendorf pled guilty before United States Chief Magistrate Judge Jon S. Scoles to each count in the Information. *See id.*, Minute Entry (docket no. 28). On October 3, 2012, the undersigned accepted Wasendorf's guilty plea. *See id.*, Order (docket no. 35). On January 31, 2013, the court sentenced Wasendorf to fifty years in prison and ordered that he pay over $215 million in restitution. *See id.*, Judgment (docket no. 70).

### 2. *Loans to the Wasendorfs and Wasendorf Construction, L.L.C.*

On September 9, 2008, U.S. Bank issued Wasendorf and his wife, Connie Wasendorf, a $3 million loan ("Wasendorfs' loan"). On that same day, Wasendorf, on Peregrine's behalf, guaranteed the Wasendorfs' loan ("2008 Guaranty"). The 2008 Guaranty stated, inter alia:

> [Peregrine] grants to [U.S. Bank] a security interest in all property in which [Peregrine] has an ownership interest which is now or in the future in possession of [U.S. Bank] to secure payment under [the 2008 Guaranty]. [Peregrine] hereby authorizes [U.S. Bank], without further notice to anyone, to charge any account of [Peregrine] for the amount of any and all Obligations due under [the 2008 Guaranty], and grants [U.S. Bank] a contractual right to set off . . . amounts due hereunder against all depository account balances, cash and other property now or hereafter in the possession of [U.S. Bank] and the right to refuse to allow withdrawals from any account . . . .

7

2008 Guaranty (docket no. 10-3) at 4. Among Peregrine's accounts at U.S. Bank, the 1845 Account had the largest balance. In January 2010, the Wasendorfs and U.S. Bank agreed to extend the maturity date of the Wasendorfs' loan. Wasendorf signed an amended agreement on behalf of Peregrine and, in doing so, Peregrine guaranteed the Wasendorfs' loan. Peregrine served as the guarantor on the Wasendorfs' loan from September 9, 2008 until the loan was paid off in February 2010. During this period, U.S. Bank collected approximately $29,000 in interest on the Wasendorfs' loan.

On September 10, 2008, U.S. Bank issued Wasendorf Construction, L.L.C. ("Construction"), a company formed on July 18, 2007 and owned by Wasendorf and his son, Russell Wasendorf, Jr., a loan for $6.4 million dollars ("Construction loan"). Construction applied for the loan to build an office building in Cedar Falls, Iowa, with Peregrine to be the building's primary tenant. On August 5, 2011, Wasendorf, on behalf of Peregrine, guaranteed the Construction loan ("2011 Guaranty"). The 2011 Guaranty stated, inter alia:

> [Peregrine] grants to [U.S. Bank] a security interest in all property in which [Peregrine] has an ownership interest which is now or in the future in possession of [U.S. Bank] to secure payment under [the 2011 Guaranty]. [Peregrine] hereby authorizes [U.S. Bank], without further notice to anyone, to charge any account of [the Guarantor] for the amount of any and all Obligations due under [the 2011 Guaranty], and grants [U.S. Bank] a contractual right to set off . . . amounts due hereunder against all depository account balances, cash and other property now or hereafter in the possession of [U.S. Bank] and the right to refuse to allow withdrawals from any account . . . .

2011 Guaranty (docket no. 10-4) at 3-4. Peregrine served as the guarantor on the Construction loan from August 2011 to July 2012. During this period, U.S. Bank collected approximately $290,000 in interest on the Construction loan. On December 13,

2012, U.S. Bank filed a claim in Peregrine's bankruptcy proceedings for the $6,662,505.38 outstanding on the Construction loan.

### 3.    *Transfers from the 1845 Account*

From June 2008 to June 2012, approximately $118 million was deposited into the 1845 Account and approximately 94% of this money was from Peregrine's customers.[5] In this same period, Wasendorf transferred approximately $35 million from the 1845 Account to himself, his companies and Connie Wasendorf, including approximately $10.5 million to Construction; $13.5 million to Wasendorf & Associates, Inc.; $5 million to My Verona, L.L.C.; $1.1 million to Wasendorf Air, L.L.C.; $2.5 million to Wasendorf personally; and $2.5 million to Connie Wasendorf as part of a divorce settlement.

### 4.    *Relief requested*

In light of U.S. Bank's alleged wrongdoing, the Commission requests that the court grant relief pursuant to 7 U.S.C. § 13a-1, including: (1) finding that U.S. Bank violated 7 U.S.C. § 6d(b) and 17 C.F.R. § 1.20(a); (2) issuing a permanent injunction prohibiting U.S. Bank or affiliated entities from violating 7 U.S.C. § 6d(b) and 17 C.F.R. § 1.20(a); (3) requiring that U.S. Bank make full restitution to any Peregrine customer harmed by its actions; (4) requiring that U.S. Bank disgorge all benefits conferred to U.S. Bank from its alleged wrongdoing; (5) requiring U.S. Bank to pay civil monetary penalties under the Act; (6) requiring U.S. Bank to pay costs and fees; (7) and providing any other relief that the court deems necessary and appropriate.

---

[5] As discussed in detail below, federal regulations also permitted Peregrine to deposit funds into the CSA. Peregrine's funds accounted for the remaining 6% of the funds in the 1845 Account.

## VI. ANALYSIS

The parties dispute whether U.S. Bank violated federal law in its handling of the 1845 Account. The laws and regulations at issue are 7 U.S.C. § 6d(b) and 17 C.F.R. § 1.20(a). 7 U.S.C. § 6d(b) provides: "It shall be unlawful for . . . any depository, that has received any money, securities, or property for deposit in a separate account . . . to hold . . . or use any such money, securities, or property as belonging to the depositing [FCM] or any person other than the customers of such [FCM]." *Id.*; *see also* 17 C.F.R. § 1.20(a) ("Under no circumstances shall any portion of futures customer funds be obligated to . . . any depository except to purchase, margin, guarantee, secure, transfer, adjust or settle trades, contracts or commodity option transactions of futures customers. No person, including any . . . depository, that has received futures customer funds for deposit in a segregated account . . . may hold . . . or use any such funds as belonging to any person other than the futures customers of the [FCM] which deposited such funds.").

The Commission asserts in Count I that U.S. Bank violated 7 U.S.C. § 6d(b) and 17 C.F.R. § 1.20(a) by improperly *using* CSA funds when U.S. Bank allegedly used the 1845 Account to secure the $3 million Wasendorfs' loan and the $6.4 million Construction loan in 2008 and 2011, respectively. The Commission asserts in Count II that U.S. Bank violated the same provisions by improperly *holding* customer funds when U.S. Bank allegedly allowed Wasendorf to transfer money from the 1845 Account to himself, his various companies and Connie Wasendorf. The Commission argues that neither the way U.S. Bank used CSA funds nor held such funds in the 1845 Account was for the benefit of Peregrine's customers, as required by 7 U.S.C. § 6d(b).

In the Motion, U.S. Bank asserts that the Commission has failed to state a claim for which relief may be granted and, thus, that the court should dismiss Counts I and II. Specifically, U.S. Bank first argues that the Act and its regulations do not apply to U.S. Bank because Peregrine failed to obtain a written acknowledgment that indicated U.S.

Bank verified the 1845 Account was a CSA. Second, U.S. Bank argues that it did not improperly "use" or "hold" any of the funds in the 1845 Account. Third, U.S. Bank argues that, even if the court does not dismiss the Commission's claims under U.S. Bank's first two arguments, the court should dismiss the Commission's request for restitution because any alleged wrongdoing on the part of U.S. Bank did not proximately cause Peregrine's customers to suffer losses. Fourth, U.S. Bank argues that the court should dismiss the Commission's request for disgorgement because U.S. Bank did not gain anything from the alleged violations.

### A. Written Acknowledgment

### 1. Parties' arguments

U.S. Bank asserts that the Commission failed to allege that Peregrine ever requested that U.S. Bank provide a written acknowledgment that the 1845 Account was subject to the Act. U.S. Bank also asserts that the Commission failed to allege that Peregrine obtained and retained such acknowledgment. Thus, according to U.S. Bank, the Commission made no allegations that showed that U.S. Bank was required to comply with the Act and its regulations. In support of its argument, U.S. Bank relies on several of the Commission's interpretative letters and notices of proposed rulemaking that it claims support its position of "the mandatory nature of a depository acknowledgment letter." Brief in Support of Motion (docket no. 10-11) at 20.

In its Resistance, the Commission first argues that it will show at trial that U.S. Bank provided Peregrine an acknowledgment letter. Second, the Commission argues that, even if U.S. Bank did not issue an acknowledgment letter, the absence of an acknowledgment letter is not dispositive of the issue of whether U.S. Bank was required to comply with the Act and its regulations. In support of its second argument, the Commission states that while the regulations contain a requirement that an FCM (Peregrine) obtain a written acknowledgment from a depository (U.S. Bank) that the

depository understands the CSA is subject to the Act, nothing in the Act requires a bank to issue a written acknowledgment as a prerequisite to it being subject to the Act and its regulations. The Commission asserts that the Complaint referenced multiple instances in which Peregrine notified U.S. Bank, both verbally and in writing, that the 1845 Account was a CSA, subjecting U.S. Bank to liability if it violated the Act.

### 2. *Applicable law*

7 U.S.C. § 6d(b) provides: "It shall be unlawful for . . . any depository[] that has received any money, securities, or property for deposit in a separate account . . . to hold, dispose of, or use any such money, securities, or property as belonging to the depositing [FCM] or any person other than the customers of such [FCM]." *Id.* Pursuant to 17 C.F.R. § 1.20(a), Peregrine was required to "obtain and retain in its files . . . a written acknowledgment from [U.S. Bank] . . . that it was informed that the futures customer funds deposited therein are those of futures customers and are being held in accordance with the provisions of the Act [and the regulations]." *See* 17 C.F.R. § 1.20(a).

### 3. *Application*

The court is not persuaded by U.S. Bank's argument that it is not subject to the Act and its regulations because the Complaint did not specifically allege that U.S. Bank issued a written acknowledgment indicating that the 1845 Account was a CSA. As an initial matter, the court notes that the parties dispute whether U.S. Bank issuing a written acknowledgment is a prerequisite to it being subject to the Act and the regulations. However, the court need not resolve this issue at this time because the court finds that the Complaint, even without a specific reference to an acknowledgment letter, has "[pled] factual content that allows the court to draw the reasonable inference that [U.S. Bank] is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The plain language of 7 U.S.C. § 6d(b) prohibits particular actions by a depository if a depository receives money in the form of a CSA. *See* 7 U.S.C. § 6d(b) ("It shall be unlawful for . . . any depository,

that has received any money, securities, or property for deposit in a separate account . . . to hold . . . or use any such money, securities, or property as belonging to the depositing [FCM] or any person other than the customers of such [FCM].").

In the Complaint, the Commission states that "U.S. Bank cannot locate any account opening documentation or signature cards for the 1845 Account" despite U.S. Bank retaining this information for all of the other accounts that Wasendorf and Peregrine had at U.S. Bank. Complaint ¶ 31. Additionally, the Commission states that the account was labeled as a CSA in numerous documents, as required by 17 C.F.R. § 1.20(a) ("Such customer funds when deposited with any bank . . . shall be deposited under an account name which clearly identifies them as such . . . ."). These allegations permit the reasonable inference that U.S. Bank, at one point, issued an acknowledgment letter, but either lost or destroyed it. Certainly, it is plausible that an acknowledgment letter existed, which, even if the court accepts U.S. Bank's argument that a written acknowledgment is a prerequisite to it being subject to the Act and the regulations, makes U.S. Bank potentially liable for the alleged misconduct. In a motion to dismiss, plaintiffs "need not provide specific facts in support of their allegations, *Erickson v. Pardus*, 551 U.S. 89 (2007) (per curiam), but they must include sufficient factual information to provide 'grounds' upon which the claim rests, and to raise a right to relief above a speculative level." *Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 549 (8th Cir. 2008) (quoting *Twombly*, 550 U.S. at 556 n. 3) (parallel citations omitted). In this case, the Commission did not indicate specifically that U.S. Bank issued a written acknowledgment, but given its other allegations, it has pled sufficient factual information to raise its right to relief above a speculative level. Accordingly, the court shall deny the Motion to the extent that U.S. Bank argues that the Commission's claims should be dismissed because the Commission failed to specifically allege that U.S. Bank submitted a written acknowledgment to Peregrine indicating that the 1845 Account was a CSA.

## B. Applicability of the 2008 and 2011 Guaranties to the 1845 Account

### 1. Parties' arguments

U.S. Bank argues that even if it was required to comply with the Act and its regulations, it did not violate 7 U.S.C. § 6d(b) through any alleged "use" of the 1845 Account, including its alleged use of the 1845 Account as security for the Wasendorfs' loan and the Construction loan, for any person other than Peregrine's customers. Specifically, U.S. Bank argues that the 2008 and 2011 Guaranties, which both contained a provision that gave U.S. Bank "a security interest in all property in which [Peregrine] has an ownership interest which is now or in the future in possession of [U.S. Bank]," 2008 Guaranty at 4; 2011 Guaranty at 3-4, only apply to the property in which Peregrine had an *ownership interest*. Accordingly, U.S. Bank argues that since the 1845 Account was a CSA and contained funds of Peregrine's customers, Peregrine did not have an ownership in such account and, therefore, Peregrine did not grant U.S. Bank a security interest in the 1845 Account.[6]

The Commission argues that even though the plain language of the guaranties may not give U.S. Bank a security interest in the 1845 Account, "at the time the guarant[ies] were executed, U.S. Bank intended to apply Peregrine's customer funds to offset the Wasendorfs' and/or Construction's debt in the event of a default on their loans." Resistance at 9. Specifically, the Commission points out, as it alleged in its Complaint, that "Peregrine had two depository accounts held by U.S. Bank when the [2008 and 2011 Guaranties] were executed. The 'house' account held less than $700,000 and the 1845 Account held over $7 million." *Id.* According to the Commission, "[i]t defies logic that

_____

[6] The court notes that the 1845 Account did contain some of Peregrine's funds, which potentially belies U.S. Bank's contention that it did not have an ownership interest in at least some of the 1845 Account. However, given the court's discussion below, the court need not address whether Peregrine's potential partial ownership interest in the 1845 Account makes the entire 1845 Account subject to the 2008 and 2011 guaranties.

U.S. Bank would extend multi-million dollar loans without a 'security interest' and 'contractual right of set off . . .' against funds in the 1845 Account." *Id.* In support of this position, the Commission states that "U.S. Bank and Banker A . . . calculated Peregrine's assets available, including the funds in the 1845 Account, to secure the two loans in the event the debtors defaulted on their obligations" and that "U.S. Bank and Banker A determined Peregrine's valuation and risk rating by using the funds in the 1845 Account." *Id.* at 7-8. The Commission also asserts that "[i]f Wasendorf's fraudulent scheme had not been discovered . . . *prior* to Construction's default on its loan, U.S. Bank would have applied Peregrine's customer funds in the 1845 Account to set off Construction's debt." *Id.* at 10.

### 2. *Applicable law*

As an initial matter, the court shall apply Iowa law when analyzing the meaning of the 2008 and 2011 guaranties given that both parties and the court agree that Iowa law controls with respect to this issue.

In *Hartig Drug Co. v. Hartig*, 602 N.W.2d 794 (Iowa 1999), the Iowa Supreme Court discussed the rules of contract interpretation. The Iowa Supreme Court stated:

> A cardinal rule of contract construction or interpretation is the intent of the parties must control. *Whalen v. Connelly*, 545 N.W.2d 284, 291 (Iowa 1996). The important time frame for determining this intent is the time the contract was executed. *Davenport Osteopathic Hosp. Ass'n v. Hospital Serv., Inc.*, 261 Iowa 247, 260, 154 N.W.2d 153, 161 (1967). If the contract is ambiguous and uncertain, extrinsic evidence can be considered to help determine the intent. Yet, a contract is not ambiguous merely because the parties disagree over its meaning. *Tom Riley Law Firm, P.C. v. Tang*, 521 N.W.2d 758, 759 (Iowa [Ct.] App. 1994). Instead, an ambiguity occurs in a contract when a genuine uncertainty exists concerning which of two reasonable interpretations is proper. *Berryhill v. Hatt*, 428 N.W.2d 647, 654 (Iowa 1988). The existence of an ambiguity, however, can be determined only

> after all pertinent rules of interpretation have been considered. *Id.* Our general rules of interpretation are used both to determine what meanings are reasonably possible as well as to choose among two reasonable meanings. Restatement (Second) of Contracts § 202 cmt. a (1981).

*Id.* at 797. The Iowa Supreme Court expounded upon its rules of contract interpretation a month later in *Fausel v. JRJ Enters., Inc.*, 603 N.W.2d 612 (Iowa 1999), when it stated: "Words and other conduct [related to contracts] are interpreted in the light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given great weight." *Id.* at 618 (quoting Restatement (Second) of Contracts § 202(1)). The Iowa Supreme Court disagreed with "cases that say extrinsic evidence cannot change the plain meaning of a writing," and instead, stated that "'meaning can almost never be plain except in a context.'" *Id.* (quoting Restatement (Second) of Contracts § 212 cmt. b). Therefore, "the rule that words and other conduct are interpreted in the light of all the circumstances *is not* limited to cases when ambiguity in the agreement exists." *Id.* (emphasis added). "[W]hen the meaning of an agreement depends on extrinsic evidence, a question of interpretation is left to the trier of fact unless 'the evidence is so clear that no reasonable person would determine the issue in any way but one.'" *Id.* (quoting Restatement (Second) of Contracts § 212 cmt. e). However, "'the words of an integrated agreement remain the most important evidence of intention.'" *Id.* (emphasis omitted) (quoting Restatement (Second) of Contracts § 212 cmt. b).

### 3. *Application*

The essence of the dispute is that the parties disagree on what the contracting parties intended when Peregrine granted a "security interest in all property in which [Peregrine] has an ownership interest." 2008 Guaranty at 4; 2011 Guaranty at 3-4. If the contracting parties intended this "property" to include the 1845 Account, then U.S. Bank may be liable for improperly using the 1845 Account as security for loans it made to Peregrine. However, if the contracting parties did not intend this "property" to include the 1845

Account, then U.S. Bank would have no liability under the law for improperly using the 1845 Account as security for the loans because the 1845 Account was not part of the security referenced in the guaranties.

The court concludes that, while the language may be unambiguous, the meaning of the language in the guaranties depends on extrinsic evidence in light of the context of the dispute. *See Fausel*, 603 N.W.2d at 618 ("[T]he rule that words and other conduct are interpreted in the light of all the circumstances is not limited to cases when ambiguity in the agreement exists."). In the Complaint, the Commission made numerous allegations supporting its position that Wasendorf, as Peregrine's representative, and U.S. Bank intended the security interest provided for in the guaranties to include the 1845 Account, including specific allegations that Banker A considered the 1845 Account to be part of the security agreement on loans entered into by the Wasendorfs and Construction. *See* Complaint ¶¶ 47, 54, 56, 58, 66, 68. As the Iowa Supreme Court stated in *Fausel*, "[w]hen the meaning of an agreement depends on extrinsic evidence, a question of interpretation is left to the trier of fact" unless there is only one reasonable meaning. *Fausel*, 603 N.W.2d at 618. Since there is more than one reasonable interpretation of what property the guaranties granted U.S. Bank a security interest in and this meaning depends on extrinsic evidence, the meaning of this portion of the guaranties must be left to the trier of fact. Therefore, the court cannot determine that the "allegations show on the face of the complaint [that] there is some insuperable bar to relief." *See Benton*, 524 F.3d at 870. Accordingly, the court shall deny the Motion to the extent that it seeks to dismiss the Commission's claims on the basis that the guaranties did not grant U.S. Bank a security interest in the 1845 Account.

### C. Alleged Improper Use and Holding of the 1845 Account

#### 1.     Applicable law

7 U.S.C. § 6d(b) provides: "It shall be unlawful for . . . any depository[] that has received any money, securities, or property for deposit in a separate account . . . to hold . . . or use any such money, securities, or property as belonging to the depositing [FCM] or any person other than the customers of such [FCM]." *Id.* However, pursuant to 17 C.F.R. § 1.23, FCMs are allowed to

> [add] to such segregated . . . customer funds such amount or amounts of money, from its own funds . . . as it may deem necessary to ensure any and all . . . customers' accounts from becoming undersegregated at any time. . . . [An FCM] may draw upon such segregated funds to its own order, to the extent of its actual interest therein, including the withdrawal of securities held in segregated safekeeping accounts held by a bank . . . .

17 C.F.R. § 1.23.  Essentially, FCMs are allowed to put excess money into the CSA so that if a customer has a shortfall in its margin requirements, the FCM funds can temporarily cover the shortfall instead of the FCM using another customer's funds to cover the shortfall.

When construing the meaning of federal statutes, "[t]he starting point in discerning congressional intent is the existing statutory text." *Lamie v. United States Trustee*, 540 U.S. 526, 534 (2004).  "It is well established that 'when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'" *Id.* (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000)); *accord Owner-Operator Indep. Drivers Ass'n v. United Van Lines, L.C.C.*, 556 F.3d 690, 693 (8th Cir. 2009).  This rule "results from 'deference to the supremacy of the Legislature, as well as recognition that Congressmen typically vote on the language of a bill.'" *Lamie*, 526 U.S. at 538 (quoting

*United States v. Locke*, 471 U.S. 84, 95 (1985)).  Therefore, "[w]here the plain meaning of a statute is clear, '[courts] are not free to replace it with an unenacted legislative intent.'" *Owner-Operator Indep. Drivers Ass'n*, 556 F.3d at 693 (quoting *INS v. Cardoza Fonseca*, 480 U.S. 421, 453 (1987) (Scalia, J., concurring)).  However, "judicial deference to the plain meaning of a statute is not an absolute."  *Id.*  "One exception consists of those 'rare cases' when a statute's plain text produces a result 'demonstrably at odds with the intentions of its drafters, and those intentions must be controlling.'"  *Id.* (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982)).  Another exception occurs when the language of the statute is ambiguous.  If the legislature has left an ambiguity in the statute, the statutory ambiguity should be resolved by the administrative agency rather than the courts.  *City of Arlington, Tex. v. FCC*, __ U.S. __, __, 133 S. Ct. 1863, 1868 (2013) (citing *Chevron U.S.A., Inc. v. National Resources Defense Counsel, Inc.*, 467 U.S. 837 (1984)); *see also id.* at 1874 ("Where Congress has established a clear line, the agency cannot go beyond it; and where Congress has established an ambiguous line, the agency can go no further than the ambiguity will fairly allow.  But in rigorously applying the latter rule, a court need not pause to puzzle over whether the interpretive question presented is 'jurisdictional.'  If 'the agency's answer is based on a permissible construction of the statute,' that is the end of the matter." (quoting *Chevron*, 467 U.S. at 842)).

## 2. *Alleged improper use of the 1845 Account*

### a. *Parties' arguments*

In the Complaint, the Commission asserts that U.S. Bank violated the Act and its regulations by using a CSA—the 1845 Account—to secure loans to the Wasendorfs and Construction.  U.S. Bank argues that even if the court finds that the 1845 Account is part of the security provided for in the 2008 and 2011 guaranties, it did not violate the Act because it did not "use" such money for any person other than Peregrine's customers.

U.S. Bank argues that since neither the Act nor the regulations define "use," the court should look to congressional intent and the plain meaning of the word to ascertain its meaning.

In looking at congressional intent, U.S. Bank asserts that Congress's purpose in adding subsection (b) to 7 U.S.C. § 6d in 1968 "was to 'prohibit expressly customers' funds from being used to offset liability of the [FCMs] or otherwise being misappropriated' by the depository." Brief in Support of Motion at 10 (quoting S. Rep. No. 90-947 (1968), *reprinted in* 1968 U.S.C.C.A.N. 1673, 1679). U.S. Bank argues that the Commission did not allege that U.S. Bank used the money to offset Peregrine's liability or that the Commission otherwise misappropriated the funds in the 1845 Account.

With regard to the plain meaning of the word "use," U.S. Bank points to authority that supports its assertion that "[i]n the context of money, . . . 'use' occurs in a transaction, such as purchasing a good or paying for rent." *Id.* at 11. U.S. Bank also cites Merriam-Webster Dictionary, which defines "use" as "'to put into action or service'" or "'avail oneself of.'" *Id.* (quoting Merriam-Webster Dictionary, *available at* http://www.merriam-webster.com/dictionary/use). In light of this definition, U.S. Bank argues that "[t]he plain meaning of 'use' in this context does not encompass simply considering that funds were on deposit in the 1845 Account when deciding to extend credit." *Id.* at 12.

The Commission agrees that since the word "use" is not defined by the Act or regulations, the court should look to the plain meaning of the words and congressional intent. The Commission argues that the plain meaning of "use" encompasses U.S. Bank's use of the 1845 Account to determine whether to issue the Wasendorfs' loan in 2008 and whether to extend the repayment period for the Construction loan in 2011. Specifically, the Commission asserts, as it alleged in its Complaint, that "Peregrine had two depository accounts held by U.S. Bank when the [2008 and 2011 Guaranties] were executed. The

'house' account held less than $700,000 and the 1845 Account held over $7 million." Resistance at 9. According to the Commission, "[i]t defies logic that U.S. Bank would extend multi-million dollar loans without a 'security interest' and 'contractual right of set off . . .' against funds in the 1845 Account." *Id.*

The Commission also argues that even considering congressional intent, in which the subsection was added "to prohibit expressly customers' funds from being used to offset liabilities of the [FCM] or otherwise being misappropriated," U.S. Bank violated the Act by using the 1845 Account to secure the Wasendorfs' loan and the Construction loan. *Id.* at 4 (quoting S. Rep. No. 90-947 at 7) (internal quotation mark omitted). According to the Commission, before Congress added subsection (b) to the Act, FCMs and depositories entered into agreements whereby the depositories agreed not to offset potential FCM liabilities owed to the depositories from CSAs. The Commission argues that Congress added subsection (b) so the Commission could directly enforce what had been contractual responsibilities of the depositories and the FCMs.

### b. Application

The language of 7 U.S.C. § 6d(b) is plain, so "the sole function of the court . . . is to enforce it according to its terms." *See Lamie*, 540 U.S. at 534 (quoting *Hartford Underwriters Ins. Co.*, 530 U.S. at 6) (internal quotation mark omitted). Accordingly, the court will give the term "use" its plain meaning.

At this stage, the court accepts the Commission's factual allegations—that the 1845 Account was part of the security interest granted to U.S. Bank in the 2008 and 2011 guaranties and that Banker A and U.S. Bank considered the 1845 Account when determining whether to issue the Wasendorfs' loan and extend the Construction loan—as true. *See Iqbal*, 556 U.S. at 678 (stating that a court may "accept[] as true" allegations in a complaint). Given the plain meaning of the word "use" and even accepting one of U.S. Bank's own definitions of "use" as "to avail oneself," the court finds that the

Commission has "[pled] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* First, the Commission alleged that U.S. Bank "used," or availed itself, of the 1845 Account when it entered into the 2008 and 2011 guaranties with Peregrine, which enabled U.S. Bank to collect interest on the associated loans it made to the Wasendorfs and Construction. Second, the Commission points out that Wasendorf and his businesses had many other accounts at U.S. Bank and, presumably, if U.S. Bank had not issued the Wasendorfs' loan or extended the Construction loan—of which the 1845 Account allegedly was the primary security—Wasendorf plausibly could have closed these other accounts, which could have been financially detrimental to U.S. Bank. Given that the Wasendorfs' loan and the Construction loan were not for the benefit of Peregrine's customers, the court could draw a reasonable inference that U.S. Bank violated 7 U.S.C. § 6d(b).[7] Accordingly, the court shall deny the Motion to the extent it requests that the court dismiss the Commission's claims on the grounds that U.S. Bank did not improperly use the 1845 Account.[8]

---

[7] The court notes that this is not a case "when a statute's plain text produces a result 'demonstrably at odds with the intentions of its drafters, [in which case] those intentions must be controlling.'" *Owner-Operator Indep. Drivers Ass'n*, 556 F.3d at 693 (quoting *Griffin*, 458 U.S. at 571). Congress's purpose in adding subsection (b) was to ensure that depositories did not offset the debts of FCMs with customer accounts or misappropriate customer funds in any way. *See* S. Rep. No. 90-947 at 7. If the Commission can prove that U.S. Bank used a CSA—the 1845 Account—as collateral for the loans, it increased the risk that U.S. Bank would use the 1845 Account to offset Peregrine's debts, and limiting this risk is precisely the result Congress was trying to achieve. *See id.*

[8] In the Complaint, the Commission alleges that U.S. Bank obtaining a security interest on the 1845 Account could qualify not only as improperly *using* the 1845 Account but also as improperly *holding* the 1845 Account. Complaint ¶ 84. However, since the court has concluded that the Motion fails because the Commission has stated a plausible claim that U.S. Bank improperly *used* the 1845 Account when it allegedly used the 1845 Account as security for the guaranties, the court need not address the issue of whether

(continued…)

### 3. Alleged improper holding of the 1845 Account

#### a. Parties' arguments

In the Complaint, the Commission asserts that U.S. Bank violated the Act and its regulations by allowing Wasendorf, as Peregrine's AP, to transfer customer funds from the 1845 Account to various accounts that he, his companies and Connie Wasendorf owned. The Commission argues that by allowing Wasendorf to transfer money out of the 1845 Account, U.S. Bank violated the Act because U.S. Bank did not hold the funds as belonging solely to Peregrine's customers.

U.S. Bank argues that to "hold" means "'to keep under restraint'" or "'to keep back from use.'" Brief in Support of Motion at 13 (quoting Merriam-Webster Dictionary, *available at* http://www.merriam-webster.com/dictionary/hold). U.S. Bank also cites various Commission releases in which the Commission stated that the purpose of 7 U.S.C. § 6d(b) is to ensure that customer funds are available to the FCM and its customers upon demand.

U.S. Bank argues that the Commission made no allegations in its Complaint that U.S. Bank ever held funds in the 1845 Account "under restraint" or "back from use." *Id.* Rather, U.S. Bank points out that the Commission argues that U.S. Bank did not put *enough* restrictions on the customer accounts, which, according to U.S. Bank, runs counter to the Commission's policy of making customer funds freely available to the customers and the FCM.

U.S. Bank also argues that it had no duty to monitor Wasendorf's transfers to assure that he was transferring money from Peregrine's excess funds rather than Peregrine customer funds. Moreover, U.S. Bank argues that it would have been impossible for it

---

[8](…continued)
U.S. Bank also improperly *held* the 1845 Account when it allegedly held the 1845 Account as security for the guaranties.

to determine whether the money that Wasendorf transferred to himself, his companies and Connie Wasendorf was Peregrine customer funds, which would be unlawful under 7 U.S.C. § 6d(b), or whether it was Peregrine's excess funds, which, because it was not Peregrine customer funds, is not unlawful under the Act. U.S. Bank argues that "[i]f withdrawal for an improper purpose by an FCM equates to the depository holding funds 'as belonging to the depositing [FCM] or any person other than the customers of such [FCM],' then all depositories would be strictly liable for the fraud of an FCM," an outcome contrary to Congress's intent. *Id*. at 14-15 (quoting 7 U.S.C. § 6d(b)).

The Commission argues that U.S. Bank's definition of "hold" is disingenuous given that the first definition in Merriam-Webster dictionary is "to have possession or ownership of or have at one's disposal." Resistance at 10 (quoting Merriam-Webster Dictionary, *available at* http://www.merriam-webster.com/dictionary/hold) (internal quotation mark omitted). The Commission argues that the plain language of the Act and the regulations prohibited U.S. Bank from holding Peregrine customer segregated funds as if they belonged to anyone other than the customers, and because U.S. Bank allowed Wasendorf to "transfer[] out of the [1845 Account] to persons and entities U.S. Bank and Banker A knew were for non-customer purposes," U.S. Bank clearly violated the Act. *Id*. at 10-11.

With regard to U.S. Bank's argument that it was impossible for it to know whether the funds Wasendorf transferred were Peregrine's excess funds or Peregrine customer funds, the Commission argues that whether U.S. Bank knew that it was transferring Peregrine customer funds rather than Peregrine's excess funds from the 1845 Account is a question of fact and, thus, a matter inappropriate at this stage of litigation and more appropriate at trial. Moreover, the Commission cites one of its interpretative letters, which states:

> [B]anks used as depositories, which have been given prior notice, may be violating the [Act] or be aiding and abetting a violation if they acquiesce to the withdrawal or use of

> customer funds by a FCM for an unlawful purpose. If less
> than actual notice is received by such a bank, then the
> [Commission] staff notes that the bank's responsibilities are
> less clear, but at least is equal to that extended to other trust
> accounts.

Resistance at 12 (first alteration in original) (emphasis omitted) (quoting Interpretative Letter 79-1, Comm. Fut. L. Rep. (CCH) at 1 (May 29, 1979)).

Next, the Commission discusses trust law as an analogy to a CSA and argues that, while trust depositories usually do not have a duty to monitor trust accounts, the depository may be liable for the amount misappropriated if it has knowledge that such misappropriation will occur. According to the Commission, because U.S. Bank knew that there were not enough excess Peregrine funds to cover Wasendorf's transfers and had notice that these transfers were for an improper purpose given that they were issued to entities that U.S. Bank knew were not customers of Peregrine, U.S. Bank is liable for the amount that Wasendorf improperly transferred.

In its Reply, U.S. Bank argues that the Commission ignores its own interpretative letters that acknowledge that "'[t]here is no case law discussing whether a bank has authority to assure that customers' funds are not misappropriated by [FCMs].'" Reply at 2 (quoting Interpretative Letter 79-1 at 2). Further, U.S. Bank argues that analogizing a CSA to a trust account is inappropriate, given that the trustee-fiduciary typically does not deposit his or her own money in the trust, whereas FCMs typically do.

### b.    *Application*

The plain language of the statute states that "[i]t shall be unlawful for . . . any depository[] that has received any money, securities, or property for deposit in a separate account . . . to hold . . . any such money . . . as belonging to the depositing [FCM] or any person other than the customers of such [FCM]." 7 U.S.C. § 6d(b). It is undisputed that many of Peregrine's customers deposited their money into the 1845 Account at U.S. Bank and, therefore, U.S. Bank, pursuant to the plain language of 7 U.S.C. § 6d(b), was

required to hold this money as belonging only to such customers. However, the ability of an FCM to deposit excess funds into such CSAs complicates matters because, pursuant to 17 C.F.R. § 1.23, if FCMs deposit money into the account, they can withdraw or transfer this money to their own order. Therefore, although the statute states that depositories must treat FCM customer funds as belonging to no one other than the customer, there is some ambiguity about depositories' duties when both the FCM and customers have deposited funds in a CSA.

To the extent the statute is ambiguous as to whether there is a duty for depositories to assure that an FCM is withdrawing or transferring its own money rather than that of its customers, Interpretative Letter 79-1 fills the gap. Interpretative Letter 79-1 states that "banks used as depositories, which have been given prior notice, may be violating the [Act] or be aiding and abetting a violation if they acquiesce to the withdrawal or use of customer funds by a FCM for an unlawful purpose." Interpretative Letter 79-1 at 1. Since the Commission alleges that U.S. Bank knew that Peregrine did not have enough of its excess funds to cover the transfers to Wasendorf and his companies[9] and that U.S. Bank knew that Wasendorf was not transferring the funds to benefit Peregrine's customers, the court finds that "[the Commission pled] factual content that allows the court to draw the reasonable inference that [U.S. Bank] is liable for the misconduct alleged." *See Iqbal*, 556 U.S. at 678. Accordingly, the court shall deny the Motion to the extent that it asks the court to dismiss the Commission's claim that U.S. Bank improperly held Peregrine customer funds.

---

[9] For example, the Commission alleges that "[b]etween June 2008 and June 2012, more than $118 million was deposited into the 1845 Account, more than 94% of which represented customer funds. During the same time, more than 30% of those funds were used by Wasendorf for personal expenditures and his other companies." Complaint ¶ 73.

### D. Restitution

#### 1. Parties' arguments

In the Complaint, the Commission seeks restitution pursuant to 7 U.S.C. § 13a-1(d)(3). Pursuant to that section: "[T]he Commission may seek, and the court may impose, on a proper showing, on any person found in the action to have committed any violation, equitable remedies including . . . restitution to persons who have sustained losses proximately caused by such violation (in the amount of such losses) . . . ." 7 U.S.C. § 13a-1(d)(3).

U.S. Bank argues that even if the Commission has adequately stated a claim asserting that it violated the Act and its regulations, the Commission has failed to allege facts that would entitle Peregrine's customers to restitution. Specifically, U.S. Bank states that the Complaint "fails to allege that anyone sustained losses 'proximately caused' by U.S. Bank's conduct . . . and fails to plead facts showing how such remedies could appropriately be imposed upon U.S. Bank, which was itself a victim of Wasendorf's fraud. Brief in Support of Motion at 23.

With respect to the Commission's request that U.S. Bank "make full restitution to each and every Peregrine customer whose funds [U.S. Bank] improperly held in the 1845 Account," Complaint at 20, U.S. Bank argues that the Commission failed to allege that U.S. Bank's conduct was the proximate cause of Peregrine's customers' losses. U.S. Bank cites to numerous cases in which courts have held that banks, without more, are not liable when their customers' funds are lost due to the bank processing the transactions of a third-party wrongdoer, because the banks did not proximately cause the losses. Finally, U.S. Bank argues that Peregrine's customers are not entitled to restitution because there is no allegation that U.S. Bank itself took the customers' money.

The Commission argues that the existence of proximate cause is "not appropriately considered or determined on a motion to dismiss." Resistance at 16. The Commission

also argues that the cases to which U.S. Bank cites are inapposite because in those cases, there was no evidence of misconduct on the part of the banks. Additionally, the Commission contends that U.S. Bank's definition of restitution is too narrow and argues that the court has wide discretion in determining the proper remedy.

### 2.    *Applicable law*

The equitable remedy of restitution is available if a plaintiff shows that a defendant's conduct was the proximate cause of the FCM's customers' losses. *See* 7 U.S.C. § 13a-1(d)(3). Neither the Act, the United States Supreme Court nor the Eighth Circuit Court of Appeals have defined proximate cause in the context of the Commodity Exchange Act. However, "i[t] is well-established that 'when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'" *Lamie*, 540 U.S. at 534 (quoting *Hartford Underwriters Ins. Co.*, 530 U.S. at 6); *accord Owner-Operator Indep. Drivers Ass'n*, 556 F.3d at 693. The United States Supreme Court explained the meaning of proximate cause in *Holmes v. Sec. Investor Protection Corp.*, 503 U.S. 258 (1992). In that case, the Supreme Court defined proximate cause in the context of a civil Racketeer Influenced and Corrupt Organizations Act ("RICO") suit. *Id.* at 268-70. The Supreme Court insisted that the central notion of proximate cause was a "demand for some direct relation between the injury asserted and the injurious conduct alleged." *Id.* at 268; *accord Newton v. Tyson Foods, Inc.*, 207 F.3d 444, 447 (8th Cir. 2000) (stating that, in the context of a RICO claim, "[s]ince but-for causation, or causation in fact, has no logical ending point, the concept of proximate cause [is needed to] cut[] off liability for those damages only distantly caused by a defendant's bad acts").

The United States Courts of Appeals are divided on the meaning of "restitution" and "disgorgement" in the context of 7 U.S.C. § 13a-1(d)(3). In *SEC v. Huffman*, 996 F.2d 800 (5th Cir. 1993), the Fifth Circuit Court of Appeals held that "disgorgement is not

precisely restitution. Disgorgement wrests ill-gotten gains from the hands of a wrongdoer. . . . Disgorgement does not aim to compensate the victims of the wrongful acts, as restitution does. . . . [Disgorgement] is not restitution." *Id.* at 802; *see also CFTC v. Rosenberg*, 85 F. Supp. 2d 424, 455 (D.N.J. 2000) ("While restitution 'is meant to make the damaged persons whole and compensate them for a defendant's wrongful acts,' the disgorgement remedy 'is intended to deprive the violator of his ill-gotten gains and to further the . . . objectives of the [Act]'" (quoting *CFTC v. AVCO Fin. Corp.*, 28 F. Supp. 2d 104, 121 (S.D.N.Y. 1998), *rev'd on other grounds*, 228 F.3d 94 (2d Cir. 2000))). However, in *CFTC v. Wilshire Inv. Mgmt. Corp.*, 531 F.3d 1339 (11th Cir. 2008), the Eleventh Circuit Court of Appeals held that "[t]he equitable remedy of restitution does not take into consideration the plaintiff's losses, but only focuses on the defendant's unjust enrichment." *Id.* at 1345; *cf. FTC v. Verity Int'l., Ltd.*, 443 F.3d 48, 66-67 (2d Cir. 2006) (holding that, in the context of the FTC Act, "restitution must be limited to so-called equitable restitution," which, according to the Second Circuit, "allowed the plaintiff to recover money or property in the defendant's possession that could 'clearly be traced' to money or property 'identified as belonging in good conscience to the plaintiff'" (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002))).

### 3.    *Application*

Since the court finds that the Supreme Court's definition of proximate cause in *Holmes* is consistent with the plain meaning of proximate cause in the Act, the court finds that, in the context of 7 U.S.C. § 13a-1(d)(3), to show proximate cause, the Commission must show "some direct relation between the injury asserted and the injurious conduct alleged." *Holmes*, 503 U.S. at 268.

With regard to the meaning of restitution, the court finds that it is inappropriate to determine whether the Commission must show that U.S. Bank received a benefit to claim restitutionary damages at this point, given the divided Courts of Appeals and the fact that

the parties have not adequately briefed this issue. Under either test, the court finds that the Commission has stated a plausible claim for restitutionary relief.

If the court were to apply the Fifth Circuit Court of Appeals test, which defines restitution as "aim[ing] to compensate the victims of wrongful acts," *Huffman*, 996 F.2d at 802, the court finds that the Commission has alleged facts sufficient to state a claim for restitution for the losses proximately caused by U.S. Bank's alleged violations of the Act. The Commission alleged that U.S. Bank improperly held Peregrine customer funds in the 1845 Account by transferring money out of the account for the benefit of Wasendorf, his companies and Connie Wasendorf—and not the benefit of Peregrine's customers. If the Commission can prove these wrongful acts, it may be able to show that U.S. Bank directly injured Peregrine's customers by not having money available when they demanded it, entitling them to restitution.

Even if the court were to apply the more limited Eleventh Circuit Court of Appeals test, which states that restitution "does not take into consideration the plaintiff's loss, but only focuses on the defendant's unjust enrichment," *Wilshire Inv. Mgmt. Corp.*, 531 F.3d at 1345, the Motion still must fail. The Commission alleged that "Banker A and other U.S. Bank personnel perceived Wasendorf as a successful, desirable bank client with the potential to be a profitable, high growth client . . . . Banker A and U.S. Bank believed that it was important to maintain Wasendorf's and Peregrine's goodwill in order to protect the bank's relationship with them." Complaint ¶ 19-20. This ongoing relationship, which could have been perpetuated by U.S. Bank's willingness to transfer Peregrine customer funds to Wasendorf and his companies, could have led to innumerable benefits (for example, increasing the bank's deposits and attracting other customers) of which the Commission is entitled to determine in discovery. Moreover, the Commission alleges that U.S. Bank benefitted from accepting customer funds by allowing U.S. Bank to extend credit on the security of the Peregrine customer funds in the 1845 Account. Although

U.S. Bank did not deposit money transferred out of the 1845 Account into its own accounts, the Commission's allegation that U.S. Bank benefitted from the transfers in other ways is factually sufficient to support a claim for restitution, the extent of which the Commission can determine in discovery.

U.S. Bank's reliance on cases in which courts held that a bank was not liable for merely processing transactions that ultimately contributed to customers' financial losses in support of its position that the Commission is not entitled to seek restitution also is unconvincing because, in those cases, there was no allegation of wrongdoing on the part of the banks. In this case, however, the Commission has made multiple allegations that U.S. Bank knew it was improperly using and holding Peregrine customer funds for the benefit of someone other than Peregrine's customers. Accordingly, the Court shall deny the Motion to the extent it asks the court to dismiss the Commission's request for restitutionary relief.

### E. Disgorgement

#### 1.    Parties' arguments

In the Complaint, the Commission requests that the court order U.S. Bank to disgorge all benefits derived from unlawful activities under the Act pursuant to 7 U.S.C. § 13a-1(d)(3). Pursuant to that section: "[T]he Commission may seek, and the court may impose, on a proper showing, on any person found in the action to have committed any violation, equitable remedies including . . . disgorgement of gains received in connection with such violation." 7 U.S.C. § 13a-1(d)(3).

U.S. Bank contends that "the only possible gains the [Commission] identifies in the Complaint consist of $290,000 of interest allegedly earned on the . . . Construction [l]oan, and $29,000 in interest earned on the Wasendorf[s'] [l]oan, during periods when the [Commission] alleges U.S. Bank wrongfully accepted [Peregrine's] guaranties of those debts." Brief in Support of Motion at 26. However, U.S. Bank argues that because it

31

incurred a loss of more than $6.6 million on the Construction loan, it did not profit on the guaranties, which means it did not receive any gains that must be disgorged under the Act.

U.S. Bank also argues that the Commission has failed to show causation between the guaranties and the interest that U.S. Bank received under the loans subject to the guaranties, because "a guaranty does not earn interest . . . [and] provides no financial return of any kind unless and until invoked and collected upon by the obligee after the primary obligor's default." *Id.* at 27. According to U.S. Bank, since the Commission "alleges only interest earned in connection with the underlying loans," there were no gains in connection with any alleged violation of the Act. *Id.*

The Commission argues that although it alleged that U.S. Bank received gains of $319,000 in interest payments on the loans that were secured by the guaranties, the Commission should be permitted to determine if there were additional gains in the discovery process. The Commission also disputes U.S. Bank's causation argument and claims that "[b]y accepting Peregrine's guaranties for the loans knowing that they included [Peregrine] customer funds and earning interest on the loans, U.S. Bank violated the Act and should be required to disgorge the interest it earned and any other ill-gotten gains," regardless of whether U.S. Bank ever exercised its rights under the guaranties. Resistance at 21.

### 2. *Applicable law*

"It is well-established that 'when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'" *Lamie*, 540 U.S. at 534 (quoting *Hartford Underwriters Ins. Co.*, 530 U.S. at 6); *accord Owner-Operator Indep. Drivers Ass'n*, 556 F.3d at 693. Under 7 U.S.C. § 6d(b), if a depository receives money for deposit in a CSA, it may not "hold . . . or use any such money . . . as belonging to the depositing [FCM] or any person other than the customers of such [FCM]." 7 U.S.C. § 6d(b). If a

depository has violated this provision, "the Commission may seek . . . disgorgement of gains received in connection with such violation."  7 U.S.C. § 13a-1(d)(3).

### 3.   *Application*

In the Complaint, the Commission alleges that U.S. Bank received $319,000 in interest payments from loans that were secured by the 1845 Account.   While the Commission concedes that U.S. Bank filed a claim in Peregrine's bankruptcy proceedings for over $6 million on the Construction loan, the Commission does not concede that U.S. Bank was entitled to this money or that it lost this amount of money from making the Construction loan.   Moreover, given the Commission's allegations about the nature of U.S. Bank's relationship with Wasendorf, it is certainly plausible that U.S. Bank received additional gains in connection with violations of the Act.   *See* Complaint at 20-21 (requesting that U.S. Bank disgorge "all benefits received[,] including, but not limited to, salaries, commissions, loans, fees, interest and revenues derived, directly or indirectly, from acts or practices that constitute violations of the Act").   Therefore, the Commission asserts that U.S. Bank received gains "in connection with" alleged violations of the Act, and, accordingly, the court shall deny the Motion to the extent it asks the court to dismiss the Commission's request for disgorgement of U.S. Bank's gains.

## VII. CONCLUSION

In light of the foregoing, Defendant U.S. Bank, N.A.'s Motion (docket no. 10) is **DENIED**.

**IT IS SO ORDERED.**

**DATED** this 5th day of November, 2013.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA