IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES COMMODITY FUTURES TRADING COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>U.S. BANK, N.A.,<br><br>Defendant. | No. C13-2041<br><br>RULING ON MOTIONS TO COMPEL |

TABLE OF CONTENTS

I.   INTRODUCTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  CFTC's MOTION TO COMPEL  . . . . . . . . . . . . . . . . . . . . . . 2
     A.   Request for Production Number 2  . . . . . . . . . . . . . . . . 2
     B.   Request for Production Number 4  . . . . . . . . . . . . . . . . 4

III. U.S. BANK'S MOTION TO COMPEL  . . . . . . . . . . . . . . . . . . . 6
     A.   The CFTC's Privilege Log  . . . . . . . . . . . . . . . . . . . . 6
          1.   Deliberative Process Privilege  . . . . . . . . . . . . . . 7
          2.   Informer's Privilege  . . . . . . . . . . . . . . . . . . . 13
          3.   Law Enforcement Privilege  . . . . . . . . . . . . . . . . 14
     B.   "NFA Memorandum"  . . . . . . . . . . . . . . . . . . . . . . . 16

IV.  ORDER  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

I. INTRODUCTION

On the 23rd day of October 2014, this matter came on for hearing on the Motion to Compel (docket number 69) filed by Plaintiff United States Commodity Futures Trading Commission ("CFTC" or "the Commission") on August 18, 2014, and the Motion to

Compel (docket number 70) filed by Defendant U.S. Bank, N.A. ("U.S. Bank" or "the Bank") on the same date. The Plaintiff was represented by its attorney, Susan J. Gradman. The Defendant was represented by its attorneys, Kristina L. Carlson and Megan Flynn.

## II. CFTC's MOTION TO COMPEL

In its motion to compel, the CFTC asks the Court to compel U.S. Bank to respond to request numbers 2 and 4 of the CFTC's second set of requests for production of documents.

### A. Request for Production Number 2

On June 12, 2014, the CFTC served U.S. Bank with its second set of requests for production of documents. In Request for Production No. 2, the CFTC asks U.S. Bank to produce "[a]ll policies and procedures of any Broker/Dealer Group relating to segregated or special accounts." "Broker/Dealer Group" is defined in the request as "any group or divisions within U.S. Bank with oversight or responsibility for U.S. Bank's broker, dealer and/or futures commission merchant clients."

In its response served on July 15, U.S. Bank first sets forth boilerplate "general objections." In response to Request for Production No. 2, the Bank repeats its general objection that the request is "overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence." U.S. Bank also claims that the meanings of "broker/dealer group" and "special account" are vague and ambiguous. Finally, the Bank objects to the request "to the extent the CFTC seeks documents that are already in its possession." Notwithstanding the objections, U.S. Bank states that "after a reasonable and diligent search, there were no such policies and procedures during the Relevant Period." In the "preliminary statement" found in U.S. Bank's response to the requests for production of documents, the Bank describes the "Relevant Period" as the "period prior to July 9, 2012."

2

According to the CFTC, multiple U.S. Bank employees have testified in their depositions that following the discovery of Wasendorf's fraud, the Bank implemented policies and procedures regarding the safeguarding of customer segregated accounts held by the Bank's futures commission merchants ("FCMs"). The CFTC argues that the adoption of such policies suggests that "it would have been feasible for U.S. Bank to implement those procedures prior to Peregrine's collapse." In response, the Bank argues that the feasibility of such procedures has never been an issue. U.S. Bank asserts that it "has never contended that having *some* customer segregated account policy or procedure would be too onerous." (italics in original) Accordingly, the Bank argues that "[b]ecause the CFTC cannot point to an actual controversy regarding the feasibility of any particular policy or procedure, there is no purpose for which U.S. Bank's subsequently enacted policies or procedures could be admitted at trial."

FEDERAL RULE OF EVIDENCE 407 provides generally that evidence of subsequent remedial measures is not admissible to prove an actor's wrongdoing. However, the evidence may be admitted for another purpose, if disputed, such as "the feasibility of precautionary measures." "Exceptions to the rule are to be narrowly read in order to preserve the 'important policy of encouraging subsequent remedial measures.'" *Williams v. Security Nat. Bank*, 358 F. Supp. 2d 782, 794 (N.D. Iowa 2005). Here, the admissibility of evidence regarding U.S. Bank's adoption of new policies and procedures following discovery of Wasendorf's fraud is admissible under RULE 407 only if the feasibility of such procedures is disputed. As noted in the advisory committee notes for the 1972 proposed rules, "[t]he requirement that the other purpose be controverted calls for automatic exclusion unless a genuine issue be present and allows the opposing party to lay the groundwork for exclusion by making an admission." *See* FED. R. EVID. 407, Advisory Committee Note, 1972 Proposed Rule. It should be noted, however, that RULE 407 addresses the *admissibility* of evidence of subsequent remedial measures at trial.

It is *not* a rule of discovery. "The discoverability of information is governed by whether it would be relevant, not by whether the information discovered would be admissible at trial." *Mid Continent Cabinetry, Inc. v. George Koch Sons, Inc.*, 130 F.R.D. 149, 152 (D. Kan. 1990).

The familiar standard governing the scope of discovery generally is found in FEDERAL RULE OF CIVIL PROCEDURE 26(b)(1): "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense. . . ." In the discovery context, relevancy "has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978). *See also Davis v. Union Pacific R.R. Co.*, 2008 WL 3992761 (E.D. Ark.) at *2 ("a request for discovery should be considered relevant if there is 'any possibility' that the information sought may be relevant to the claim or defense of any party"); *Moses v. Halstead*, 236 F.R.D. 667, 671 (D. Kan. 2006) (same).

I make no judgment regarding whether evidence of the Bank's adoption of new policies and procedures after Wasendorf's fraud was discovered will be admissible at the time of trial. That decision will be made by the trial court pursuant to FEDERAL RULE OF EVIDENCE 407. Under the broad discovery permitted by the FEDERAL RULES OF CIVIL PROCEDURE, however, the Court concludes that the information sought is discoverable. Accordingly, the motion to compel regarding Request for Production No. 2 will be granted.

### B. Request for Production Number 4

Request for Production No. 4 in the second set of requests for production of documents seeks documents "regarding customer segregated funds held at U.S. Bank relating to any futures commission merchant customers of U.S. Bank. . . ." In response,

U.S. Bank objects (twice) that the request is "overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence."

The CFTC argues that U.S. Bank documents relating to other FCMs are relevant "to determine whether U.S. Bank's handling of Peregrine's customer segregated account was consistent with its handling of other future commission clients' customer segregated accounts." According to the CFTC, if the Bank's actions in dealing with Peregrine were inconsistent with its actions in dealing with other futures commission merchant clients, then "U.S. Bank's ability to argue consistency with industry custom and practice would weaken significantly, as it could not even argue consistency with internal custom and practice." In response, U.S. Bank asserts that internal inconsistencies, if any, are not evidence of noncompliance with standard banking practices.

> [E]vidence as to how U.S. Bank treated other FCMs' customer segregated accounts — whether consistently or inconsistently with how it handled the 1845 Account — does not make it any more or less likely that the Bank's treatment of the 1845 Account was consistent with how other banks in the industry handle customer segregated accounts. *U.S. Bank's internal practices are simply not the gauge for industry custom and practice.*

U.S. Bank's Memorandum of Law (docket number 84) at 7. (emphasis added)

While U.S. Bank's practices may not be "the gauge" for generally accepted custom and practice in the banking industry, it is at least *evidence* of the custom and practice. Furthermore, if U.S. Bank monitored Peregrine's activities in a manner which was inconsistent with its monitoring of other futures commission merchants, then it would seem to be relevant to the CFTC's claim that U.S. Bank mishandled Peregrine's account and failed to comply with the Commodities Exchange Act. At the least, I believe information regarding how the Bank handled other FCM segregated accounts is discoverable under the

5

broad definition of relevance applied to discovery. Accordingly, the Court finds the requested discovery must be produced and the motion to compel will be granted.

## III. U.S. BANK'S MOTION TO COMPEL

In its motion to compel, U.S. Bank raises two issues. First, the Bank argues that the CFTC's privilege log is deficient and, therefore, the Court should compel disclosure of all documents for which the CFTC is claiming a privilege. Alternatively, the Bank argues that the claimed privileges are inapplicable. Second, the Bank asks the Court to compel the CFTC to produce a memorandum which was used to facilitate a discussion between CFTC officials and NFA personnel.

### A. The CFTC's Privilege Log

On June 4, 2014, the Court ordered the CFTC to produce certain documents relating to "what the Commission knew and when it knew it." The CFTC was ordered to comply not later than July 2. A privilege log was produced on that date, which was subsequently revised on July 15 and August 6. After U.S. Bank filed its instant motion to compel, the Commission agreed to produce certain documents which were previously identified as privileged. It is the Court's understanding that 61 documents remain in dispute. *See* Declaration of Kristina L. Carlson (docket number 90).

According to a "Declaration" signed by Gary Barnett, Director of the Division of Swap Dealer and Intermediary Oversight of the CFTC, 18 documents are protected by the "deliberative process privilege." In addition, a Declaration of Aitan Goelman, Director of the Division of Enforcement of the CFTC, asserts that 6 additional documents are protected by the deliberative process privilege, 9 documents are protected by the informer's (whistleblower's) privilege, and 57 documents are protected by the law enforcement privilege.[1]

---

[1] Mr. Goelman also asserts that one document contains attorney legal theories,
(continued...)

### 1. Deliberative Process Privilege

The deliberative process privilege, which seems to be addressed most often in the context of a Freedom of Information Act case, exempts from disclosure certain inter-agency and intra-agency communications. The privilege rests "on the policy of protecting the 'decision making processes of government agencies.'" *NLRB v. Sears, Robuck & Co.*, 421 U.S. 132, 150 (1975). "[T]he ultimate purpose of this long-recognized privilege is to prevent injury to the quality of agency decisions." *Id.* at 151. *See also State of Mo. ex rel. Shorr v. U.S. Army Corps of Engineers*, 147 F.3d 708, 710 (8th Cir. 1998) ("The purpose of the deliberative process privilege is to allow agencies freely to explore alternative avenues of action and to engage in internal debates without fear of public scrutiny.").

To fall within the privilege, the inter-agency or intra-agency communication must be both predecisional and deliberative.

> A predecisional document is one which is designed to assist agency decision-makers in arriving at their decisions and which contains the personal opinions of the writer rather than the policy of the agency. A document is deliberative if its disclosure would expose the agency's decisionmaking process in a way that would discourage candid discussion and thus undermine the agency's ability to perform its functions; the focus is on whether the document is part of the agency's deliberative process.

*Shorr*, 147 F.3d at 710.

More recently, the Eighth Circuit Court of Appeals summarized the privilege as follows:

---

[1](...continued)
strategies, and recommendations and is protected work product. It is the Court's understanding that the referenced document is an internal memo dated January 23, 2013, and it will be discussed separately.

7

> The FOIA deliberative process privilege exempts from disclosure "interagency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." The deliberative process exemption permits nondisclosure if the document is both predecisional and deliberative. A predecisional document may be virtually any document that contains personal opinions and is designed to assist agency decision-makers in making their decisions. A document is deliberative if its disclosure would expose the decision-making process in such a way that candid discussion within the agency would be discouraged, undermining the agency's ability to perform its functions. Documents need not contain only subjective information to be exempt under the deliberative process privilege.

*Missouri Coalition for Environment Foundation v. U.S. Army Corps of Engineers*, 542 F.3d 1204, 1211 (8th Cir. 2008) (internal citations omitted).

At the time of hearing, counsel for the Bank acknowledged that the declarations of Gary Barnett and Aitan Goelman describe documents which fall within the deliberative process privilege. That is, the described documents appear to be "predecisional" and "deliberative." The Bank argues, however, that the privilege is qualified and subject to exceptions. The law in this regard was summarized by Judge Walters in the Southern District of Iowa as follows:

> The privilege, however, is a qualified one and is subject to exceptions. It only protects documents which are both (1) pre-decisional and (2) deliberative. Where it exists it may be overcome by a showing that the non-governmental party's need for the information outweighs the government's interest in non-disclosure. Usually four factors weigh in the balance: "(1) the relevance of the evidence; (2) the availability of other evidence; (3) the government's role in the litigation; and (4) the extent to which disclosure would hinder frank and independent discussion regarding contemplated policies and decisions."

*Qamhiyah v. Iowa State University*, 245 F.R.D. 393, 396 (S.D. Iowa 2007) (internal citations omitted).

The 18 documents described by Gary Barnett fall into three categories: (1) internal documents regarding "watch list risk procedures" and a watch list of registered entities,[2] (2) internal documents regarding limited reviews of Peregrine prior to the issuance of final reports dated October 30, 2008 and July 9, 2009,[3] and (3) a draft memorandum dated December 16, 2010 regarding the Commission's "anti-money laundering review of Peregrine," which predated the final memorandum dated April 28, 2011 (which has been produced to the Bank).[4] In his declaration, Aitan Goelman identifies six additional documents which fall into three categories: (1) documents which predate a decision on May 22, 2006, regarding whether to open an investigation against Peregrine based on a referral to the Division of Enforcement ("DOE") from the Division of Swap Dealer and Intermediary Oversight ("DSIO"),[5] (2) a document regarding review of electronic trading

---

[2] Barnett identifies eight documents in the first category. According to the privilege log, the first document (CFTC-0015245), dated February 9, 2012, has been produced in redacted form. The next six documents (P104, P105, P106, P110, P111, and P112) are emails or email attachments, dated February 7, April 3, and April 5, 2012. The final document (P274) is a spreadsheet dated July 9, 2012.

[3] According to Barnett, there are nine documents falling within this category. Three of the documents (P348, P349, and P374) are "powerpoint[s]" dated January 17, 2008. Five of the documents (P366, P368, P373, P381, and P382) are Word documents dated August 17, 1999, October 26, 1999, December 2, 2003, January 14, 2008, and February 6, 2009. There is also a spreadsheet (P372) dated November 21, 2003.

[4] According to Barnett's declaration, the draft memorandum is dated December 16, 2010. However, the privilege log identifies the referenced document (P126) as a Word document dated April 19, 2011.

[5] According to Goelman, there are four documents falling within this category. On May 16, 2006, there were three emails (P297, P298, and P306). According to the
(continued...)

platforms used by Peregrine which predated the decision whether to investigate Peregrine for the use of the electronic trading platforms,[6] and (3) a request for a formal order of investigation, which predated the decision to grant the formal order of investigation in March 2000.[7]

In its complaint, the CFTC asserts that U.S. Bank violated the Commodity Exchange Act by holding and/or using Peregrine's customer segregated funds to secure loans made to Peregrine and the Wasendorfs, and by treating Peregrine's customer segregated funds (the "1845 Account") "as if it were Peregrine's and/or Wasendorf's checking account, and knowingly allowing Wasendorf to transfer customer funds from the 1845 Account to his various entities that U.S. Bank and Banker A knew were not for the benefit of Peregrine's customers." The Bank denies the material allegations and asserts, among other things, that the Commission's claims "are barred in whole or in part by the doctrine of unclean hands." The Commission argues that there were various "red flags" which should have alerted the Bank to Wasendorf's fraud. In my Ruling on the Bank's first motion to compel, I concluded that "if the Commission had similar information which raised 'red flags' that Wasendorf was violating the Commodity Exchange Act and it did not act on that information, then the information is relevant to rebut the claim that a reasonable person should have concluded from similar information that a violation had

---

[5](...continued)
privilege log, the fourth document (CFTC-0014877) was produced in redacted form.

[6] The referenced email (P299) was dated September 22, 2004.

[7] According to the privilege log, this document (CFTC-0271491) was produced in redacted form.

occurred."[8] That is, I concluded that "documents relating to 'what the Commission knew and when it knew it' is 'relevant to any party's claim or defense.'"[9]

The deliberative process privilege "may be overcome by a showing that the non-governmental party's need for the information outweighs the government's interest in non-disclosure." *Qamhiyah*, 245 F.R.D. at 396. In weighing the competing interest, the Court considers the relevance of the evidence, the availability of other evidence, the Government's role in the litigation, and the effect disclosure may have on "frank and independent discussion regarding contemplated policies and decisions." *Id.*

Here, the Commission argues that the Bank should have discovered Wasendorf's fraud some time prior to July 2012. There is evidence to suggest, however, that the Commission also received information — perhaps similar to the information available to the Bank — which suggested Wasendorf's wrongdoing. Accordingly, I believe some of the requested information may be highly relevant to the Commission's claims and the Bank's defenses. Regarding the second factor, information regarding what the Commission knew and when it knew it are available only from the Commission. Regarding the third factor, the Government is an active participant in the litigation. That is, this is not a Freedom of Information Act case, where a government agency may be a disinterested bystander. Instead, the CFTC is seeking judgment against U.S. Bank for tens of millions of dollars. Finally, if the Commission received information regarding Wasendorf's fraud and failed to act, disclosure of those documents at this point would not seem to have any serious chilling effect on agency actions.

With these principles in mind, the Court turns to the 24 documents in which the Commission claims a deliberative process privilege. The first documents described by

---

[8] Ruling on Motion to Compel (docket number 50) at 6.

[9] *Id.* at 9 (citing FED. R. CIV. P. 26(b)(1)).

11

Barnett were generated in 2012 and relate to the preparation of a "watch list." It would appear that those documents have marginal relevance to this action and, on balance, the Court finds that U.S. Bank's need for the information is outweighed by the Commission's interest in non-disclosure. The second category of documents predated limited reviews of Peregrine leading to final reports dated October 30, 2008 and July 9, 2009. The final reports have apparently been provided to U.S. Bank, but have not been reviewed by the Court. In weighing the four factors set forth above, I conclude that U.S. Bank has shown a need for the information which outweighs the Commission's interest in non-disclosure. Accordingly, the nine documents falling within the second category described by Barnett must be produced. The draft memorandum described by Barnett relating to an anti-money laundering review of Peregrine is not identified by Ms. Carlson as a remaining challenged document. Accordingly, the Court makes no finding in that regard.

Regarding the six additional documents identified by Goelman, there were three emails dated May 16, 2006 regarding a referral by the DSIO to the DOE, regarding whether to open an investigation against Peregrine. I believe this information may be highly relevant and is otherwise unavailable to U.S. Bank. Because the CFTC is seeking a substantial judgment against the Bank, and because disclosure would not substantially hinder "frank and independent discussion regarding contemplated policies and decisions," I believe these emails must be produced. According to the privilege log, the fourth document identified in Goelman's first category was previously produced in redacted form. The next document identified by Goelman referred to the use of electronic trading platforms and, it would appear, has little relevance to this action. On balance, the Court finds that it need not be produced. The final document identified by Goelman relates to a formal order of investigation in 2000, but according to the privilege log was previously produced in redacted form.

In summary, regarding the 24 documents identified in Barnett's and Goelman's declarations as falling within the deliberative process privilege, the Court finds that 12 of the documents must be produced. Specifically, the Commission must produce the nine documents described in footnote 3 above, and the three emails described in footnote 5 above.

### 2. Informer's Privilege

Next, the Court turns to the nine documents identified by Aitan Goelman as protected by the informer's (or whistleblower's) privilege.[10] According to the privilege log, six of the documents are emails or attachments, dated August 28, August 29, and December 20, 2012. Two of the documents (P280 and P282) are emails dated February 23 and March 19, 2007. According to Goelman, document P280 is an email "summarizing an allegation of misconduct against Russell Wasendorf, Sr. by a tipster," while document P282 forwards an email from a tipster. In the first document, the tipster is identified by first name, occupation, employer, and dates of employment. In the second document, the tipster is identified by full name, address, and telephone number.

In *Roviaro v. United States*, 353 U.S. 53 (1957), the Court recognized the informer's privilege as "the Government's privilege to withhold from disclosure the identity of persons who furnished information of violations of law to officers charged with enforcement of that law." *Id.* at 59. The Court found that by preserving the anonymity of an informer, it encourages citizens to perform their obligation of "communicat[ing] their knowledge of the commission of crimes to law enforcement officials." *Id.* However, the Court emphasized that the "scope of the privilege is limited by its underlying purpose." *Id.* at 60. That is, "where the disclosure of the contents of a communication will not tend to reveal the identity of an informer, the contents are not privileged." *Id.* at 60.

---

[10] It is likely there are only eight distinct documents. Goelman states that document numbers P52 and P172 appear to be identical.

Moreover, "[a] further limitation on the applicability of the privilege arises from the fundamental requirements of fairness." *Id.* That is, when the disclosure of an informer's identity, or the contents of his communication, is "relevant and helpful," then "the privilege must give way." *Id.* at 60-61. *See also In re Apollo Group, Inc. Securities Litigation*, 251 F.R.D. 12, 34 (D.D.C. 2008) ("Only the identity of the informer is privileged. The content of the communication is not privileged unless it would tend to reveal the identity of the informer.") (quoting *Westinghouse Elec. Corp. v. Burlington*, 351 F.2d 762, 768 (D.C. Cir. 1965)). While the privilege only applies to the informer's identity and not his communications, it "extends to information that would tend to reveal the identity of the informant." *U.S. Commodity Futures Trading Com'n v. Parnon Energy Inc.*, 2014 WL 2116147 at *3 (S.D.N.Y.).

At the time of hearing, counsel for the Commission advised the Court that it was not possible to redact the documents to protect the identity of the informer, while still disclosing the contents of the document. Five of the documents were generated after Wasendorf's fraud was discovered in July 2012 and the Court suspects that they have little relevance, if any, to "what the Commission knew and when it knew it." The Court reaches a different conclusion, however, regarding the documents dated February 23 and March 19, 2007. The Court finds that the Commission must submit those documents to the Court for an *in camera* review, to determine whether they can be produced in redacted form. Documents Nos. P280 and P282 must be provided to the Court for this purpose not later than seven days following the entry of this Order.

### 3. *Law Enforcement Privilege*

Finally, the Bank challenges the Commission's claim to a law enforcement privilege for 25 emails between CFTC and other government agencies "discussing pending

14

investigations of and relating to Peregrine."[11] Seventeen of the emails were generated during the first two weeks after Wasendorf's fraud was discovered. The remaining documents were generated in August (three), September (three), and November (two). From a review of the privilege log, it would appear that 17 of the documents were to or from an assistant United States attorney, 1 document was to the FBI, and 2 documents were to the Department of Justice. Three documents were apparently internal Commission communications, and the Court is unable to determine the recipient of the remaining two documents.

The so-called "law enforcement privilege" is "a limited evidentiary privilege which protects the informal investigatorial and trial-preparatory processes of regulatory agencies." *Stephens Produce Co., Inc. v. N.L.R.B.*, 515 F.2d 1373, 1376 (8th Cir. 1975). The privilege is "a very narrow one" and the "mere incantation" of the stated policy behind it is not always "necessarily sufficient to bring the privilege into effect." *Id.* at 377. Furthermore, it is "not absolute" and "can be overridden in appropriate cases by the need for the privileged materials." *Dellwood Farms, Inc. v. Cargill, Inc.*, 128 F.3d 1122, 1125 (7th Cir. 1997). The party claiming privilege has the burden to establish its existence. *Friedman v. Bache Halsey Stuart Schields, Inc.*, 738 F.2d 1336, 1341 (D.C. Cir. 1984).

In this case, the Court finds it unnecessary to conduct a detailed analysis of whether the communications following the discovery of Wasendorf's fraud fall within the law enforcement privilege. The Court believes it is unlikely such communications — prepared shortly after Wasendorf's fraud was discovered — are relevant to the issue of "what the

---

[11] In his declaration, Aitan Goelman also identifies 32 documents consisting of communications between the Commission and other government agencies regarding procedures for sharing information regarding the Peregrine investigation. Because these documents only discuss "procedure," the Bank is no longer asking that they be produced.

15

Commission new and when it knew it." Even given the broad definition of relevance applied in discovery matters, the Court finds that the disputed documents need not be produced.

### B. "NFA Memorandum"

After Wasendorf's fraud was discovered, officials from the CFTC met with officials from the NFA. In preparation for that meeting, a Commission attorney prepared a memorandum dated January 23, 2013, regarding issues to be discussed. The Court finds that the memorandum is clearly privileged pursuant to the work-product doctrine. The Bank's claim that the privilege was waived by providing a copy of the memorandum to NFA officials is not supported by the record. The deposition testimony of Richard Wagner makes it clear that the memorandum was not provided to NFA officials. The Court concludes that it need not be produced.

### IV. ORDER

IT IS THEREFORE ORDERED as follows:

1. The Motion to Compel (docket number 69) filed by the CFTC is **GRANTED**.

2. The Motion to Compel (docket number 70) filed by U.S. Bank is **GRANTED in part** and **DENIED in part**, as set forth above.

DATED this 27th day of October, 2014.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA