**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

UNITED STATES COMMODITY
FUTURES TRADING COMMISSION,

Plaintiff,

vs.

U.S. BANK, N.A.,

Defendant.

No. 13-CV-2041-LRR

**ORDER**

_____

### *TABLE OF CONTENTS*

| | | |
|---|---|---|
| *I.* | *INTRODUCTION.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **3** |
| *II.* | *PROCEDURAL HISTORY.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **3** |
| *III.* | *SUBJECT MATTER JURISDICTION.* . . . . . . . . . . . . . . . . . . . . . . . . | **4** |
| *IV.* | *SUMMARY JUDGMENT STANDARD.* . . . . . . . . . . . . . . . . . . . . . . | **4** |
| *V.* | *FACTUAL BACKGROUND.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **5** |

*A.*     *Parties.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**
*B.*     *Overview of the Dispute.* . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**
      *1.*     *The 1845 Account.* . . . . . . . . . . . . . . . . . . . . . . . . . . **6**
          *a.*     *Opening of the 1845 Account.* . . . . . . . . . . . . . . . **6**
          *b.*     *Funding of the 1845 Account.* . . . . . . . . . . . . . . . **8**
          *c.*     *Wasendorf's fraud.* . . . . . . . . . . . . . . . . . . . . . . . **9**
          *d.*     *U.S. Bank's knowledge of the nature
             of the 1845 Account.* . . . . . . . . . . . . . . . . . . . . . **10**
      *2.*     *U.S. Bank's knowledge of Wasendorf.* . . . . . . . . . . . . . . . **12**
          *a.*     *Other accounts.* . . . . . . . . . . . . . . . . . . . . . . . . . **12**
          *b.*     *Finances and relationship.* . . . . . . . . . . . . . . . . **13**
      *3.*     *Loans.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **14**
          *a.*     *Credit-approval process.* . . . . . . . . . . . . . . . . . . **14**
          *b.*     *September 4, 2008 SCD.* . . . . . . . . . . . . . . . . . . **15**
          *c.*     *2008 Guaranty—Wasendorf Loan.* . . . . . . . . . . . . **16**
          *d.*     *July 28, 2011 SCD.* . . . . . . . . . . . . . . . . . . . . . **17**
          *e.*     *2011 Guaranty—Construction Loan.* . . . . . . . . . . . **17**
          *f.*     *Peregrine references in SCDs.* . . . . . . . . . . . . . . . **18**

           *g.*    *U.S. Bank's actions post-Peregrine bankruptcy.* . . . . . **18**

    **4.**    **Transactions involving the 1845 Account** . . . . . . . . . . . . . . **18**

        *a.*    *McCormack Declaration.* . . . . . . . . . . . . . . . . . . . **18**

           *(1)*    *Parties' arguments.* . . . . . . . . . . . . . . . **19**

           *(2)*    *Applicable law and application.* . . . . . . . . . . . **20**

        *b.*    *Deposits.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **22**

        *c.*    *Transfers and withdrawals.* . . . . . . . . . . . . . . . **22**

        *d.*    *Payments to U.S. Bank.* . . . . . . . . . . . . . . . . . . **23**

    **5.**    **Audits of Peregrine** . . . . . . . . . . . . . . . . . . . . . . . . . . **24**

**VI.**   **ANALYSIS.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **25**

   **A.**    *The Act and the Regulations.* . . . . . . . . . . . . . . . . . . . . . . **25**

   **B.**    *Improper Use of Customer Funds.* . . . . . . . . . . . . . . . . . . . . . **26**

     **1.**    *Was the 1845 Account subject to the Guaranties?* . . . . . . . . **27**

        *a.*    *Parties' arguments.* . . . . . . . . . . . . . . . . . . . . . . . . **27**

        *b.*    *Applicable law.* . . . . . . . . . . . . . . . . . . . . . . . . . **27**

        *c.*    *Application.* . . . . . . . . . . . . . . . . . . . . . . . . . . . **29**

     **2.**    *Is merely acquiring a right of set off unlawful,*
        *or were any other actions by U.S. Bank in enforcing*
        *the Guaranties unlawful?* . . . . . . . . . . . . . . . . . . . . . . . **31**

        *a.*    *Parties' arguments.* . . . . . . . . . . . . . . . . . . . . . . . . **31**

        *b.*    *Applicable law.* . . . . . . . . . . . . . . . . . . . . . . . . . **31**

        *c.*    *Application.* . . . . . . . . . . . . . . . . . . . . . . . . . . . **33**

     **3.**    *Did U.S. Bank improperly use the customer funds*
        *in the 1845 Account to inform its decision on whether*
        *to issue the Loans?* . . . . . . . . . . . . . . . . . . . . . . . . . . **34**

        *a.*    *Parties' arguments.* . . . . . . . . . . . . . . . . . . . . . . . . **35**

        *b.*    *Applicable law and application.* . . . . . . . . . . . . . . . . . **35**

     **4.**    *Summary.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **36**

   **C.**    *Improper Holding of Customer Funds.* . . . . . . . . . . . . . . . . . . **36**

     **1.**    *Duty.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **37**

        *a.*    *Parties' arguments.* . . . . . . . . . . . . . . . . . . . . . . . . **37**

        *b.*    *Applicable law.* . . . . . . . . . . . . . . . . . . . . . . . . . **38**

        *c.*    *Application.* . . . . . . . . . . . . . . . . . . . . . . . . . . . **39**

     **2.**    *Trust accounts.* . . . . . . . . . . . . . . . . . . . . . . . . . . . **41**

        *a.*    *Parties' arguments.* . . . . . . . . . . . . . . . . . . . . . . . . **41**

        *b.*    *Applicable law.* . . . . . . . . . . . . . . . . . . . . . . . . . **42**

        *c.*    *Application.* . . . . . . . . . . . . . . . . . . . . . . . . . . . **47**

           *(1)*    *Transfers to U.S. Bank.* . . . . . . . . . . . . . . . **47**

           *(2)*    *Transfers to other entities.* . . . . . . . . . . . . . . **51**

               *(a)*    *Knowledge.* . . . . . . . . . . . . . . . . . . . . **51**

|     |     | i.   | *Parties' arguments.* | 51 |
|     |     | ii.  | *Applicable law and application.* | 52 |
|     | (b) | *Bad faith.* | | 53 |
|     |     | i.   | *Parties' arguments.* | 53 |
|     |     | ii.  | *Applicable law.* | 55 |
|     |     | iii. | *Application.* | 56 |
| D.  | *Unclean Hands.* | | | 59 |
|     | 1.  | *Parties' arguments.* | | 59 |
|     | 2.  | *Applicable law.* | | 61 |
|     | 3.  | *Application.* | | 65 |
| E.  | *Remedies.* | | | 66 |
|     | 1.  | *CFTC Motion.* | | 66 |
|     | 2.  | *U.S. Bank Motion.* | | 66 |
| VII. | *CONCLUSION.* | | | 68 |

## I. INTRODUCTION

The matters before the court are Plaintiff United States Commodity Futures Trading Commission's ("CFTC") Motion for Summary Judgment ("CFTC Motion") (docket no. 77) and Defendant U.S. Bank, N.A.'s ("U.S. Bank") Motion for Summary Judgment ("U.S. Bank Motion") (docket no. 80) (collectively, "Motions").

## II. PROCEDURAL HISTORY

On June 5, 2013, CFTC filed a Complaint (docket no. 2) alleging that U.S. Bank improperly used (Count I) and held (Count II) customer funds in violation of: (1) Section 4d(b) of the Commodity Exchange Act ("Act"), codified as amended at 7 U.S.C. § 6d(b); and (2) Commission Regulation 1.20(a), codified at 17 C.F.R. § 1.20(a).[1] On April 18,

---

[1] After filing the Complaint, CFTC amended its regulations, codifying Commission Regulation 1.20(a) at 17 C.F.R. § 1.20(f)(3). *See* 17 C.F.R. § 1.20(f)(3); *see also* Final Rule, Enhancing Protections Afforded Customers and Customer Funds Held by Futures Commission Merchants and Derivatives Clearing Organizations, 78 F.R. 68506, 68542 (Nov. 13, 2013) ("The Commission notes that the language in proposed § 1.20(f) largely mirrors the language set forth in current § 1.20, which language was, and continues to be, intended to further implement the segregation provisions of the Act."). As the regulation

(continued…)

2014, U.S. Bank filed an Amended Answer (docket no. 43) denying CFTC's claims and asserting affirmative defenses.

On September 3, 2014, CFTC filed the CFTC Motion. On September 30, 2014, U.S. Bank filed U.S. Bank's Resistance (docket no. 93). On October 7, 2014, CFTC filed the CFTC Reply (docket no. 102).

On September 3, 2014, U.S. Bank filed the U.S. Bank Motion. On September 30, 2014, CFTC filed CFTC's Resistance (docket no. 94). On October 14, 2014, U.S. Bank filed U.S. Bank's Reply (docket no. 105).

The parties request oral argument, but the court finds that oral argument is unnecessary. The Motions are fully submitted and ready for decision.

### III. SUBJECT MATTER JURISDICTION

The court has federal question jurisdiction over CFTC's claims against U.S. Bank, which arise under Section 4d(b) of the Act and Commission Regulation 1.20. *See* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").

### IV. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." *Amini v. City of Minneapolis*, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252 (1986)). "[U]nsupported, self-serving allegations and denials are insufficient to create a genuine

---

[1](...continued)
in effect during the time of the alleged violations was codified at 17 C.F.R. § 1.20(a), the court will refer to this section in its discussion of the case.

4

issue of material fact." *Anuforo v. Comm'r of Internal Revenue*, 614 F.3d 799, 807 (8th Cir. 2010). "To survive a motion for summary judgment, the nonmoving party must substantiate [its] allegations with sufficient probative evidence [that] would permit a finding in [its] favor based on more than mere speculation, conjecture, or fantasy." *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 801 (8th Cir. 2011) (second alteration in original) (quoting *Putman v. Unity Health Sys.*, 348 F.3d 732, 733-34 (8th Cir. 2003)) (internal quotation marks omitted). If there is a genuine dispute about a material fact, the court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences. *See Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id.* at 586 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)) (internal quotation marks omitted).

## V. FACTUAL BACKGROUND

The following factual background sets forth the uncontested material facts. Additional contested material facts are discussed in the court's legal analysis. When considering the Motions, the court viewed the evidence in the light most favorable to the nonmoving party and afforded it all reasonable inferences.

### A. Parties

CFTC is "an independent federal regulatory agency charged by Congress with the administration and enforcement of the Act and the Regulations thereunder." Complaint ¶ 7; Amended Answer ¶ 7.

U.S. Bank is a nationally chartered bank with its main office located in Cincinnati, Ohio. Amended Answer ¶ 8. U.S. Bank has several branches in the Northern District of Iowa, including in Cedar Falls, Iowa. U.S. Bank is a wholly-owned subsidiary of U.S. Bancorp. *Id.*

### B. Overview of the Dispute

#### 1. The 1845 Account

##### a. Opening of the 1845 Account

Russell Wasendorf, Sr.[2] incorporated Peregrine Financial Group, Inc. ("Peregrine") in 1990 and in so doing, became its CEO. Wasendorf remained its CEO at all times and always held a dominant and controlling interest in Peregrine, even though other individuals and entities at times held minor amounts of Peregrine stock. From its inception until its bankruptcy, Peregrine was a registered futures commission merchant ("FCM"). An FCM is an entity authorized to solicit and accept orders to buy or sell futures contracts or options on futures contracts, and accepts money and other assets from customers to support those orders. FCMs receive money, securities and other property from their customers to margin, guarantee or secure the customers' futures and options trades. FCMs may keep their own funds ("excess funds") in customer segregated accounts. An FCM reports both its customer funds and its excess funds daily via a daily segregation filing to the National Futures Association ("NFA"), a not-for-profit self-regulatory agency for the United States futures industry, and monthly to the CFTC. Peregrine was regulated by the CFTC and the NFA.

On August 3, 1992, Peregrine opened a business checking account, designated as "Peregrine Financial Group, Inc. Customer Segregated Account," with Firstar Bank Cedar Falls ("Firstar"), a depository bank.[3] *See* Firstar Signature Card, CFTC Fact Appendix ("CFTC Fact App'x") (docket nos. 77-4 through -7) at 3; *see also* August 3, 1992

---

[2] For ease of reading, the court will refer to Russell Wasendorf, Sr. as "Wasendorf." The court will refer to other members of Wasendorf's family by their full names.

[3] Firstar acted as the depository for the 1845 Account until it merged with U.S. Bancorp in 2001, after which U.S. Bank acted as the depository for the 1845 Account.

Acknowledgment Letter, CFTC Fact App'x at 39. The last four digits of the account initially ended in 9434, but at some point the account number was changed to the number ending in 1845 (the "1845 Account"). Wasendorf, his then-wife, Connie Wasendorf, and his son, Russell Wasendorf, Jr., were initially listed as signatories on the 1845 Account, but at some point Wasendorf became the only signatory on the 1845 Account. On the same day that Peregrine opened the 1845 Account, Firstar provided Peregrine with an acknowledgment letter. The acknowledgment letter, signed by then-Vice President of Firstar, Clifford Mortenson, stated the following:

> You have opened [the 1845 Account], as well as a safekeeping account, with both designated "Peregrine Financial Group, Inc. Customer Segregated Account." You have advised us that the funds deposited . . . in the [1845 Account] constitute monies belonging or accruing to your futures and options customers which you are required to segregate from your own funds under the Commodity Exchange Act . . . . You have further advised that the securities and other property deposited in the safekeeping account above described constitute investments of the funds of your futures and options customers and securities deposited with you by those futures and options customers to margin, guarantee or secure the trades or contracts of your futures and options customers that all such securities and other property are to be segregated and kept apart from your own securities and property.
>
> We hereby acknowledge your notice that monies, securities and other property deposited in the accounts above described are those of your futures and options customers and are being held in accordance with the provisions of the Commodity Exchange Act . . . . We further acknowledge that the monies, securities and property contained in such accounts shall not be subject to any right of offset or lien in our favor for or on account of any indebtedness, obligations or liabilities owing by you to us.

August 3, 1992 Acknowledgment Letter, CFTC Fact App'x at 39.[4] At some point, Wasendorf spoke with Clifford Mortenson about the "concept of segregated funds" and the requirements of the Act, but it is unclear whether this conversation took place before or after opening the 1845 Account. *See* Wasendorf Deposition, CFTC Fact App'x at 6-7. In the winter of 1993, Wasendorf gave Mortenson a copy of the rules and regulations pertaining to customer segregated funds and was told that Firstar could comply with such rules and regulations.

Two individuals at U.S. Bank had primary responsibility for managing U.S. Bank's relationship with Wasendorf and his businesses: Douglas Boe (Senior Vice President of Commercial Lending and Relationship Manager for the Peregrine/Wasendorf relationship, who officed in Cedar Rapids) and Hope Timmerman (Assistant Relationship Manager for the Peregrine/Wasendorf relationship, who officed in Cedar Falls).

### b.    *Funding of the 1845 Account*

During the Relevant Period—June 2008 through July 2012— customer checks were deposited into the 1845 Account at U.S. Bank, and some of these checks were paid to the order of Peregrine's customer segregated account. The back of the checks were endorsed by Peregrine with the following language:

> PAY TO THE ORDER OF US BANK FOR DEPOSIT ONLY PEREGRINE FINANCIAL GROUP, INC. CUSTOMER SEGREGATED ACCOUNT [1845].

*See, e.g.*, Customer Checks, CFTC Fact App'x at 328-31. Money was also deposited into the 1845 Account through wire transfers from customers, wire transfers from Peregrine's customer segregated account held at JPMorgan Chase and transfers from other Peregrine

---

[4] An additional identical acknowledgment letter, this time signed by Vice President David G. McDermott, was issued by Firstar to Peregrine on June 10, 1996. *See* June 10, 1996 Acknowledgment Letter, CFTC Fact App'x at 41.

customer-related accounts at U.S. Bank. There were also deposits from non-customer related sources, including money from Wasendorf himself.

### c.    *Wasendorf's fraud*

On or about July 9, 2012, Wasendorf admitted to perpetuating a fraud accomplished by falsifying U.S. Bank records for the 1845 Account. He accomplished this fraud by opening a post office box—P.O. Box 706—in Cedar Falls, Iowa, which he set up to appear to be a Firstar, and then a U.S. Bank, address. Early on, Wasendorf created a forged bank statement that he apparently sent to the NFA and CFTC, which listed, falsely, P.O. Box 706 as Firstar's address. As a result, when the NFA or CFTC sent documents, including account balance confirmations, to Firstar or U.S. Bank, they would arrive at P.O. Box 706. Wasendorf intercepted the mail that the NFA and CFTC intended to send to U.S. Bank and, after receiving the mail, Wasendorf used Photoshop and inkjet printers to alter bank statements and return them to the NFA or CFTC. In so doing, Wasendorf was able to conceal his fraud from the NFA, CFTC, U.S. Bank employees, his family, associates and outside auditors. On July 9, 2012, sensing that his fraud was being uncovered, Wasendorf attempted suicide. He was found in his car with an apparent suicide note addressed to his wife, Nancy Paladino, and a signed statement detailing his theft of Peregrine's customers' funds and forgery of bank statements and related documents. On July 10, 2012, CFTC instituted a civil action against Wasendorf and Peregrine for injunctive relief. *See CFTC v. Peregrine Fin. Grp., Inc.*, No. 12-CV-05383 (N.D. Ill. July 10, 2012). CFTC stated that although Wasendorf's fraud would have also merited an award of restitution, it did not seek that relief against Wasendorf because the judgment in Wasendof's criminal case had ordered him to pay restitution to defrauded investors. After initiation of the lawsuit, Peregrine immediately filed for Chapter 7 liquidation in the United States Bankruptcy Court for the Northern District of Illinois. *See In re Peregrine Fin. Grp., Inc.*, No. 12-BK-27488 (N.D. Ill. July 10, 2012). In

9

September 2012, Wasendorf pled guilty to embezzling $215.5 million from more than 13,000 Peregrine customers over the course of twenty years. On January 31, 2013, he was sentenced to fifty years in federal prison by the undersigned. *See* Judgment, *United States v. Wasendorf*, No. 12-CR-2021-LRR (N.D. Iowa January 31, 2013) (docket no. 70).

### d.    U.S. Bank's knowledge of the nature of the 1845 Account

U.S. Bank utilizes two internal computer systems that contain account and client information, commonly referred to as the Hogan and Wizard systems. U.S. Bank began utilizing the Hogan system at the latest in 2002 and it is unclear when U.S. Bank began utilizing the Wizard system. The Hogan and Wizard systems list the 1845 Account title as "Peregrine Financial Group, Inc." and list "CEA Customer Segregated Accounts" as a related customer.

Wasendorf instructed U.S. Bank that communications, including written and telephonic communications, regarding his accounts should be directed to him. In January 2008, Wasendorf instructed U.S. Bank not to allow any balance confirmations on the 1845 Account, and in October 2009, he requested that any inquiries to U.S. Bank about the 1845 Account be directed to Boe or Timmerman. In addition, Wasendorf instructed U.S. Bank on multiple occasions that he wanted it to notify him if anyone asked any questions regarding the 1845 Account. Timmerman testified that Wasendorf, more than other clients, "seemed very persistent in that he didn't want anyone talking to anyone else but [Boe] or [her] on his accounts." Timmerman Deposition, CFTC Fact App'x at 84. Timmerman never asked Wasendorf why he was so concerned about restricting account inquiries to her and Boe.

U.S. Bank "is unaware of any U.S. Bank employee that had responsibility for the 1845 Account who understood the 1845 Account was a customer segregated funds account" during the Relevant Period. U.S. Bank's Response to Interrogatory No. 20,

10

CFTC Fact App'x at 75.  At his deposition, Boe testified as to his knowledge of customer segregated accounts as follows:

> Q:    Are you familiar generally with customer segregated accounts?
>
> A:    I have no idea what that means.  Until—Until all this stuff went down, I had no idea what that meant.
>
> Q:    What's your present understanding of what a customer segregated account is?
>
> . . . .
>
> A:    I truly do not know what it means to have a segregated account.  I did not believe I had one, so I'm not aware of the policies, procedures, and rules that would govern such an account.
>
> Q:    What about the definition?   I mean what's your understanding as to—Do you have any understanding as to what customer segregated account means?
>
> A:    No.
>
> Q:    Do you know if you've ever had a client that had a customer segregated account?
>
> A:    No.

Boe Deposition, CFTC Fact App'x at 79.  At her deposition, Timmerman testified as follows:

> Q:    Peregrine Financial Group, Inc., and that's the account ending in 1845.  Do you know the purpose of that account?
>
> A:    No.
>
> Q:    And the source of the funds that went into that account?
>
> A:    No.
>
> Q:    And that was a business checking account?
>
> A:    Business commercial checking account.

Timmerman Deposition, CFTC Fact App'x at 86.

No U.S. Bank employee ever considered whether the 1845 Account contained excess funds from Peregrine prior to July 9, 2012, and neither Timmermann nor Boe were familiar with the concept of excess funds during the Relevant Period.

11

Until after Wasendorf's suicide attempt in July 2012, U.S. Bank had no policies, procedures or training specifically applicable to FCM customers or customer segregated funds. Aside from Peregrine, U.S. Bank had at least eight other FCM customers during the Relevant Period. U.S. Bank implemented new policies relating to FCM clients after July 2012.

### 2. U.S. Bank's knowledge of Wasendorf

#### a. Other accounts

Peregrine had four other accounts and Wasendorf had several other accounts at U.S. Bank. On April 24, 1990, Peregrine opened an account ending in 7467 (the "7467 Account," or "house account") with Cedar Falls Trust & Savings Bank ("Cedar Falls T&S"). Cedar Falls T&S eventually became U.S. Bank. The 7467 Account was not a customer segregated funds account and was sometimes referred to by U.S. Bank employees as the "house account." A "house account" is an account of an FCM that does not contain customer funds. Peregrine also had a second customer segregated funds account ending in 8590 (the "8590 Account") at U.S. Bank that was subject to the Act and Regulations. Unlike the 1845 Account, which was categorized by the bank as a commercial checking account, the 8590 Account was categorized as a "custody account." August 1, 2012 Letter from Peter Carter, CFTC Fact App'x at 402. Also unlike the 1845 Account, the 8590 Account was unfunded. In addition, Peregrine had a 30.7 Secured Account, ending in 0394 (the "30.7 Secured Account) and a Foreign Exchange Account, ending in 3366 (the "Foreign Exchange Account"). *See id.* at 400-01.

Although Wasendorf conducted a fair amount of business at U.S. Bank in Cedar Falls, he led U.S. Bank employees to believe that the majority of Peregrine's banking was done at larger banks. In fact, in addition to the 1845 Account, Peregrine maintained multiple other customer segregated accounts at multiple financial institutions worldwide.

Wasendorf owned several entities that had accounts at U.S. Bank, including Wasendorf & Associates, Inc. aka Mountain Town, Inc.; The Peregrine Charities; Wasendorf Air, L.L.C.; My Verona, L.L.C.; Wasendorf Construction, L.L.C.; Trader Press, Inc.; Best Kids, L.L.C.; Lit Subsidized Funds; Portfolio Advisor Promotion, Inc. d/b/a Village Gate Communications; and Wasendorf & Sons Company, Inc. *Id.* at 400-02.

Finally, Wasendorf and his family owned several accounts at U.S. Bank. Altogether, Wasendorf, his family and his businesses held twenty-four accounts that were designated as checking accounts, four accounts that were designated as savings accounts, two accounts designated as being from a commercial loan, two accounts designated as being from a mortgage loan, one account designated as being from an installment loan, one account designated as a safe box, one account designated as a reserve line and one account designated as a custody account. *See id.* In the period after 2001, these accounts became subject to "know your customer" procedures and, when opened, anti-money laundering procedures. Lisa Rolinger Deposition, CFTC Material Fact App'x at 407.

### b. Finances and relationship

Wasdendorf had cultivated a reputation as a civic leader in the Cedar Falls community and a leader in the commodities industry, and U.S. Bank was aware of that reputation. Wasendorf took affirmative steps to "create an impression that [he was] a legitimate businessman" so that employees of U.S. Bank would view him as "honest and successful." Wasendorf Deposition, U.S. Bank's Summary Judgment Appendix ("U.S. Bank Summary Judgment App'x") (docket nos. 80-3 through -5) at 281-82, 285-87. Wasendorf testified that he "probably gave [Timmerman] [his personal financial statement] every year since 2000, 2001, something like that." Wasendorf Deposition, CFTC Fact App'x at 571.

U.S. Bank was aware of Wasendorf's divorce from Connie Wasendorf in 2010 and discussed its impact on his finances with Wasendorf. U.S. Bank employees dined at

Wasendorf's restaurants, My Verona, L.L.C. and Harvest on Huron, donated to The Peregrine Charities and were invited to Wasendorf's wedding to Nancy Paladino in June 2012. U.S. Bank viewed Wasendorf as a successful and desirable customer and U.S. Bank sought opportunities to expand its business with him and his businesses.

### 3. Loans

Peregrine guaranteed two loans that U.S. Bank issued to Wasendorf, Connie Wasendorf and Wasendorf's companies: (1) a $6.4 million loan ("Construction Loan") to Wasendorf Construction, L.L.C. ("Wasendorf Construction"); and (2) a $3 million loan ("Wasendorf Loan") (collectively, "Loans") to Wasendorf and Connie Wasendorf.

Wasendorf Construction was a real estate holding company owned by Wasendorf and his son, Russell Wasendorf, Jr. The purpose of the Loans was to build an office building in Cedar Falls to house Peregrine as the primary tenant.

Prior to Peregrine's bankruptcy, no U.S. Bank employee responsible for the Loans understood that the 1845 Account was a customer segregated funds account or reviewed the acknowledgment letters U.S. Bank provided to Peregrine. These acknowledgment letters stated that the 1845 Account held futures and options customer funds which Peregrine was required to segregated under the Act and that U.S. Bank could not subject the 1845 Account to any right of offset or lien.

### a. Credit-approval process

U.S. Bank uses an internal system called the CAPE system as part of its loan approval process. The CAPE system is used to generate a set of documents called a Standard Credit Display ("SCD") that U.S. Bank uses to review and approve loan requests. SCDs are comprised of qualitative and quantitative information about the potential borrower and other parties critical to the credit decision, including a summary of the banking relationship between U.S. Bank and the parties involved; a summary of the strengths, weaknesses, key risks and risk mitigation factors associated with the credit

14

decision; a financial analysis of the borrower and other critical parties; and collateral depictions. The SCDs contain all the information necessary for senior credit officers at U.S. Bank to approve loan requests. An Assistant Relationship Manager typically authors the SCD that other U.S. Bank employees use in determining whether to approve loans. The SCD then is approved by a Relationship Manager and, subsequently, depending on the total loan exposure and the risk rating, by higher-level U.S. Bank employees. The extension of credit and funding of the loan takes place after loan documents are executed by the borrower and other parties as per the approval terms and conditions.

### b. *September 4, 2008 SCD*

In August 2007, Timmerman authored an SCD for the Loans. In preparing the SCD, Timmerman requested and received Wasendorf's and Connie Wasendorf's personal financial statements and tax returns, Peregrine's financial statements, Wasendorf Construction's financial statements, CFTC Form 1-FRs[5] and other information relevant to U.S. Bank's decision to issue a loan. Timmerman then entered the relevant information from these documents into the SCD. On September 4, 2008, U.S. Bank approved Wasendorf Construction's request for a $6.4 million loan and the Wasendorfs' request for a $3 million loan. Timmerman; Kelly Lind, Vice President of Commercial Real Estate; Boe; Jeff Lara; and Richard "Dick" Edwards, the final and most senior employee, are listed as approving the Loans. *See* September 4, 2008 SCD, CFTC Fact App'x at 445-46. After the Loans were approved, the SCD was provided to outside counsel, who drafted the loan documents and the 2008 Guaranty.

---

[5] FCMs are required to complete Form 1-FRs on a monthly basis and submit them to the CFTC. Form 1-FRs detail the FCM's assets, including the amount of customer funds deposited with the FCM.

### c. *2008 Guaranty—Wasendorf Loan*

On approximately September 9, 2008, Peregrine executed a Continuing Guaranty (Unlimited) (the "2008 Guaranty") for the Wasendorf Loan. U.S. Bank requested the 2008 Guaranty and knew that Peregrine was the repayment source for both the Wasendorf Loan and the Construction Loan; the excess cash flow from the rental payments made by Peregrine, who would be the primary tenant in Wasendorf Construction's new office building, to Wasendorf Construction would be used to repay the Loans. The 2008 Guaranty stated, in pertinent part:

> Collateral; Setoff. [Peregrine] grants to [U.S. Bank] a security interest in all property in which [Peregrine] has an ownership interest which is now or in the future in possession of [U.S. Bank] to secure payment under this Guaranty. [Peregrine] hereby authorizes [U.S. Bank], without further notice to anyone, to charge any account of [Peregrine] for the amount of any and all Obligations due under this Guaranty, and grants [U.S. Bank] a contractual right to set off (without notice or demand) amounts due hereunder against all depository account balances, cash and other property now or hereafter in the possession of [U.S. Bank] and the right to refuse to allow withdrawals from any account (collectively "Setoff").

2008 Guaranty, CFTC Fact App'x at 534 (emphasis omitted). The 2008 Guaranty, as well as the 2011 Guaranty discussed below, were signed by Wasendorf pursuant to Peregrine corporate resolutions that gave him the right "to pledge, assign, mortgage or otherwise grant a security interest in any or all real property, fixtures, tangible or intangible personal property, or any other assets of [Peregrine]." 2008 Corporate Resolution, U.S. Bank Summary Judgment App'x at 111; *see also* 2011 Corporate Resolution, U.S. Bank's Summary Judgment App'x at 114. On or about January 2010, U.S. Bank and the Wasendorfs executed a First Amendment to Term Loan Agreement and Term Note, which extended the maturity date of the Wasendorf Loan. Wasendorf also signed this amendment on behalf of Peregrine, acknowledging that it continued to guarantee the obligations of the

Wasendorfs to U.S. Bank. Peregrine was a guarantor on the Wasendorf Loan from September 9, 2008 until the loan was paid off in mid-February 2010. During this period, U.S. Bank collected $30,180.59 in interest on the Wasendorf Loan.

### d. *July 28, 2011 SCD*

Initially, when the Loans were in the process of being approved in September 2008, Wasendorf told U.S. Bank that Peregrine was not permitted to guarantee the Construction Loan due to regulatory reasons. At some point, U.S. Bank employees came to the understanding that a regulatory interpretation had changed, enabling Peregrine to guarantee the Construction Loan. Boe then began working on a new SCD in April 2011, and on July 28, 2011, U.S. Bank approved the new SCD. This SCD improved the risk ratings of Wasendorf Construction based upon the guaranty provided by Peregrine. Edwards testified that had Peregrine been unable to provide the guaranty at that time, then "[w]e either would not have renewed the [Construction Loan] and asked him to pay it off and refinance it, or we would have carried the loan with a weaker PDR rating or asked for injections to pay the loan balance down such that it would cash flow at a lower debt service amount." Edwards Deposition, CFTC Fact App'x at 363. Timmerman, Boe, Lara, Nancy Kasparek, Steve Caves and Edwards are listed as approving the renewed Construction Loan. July 28, 2011 SCD, CFTC Fact App'x at 480-81.

### e. *2011 Guaranty—Construction Loan*

On or about August 5, 2011, Wasendorf on behalf of Peregrine executed a Continuing Guaranty (Unlimited) (the "2011 Guaranty"), which was also drafted by outside counsel, for the Construction Loan. The 2011 Guaranty stated, in pertinent part:

> Collateral; Setoff. [Peregrine] grants to [U.S. Bank] a security interest in all property in which [Peregrine] has an ownership interest which is now or in the future in possession of [U.S. Bank] to secure payment under this Guaranty. [Peregrine] hereby authorizes [U.S. Bank], without further notice to anyone, to charge any account of [Peregrine] for the amount

17

of any and all Obligations due under this Guaranty, and grants
[U.S. Bank] a contractual right to set off (without notice or
demand) amounts due hereunder against all depository account
balances, cash and other property now or hereafter in the
possession of [U.S. Bank] and the right to refuse to allow
withdrawals from any account (collectively "Setoff").

2011 Guaranty, CFTC Fact App'x at 539-40 (emphasis omitted).

### f. Peregrine references in SCDs

The 2008 and 2011 SCDs contained a section called "depository accounts" that
listed the number of Peregrine depository accounts held by U.S. Bank and the six-month
average balance in those accounts. *See* September 4, 2008 SCD, CFTC Fact App'x at
447; July 28, 2011 SCD, CFTC Fact App'x at 484. The 1845 Account was included as
a Peregrine depository account and made up the largest portion of the listed six-month
average balances.

### g. U.S. Bank's actions post-Peregrine bankruptcy

On December 13, 2012, U.S. Bank filed a Proof of Claim in Peregrine's bankruptcy
case for $6,662,505.38, the amount of Wasendorf Construction's obligations to U.S. Bank
as of the bankruptcy petition date. In the Proof of Claim, U.S. Bank asserted that
Peregrine's debt to U.S. Bank was secured only up to the amount of $896,350.56, which
was the balance of Peregrine's house account. The Proof of Claim contained no assertion
that U.S. Bank had a security interest in any amounts held in the 1845 Account. When
Peregrine's Bankruptcy Trustee asked U.S. Bank to remit the balance of the 1845 Account
to it, U.S. Bank did so promptly.

### 4. Transactions involving the 1845 Account

### a. McCormack Declaration

Transactions involving the 1845 Account are detailed in a declaration and report
prepared by Joy McCormack, who is employed as a Senior Futures Trading Investigator
in the Division of Enforcement of the CFTC. *See* McCormack Declaration, CFTC Fact

App'x at 90. In July 2012, McCormack was assigned to investigate U.S. Bank's involvement in this case and she participated "in the discovery processes including investigative interviews, testimony, and depositions; performed financial analyses; and reviewed documents and records obtained by the Division, including . . . bank records subpoenaed and produced by U.S. Bank [and] loan records produced by U.S. Bank." *Id.* at 90-91. To determine the cash flow in the 1845 Account, McCormack "entered all transactions from the 1845 Account bank statements into a spreadsheet." *Id.* at 94. She then "entered information into the spreadsheet from supporting documents such as wire transfers, deposit slips, deposit items, and counter withdrawals." *Id.* Next, she determined "[b]ased upon [her] review of interview notes, transcripts, bankruptcy trustee reports, and a [Peregrine] customer list, . . . which transactions related to Wasendorf, [Peregrine] customers, and/or other categories." *Id.* To ensure accuracy, she "reconciled the transactions on the spreadsheet to the bank statements" and, finally, she "prepared a summary of [her] review of the cash flow in the 1845 Account, which is supported by a bank account reconstruction analysis" that she has attached as an exhibit. *Id.*

### (1) *Parties' arguments*

U.S. Bank argues that the McCormack Declaration is inadmissible because she has not been named as an expert witness and because she lacks personal knowledge. U.S. Bank Response to CFTC Statement of Material Facts (docket no. 93-2) at 9-10. U.S. Bank contends that because all of McCormack's "'knowledge' came from either a review of documents or from out-of-court statements made by other persons" that "her attempt to serve as a conduit for the evidence in this case runs afoul of [Federal Rule of Evidence] 1002 (the best-evidence rule) and [Federal Rule of Evidence] 802 (hearsay)." *Id.* at 10.

CFTC contends that the McCormack Declaration "is admissible for purposes of summary judgment, and the content of [the McCormack Declaration] would be admissible

at trial." CFTC Reply at 3-4. CFTC argues that the McCormack Declaration is admissible pursuant to Federal Rule of Evidence 1006 as a summary of her findings.

### (2) *Applicable law and application*

Federal Rule of Civil Procedure 56(c)(4) states that a "declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

"A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602. Although McCormack was not a party to any of the transactions she summarized, the court finds that, based on McCormack's extensive review of the bank records and other relevant documents, she had personal knowledge of the transactions involving the 1845 Account. *See, e.g.*, *FDIC v. Cashion*, 720 F.3d 169, 172, 175 (4th Cir. 2013) (finding that an FDIC employee whose information came from "records and employees" of a bank had the requisite personal knowledge to support her affidavit); *Baker v. Veneman*, 256 F. Supp. 2d 999, 1005 (E.D. Mo. 2003) ("It appears . . . that [a farm loan manager for the USDA] based his Declaration upon his review of the loan files and his experience as a Farm Loan Manager. His statements are therefore based upon his personal knowledge and are not inadmissible hearsay."); *Howard Acquisitions, LLC v. Giannasca New Orleans, LLC*, Civil No. WDQ-09-2651, 2010 WL 3834917, at *3 (N.D. Md. Sept. 28, 2010) ("The affiant's personal knowledge may be based on review of files . . . ."); *Stenger v. World Harvest Church, Inc.*, No. Civ.A.1:04CV00151-RW, 2006 WL 870310, at *12 (N.D. Ga. March 31, 2006) ("Defendant's argument that the affidavit is not made [with] 'personal knowledge' is without merit. Personal knowledge, as innumerable decisions from the federal courts make clear, can be gleaned from a review of records pertinent to a given case.").

Certainly, with respect to McCormack's summary of the transactions involving the 1845 Account, her declaration does not contain hearsay. Her affidavit is based on documents from U.S. Bank, which, to the extent such documents contain statements, are not hearsay because they are an opposing party's statements. *See* Fed. R. Evid. 801(d)(2)(A).

U.S. Bank's contention that McCormack's declaration violated the best-evidence rule is without merit. The best-evidence rule states that "[a]n original writing . . . is required in order to prove its content unless these rules or a federal statute provides otherwise." Fed. R. Evid. 1002. However, Federal Rule of Evidence 1006 states that "[t]he proponent may use a summary, chart, or calculation to prove the content of voluminous writings . . . that cannot be conveniently examined in court." Fed. R. Evid. 1006. McCormack has attached much of the documentation on which she relies and additional documentation is in the CFTC Fact Appendix. Moreover, for purposes of the transactions involving the 1845 Account, the documentation consists of U.S. Bank statements and associated documents in U.S. Bank's possession. It would be inconvenient to present thousands of documents in court, and U.S. Bank has not questioned the authenticity of the documents upon which McCormack relies. Accordingly, McCormack's summary of the evidence does not violate the best-evidence rule.

Finally, based on McCormack's experience as an investigator, she is "competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

Since the McCormack Declaration is based on "personal knowledge, set[s] out facts that would be admissible in evidence, and [the CFTC has shown] that the affiant or declarant is competent to testify on the matters stated," Fed. R. Civ. P 56(c)(4), the McCormack Declaration, at least to the extent that McCormack summarizes transactions involving the 1845 Account, is admissible for purposes of summary judgment.

### b.    Deposits

During the Relevant Period, $112,453,821.23 was deposited into the 1845 Account. Of this amount, $11,503,937.67 came from 700 of Peregrine's customers in the form of 1400 checks and one wire transfer. $94,000,000 came from twelve wire transfers from another customer segregated account held at JPMorgan Chase. $6,949,883.56 was transferred from other Peregrine customer-related accounts at U.S. Bank, specifically the 30.7 Secured Account and the Foreign Exchange Account. *See* McCormack Declaration, CFTC Fact App'x at 95. These deposits totaled $112,453,821.23. There were also deposits of $6,522,066.19 from non-customer related sources, including $602,932 from Wasendorf himself. Cash Flow Summary, CFTC Fact App'x at 148.

### c.    Transfers and withdrawals

During the Relevant Period, there were withdrawals of $161,971,259.11 from the 1845 Account. Of this amount, $108,500,000 was withdrawn via twenty wire transfers to the JPMorgan Chase customer segregated account, $111,345.70 was wired to a customer and $33,700 was withdrawn by checks issued to four customers. *Id.* at 95.

Wasendorf withdrew a net amount of $35,665,995.40 from the 1845 Account for non-customer purposes during the Relevant Period. McCormack Declaration, CFTC Fact App'x at 96.

Wasendorf, through Timmerman and other U.S. Bank personnel, made many transfers out of the 1845 Account. For example, on June 13, 2008, Wasendorf telephoned Timmerman and requested that U.S. Bank transfer $400,000 from the 1845 Account to a U.S. Bank account for Wasendorf & Associates. Timmerman then asked another bank employee to process that request. Customer Advice Debit, CFTC Fact App'x at 324. Also, on December 31, 2010, Wasendorf requested and U.S. Bank transferred $2,469,692 from the 1845 Account to Connie Wasendorf's U.S. Bank savings account. *Id.* at 326.

22

Wasendorf also made large in-person counter withdrawals at local U.S. Bank branches from the 1845 Account to purchase cashier's checks payable to other entities. Wasendorf indicated that he would like an entity or person other than Peregrine to be identified as the payor/remitter on the cashier's checks. For example, on June 27, 2008, a counter withdrawal was made from the 1845 Account in the amount of $563,956.02. At around the same time, a cashier's check was purchased in the amount of $563,956.02 made payable to Anfinson & Luce Trust, reflecting a payor/remitter of Wasendorf Construction.

In addition, Wasendorf used the 1845 Account on multiple occasions to pay for fees and expenses related to Wasendorf Construction and the building of the office building. For example, on December 1, 2008, Wasendorf Construction's account, the 0329 Account, had a balance of $7109.83. On December 5, 2008, a telephonic transfer of $370,000 was made from the 1845 Account to the 0329 Account. On that same date, a check cleared the 0329 Account in the amount of $371,823.96. No other deposits to the 0329 Account were made during that time.

### d.    Payments to U.S. Bank

Under Wasendorf's direction, certain bank fees for Peregrine accounts and other Wasendorf entities were automatically deducted on a monthly basis from the 1845 Account.

Also, Wasendorf indirectly used money from the 1845 Account to repay the Wasendorf Loan. On February 18, 2010, Wasendorf transferred $3,005,150 by electronic funds transfer from the 1845 Account to the U.S. Bank account in the name of Wasendorf Construction, which had an account number ending in 0329 (the "0329 Account"). Prior to receiving the transfer, the 0329 Account had a total balance of $425.13. On February 19, 2010, a check payable to U.S. Bank cleared the 0329 Account, paying off the outstanding balance of $3,005,150 on the Wasendorf Loan.

23

### 5.    *Audits of Peregrine*

CFTC conducted an audit of Peregrine in 1999. In a thirty-five-page report, CFTC found numerous "material violations" of the Act, including an "inaccurate segregation record" that violated the Regulations promulgated under the Act. 1999 CFTC Audit, U.S. Bank Summary Judgment App'x at 616, 633. CFTC also found that Peregrine had made "intentional misstatements or omissions" to the CFTC and that "oral responses provided by [Peregrine] appeared to be provided as an attempt to mislead the audit process." *Id.* at 643. CFTC recommended that Peregrine be issued a warning letter and the audit findings be referred to CFTC's Division of Enforcement for appropriate sanctions. CFTC did not conduct another audit of Peregrine until 2007, and the audit was a limited review.

The NFA conducted regular, extensive audits of Peregrine. On May 13, 2011, at the request of Peregrine's compliance officer, who had no knowledge of the fraud, Timmerman sent an e-mail to the NFA confirming the actual balance of the 1845 Account, which accurately reported the balance as $7,181,336.36. The confirmation form Timmerman returned listed the 1845 Account as a "Customer Segregated Account" and listed U.S. Bank's address as P.O. Box 706, the false address that Wasendorf had used to intercept mail intended for U.S. Bank. Prior to May 13, 2011, Peregrine had falsely reported to the NFA that the 1845 Account held in excess of $200 million. Wasendorf found out about the confirmation—either from the compliance officer or from Timmerman. Wasendorf then told Timmerman that a mistake had been made in the confirmation and asked her for a copy of the confirmation form that she had received. Timmerman provided the confirmation form to Wasendorf, who, on the next business day, sent the NFA a "corrected" form indicating that the balance was $218,650,550.96, which was signed under Timmerman's forged signature. The NFA accepted the "corrected" information without question and conducted no further investigation.

## VI.  ANALYSIS

In the CFTC Motion, CFTC argues that U.S. Bank violated Section 4d(b) of the Act and Commission Regulation 1.20 by "treat[ing] the 1845 Account like the personal piggy bank of . . . Wasendorf . . . , in part by using Peregrine's customer funds to guarantee multi-million dollar loans to Wasendorf, his wife, and one of his companies and allowing Wasendorf to withdraw funds from the 1845 Account as he pleased." CFTC Motion at 1. CFTC contends that it is entitled to judgment as a matter of law as to Count 1, improper use of Peregrine's customer funds in violation of Section 4d(b) of the Act and Regulation 1.20; and Count II, improper holding of Peregrine's customer funds in violation of the same provisions. CFTC contends that U.S. Bank's violations "enabled Wasendorf to steal $215 million of Peregrine customer funds before Peregrine collapsed in July 2012." *Id.* In addition, CFTC argues that U.S. Bank's affirmative defense of unclean hands is without merit.

In the U.S. Bank Motion, U.S. Bank argues that all of CFTC's theories must fail because it did not "hold" or "use" the funds in violation of the Act and the Regulations.

### A.  The Act and the Regulations

Although this case is factually complex, its resolution is governed primarily by the interpretation of two provisions of federal law: Section 4d(b) of the Act, codified at 7 U.S.C. § 6d(b), and Commission Regulation 1.20(a), codified at 17 C.F.R. § 1.20(a).

7 U.S.C. § 6d(b) states, in pertinent part:

> It shall be unlawful for . . . any depository . . . that has received any money, securities, or property for deposit in a separate account . . . to hold, dispose of, or use any such money, securities, or property as belonging to the depositing futures commission merchant or any person other than the customers of such futures commission merchant.

7 U.S.C. § 6d(b). Similarly, 17 C.F.R. § 1.20(a) states, in pertinent part:

25

> No person, including any [] depository, that has received
> futures customer funds for deposit in a segregated account, as
> provided in this section, may hold, dispose of, or use any such
> funds as belonging to any person other than the futures
> customers of the futures commission merchant which deposited
> such funds.

17 C.F.R. § 1.20(a) (2013). Also at issue is 17 C.F.R. § 1.23, which states:

> The provisions in section 4d(a) and 4d(b) of the Act and the
> provision in § 1.20(c), which prohibit the commingling of
> futures customer funds with the funds of a futures commission
> merchant, shall not be construed to prevent a futures
> commission merchant from having a residual financial interest
> in the futures customer funds, segregated as required by the
> Act and the rules in this part and set apart for the benefit of
> futures customers; nor shall such provisions be construed to
> prevent a futures commission merchant from adding to such
> segregated futures customer funds such amount or amounts of
> money, from its own funds or unencumbered securities from
> its own inventory, of the type set forth in § 1.25, as it may
> deem necessary to ensure any and all futures customers'
> accounts from becoming undersegregated at any time.

17 C.F.R. § 1.23 (2013). Pursuant to the Act and Regulations, it is undisputed that
Peregrine was an FCM, the 1845 Account was a customer segregated account and U.S.
Bank was a depository. The issue is whether U.S. Bank violated the Act and Regulations.

### B. Improper Use of Customer Funds

The parties dispute three issues regarding whether U.S. Bank improperly used
customer funds in the 1845 Account: (1) whether the 1845 Account was subject to the 2008
Guaranty and 2011 Guaranty; (2) if so, whether U.S. Bank violated the Act and
Regulations by acquiring a right to set off the debt from the Loans with the customer funds
in the 1845 Account or, if merely acquiring a right is not enough, whether they violated
the Act and Regulations by taking preliminary actions in attempt to set off the debt from

the customer funds in the 1845 Account; and (3) whether U.S. Bank improperly used the funds in the 1845 Account [when deciding] whether to issue the Loans.

### 1. Was the 1845 Account subject to the Guaranties?

#### a. Parties' arguments

In the CFTC Motion, CFTC argues that U.S. Bank "improperly used the customer funds in the 1845 Account as part of two [G]uarant[i]es U.S. Bank obtained as security" for the 2008 Construction Loan and the 2011 Wasendorf Loan. CFTC Brief in Support of the Motion (docket no. 77-1) at 14. CFTC contends that "[a]t the time the loan documents and [G]uarant[i]es were executed . . . , U.S. Bank understood the 1845 Account was a Peregrine depository account in the possession of U.S. Bank and intended for [the 1845 Account] to be included as part of the [G]uarant[i]es." *Id.* at 15.

U.S. Bank argues that it could not have violated the Act and the Regulations with respect to the Loans and the Guaranties because the Guaranties "did not grant U.S. Bank a security interest in or setoff rights against customer funds." U.S. Bank Brief in Support of the Resistance (docket no. 93-1) at 8 (emphasis omitted). U.S. Bank asserts that "[t]he unambiguous terms of the Guaranties did not grant U.S. Bank a security interest in or setoff rights against customer funds." *Id.* (emphasis omitted). Moreover, U.S. Bank contends that even if the court looks at extrinsic evidence to determine whether the 1845 Account was subject to the Guaranties, "it would find undisputed material facts establishing that neither U.S. Bank nor [Peregrine] intended to give U.S. Bank a security interest in or setoff rights against customer funds." *Id.* at 10.

#### b. Applicable law

As an initial matter, the court shall apply Iowa law when analyzing the meaning of the 2008 Guaranty and the 2011 Guaranty given that both parties and the court agree that Iowa law controls with respect to this issue. *Cf., e.g.*, *Epps v. Stewart Info. Servs. Corp.*, 327 F.3d 642, 649 (8th Cir. 2003) ("State law is viewed to determine whether and how

to pierce the corporate veil."); *In re Nerland Oil, Inc.*, 303 F.3d 911, 917 (8th Cir. 2002) ("We apply federal law to determine the priority order of liens competing with federal tax liens. However, we apply state law to determine the competing legal interest at stake." (citation omitted)).

In *Hartig Drug Co. v. Hartig*, 602 N.W.2d 794 (Iowa 1999), the Iowa Supreme Court discussed the rules of contract interpretation. The Iowa Supreme Court stated:

> A cardinal rule of contract construction or interpretation is the intent of the parties must control. *Whalen v. Connelly*, 545 N.W.2d 284, 291 (Iowa 1996). The important time frame for determining this intent is the time the contract was executed. *Davenport Osteopathic Hosp. Ass'n v. [Hosp.] Serv., Inc.*, 261 Iowa 247, 260, 154 N.W.2d 153, 161 (1967). If the contract is ambiguous and uncertain, extrinsic evidence can be considered to help determine the intent. Yet, a contract is not ambiguous merely because the parties disagree over its meaning. *Tom Riley Law Firm, P.C. v. Tang*, 521 N.W.2d 758, 759 (Iowa [Ct.] App. 1994). Instead, an ambiguity occurs in a contract when a genuine uncertainty exists concerning which of two reasonable interpretations is proper. *Berryhill v. Hatt*, 428 N.W.2d 647, 654 (Iowa 1988). The existence of an ambiguity, however, can be determined only after all pertinent rules of interpretation have been considered. *Id.* Our general rules of interpretation are used both to determine what meanings are reasonably possible as well as to choose among two reasonable meanings. Restatement (Second) of Contracts § 202 cmt. a (1981).

*Id.* at 797. The Iowa Supreme Court expounded upon its rules of contract interpretation a month later in *Fausel v. JRJ Enters., Inc.*, 603 N.W.2d 612 (Iowa 1999), when it stated: "Words and other conduct [related to contracts] are interpreted in the light of all the circumstances, and if the principal purpose of the parties is ascertainable[,] it is given great weight." *Id.* at 618 (quoting Restatement (Second) of Contracts § 202(1)). The Iowa Supreme Court disagreed with "cases that say extrinsic evidence cannot change the plain meaning of a writing," and clarified that "'meaning can almost never be plain except in

28

a context.'" *Id.* (quoting Restatement (Second) of Contracts § 212 cmt. b). "Therefore, the rule that words and other conduct are interpreted in the light of all the circumstances *is not* limited to cases when ambiguity in the agreement exists." *Id.* (emphasis added). "[W]hen the meaning of an agreement depends on extrinsic evidence, a question of interpretation is left to the trier of fact unless 'the evidence is so clear that no reasonable person would determine the issue in any way but one.'" *Id.* (quoting Restatement (Second) of Contracts § 212 cmt. e). However, "'the words of an integrated agreement remain the most important evidence of intention.'" *Id.* (emphasis omitted) (quoting Restatement (Second) of Contracts § 212 cmt. b).

### c. Application

The essence of the dispute is that the parties disagree on what the contracting parties intended when Peregrine granted a "security interest in all property in which [Peregrine] has an *ownership* interest." 2008 Guaranty, CFTC Fact App'x at 534 (emphasis added); 2011 Guaranty, CFTC Fact App'x at 539 (emphasis added). If the contracting parties intended this "property" to include the 1845 Account, then U.S. Bank may be liable for improperly using the 1845 Account as security for loans it made to Peregrine. However, if the contracting parties did not intend this "property" to include the 1845 Account, then U.S. Bank would have no liability under the law for improperly using the 1845 Account as security for the loans because the 1845 Account was not part of the security referenced in the Guaranties.

The court concludes that, while the language may be unambiguous, the meaning of the language in the Guaranties depends on extrinsic evidence in light of the context of the dispute. *See Fausel*, 603 N.W.2d at 618 ("[T]he rule that words and other conduct are interpreted in the light of all the circumstances is not limited to cases when ambiguity in the agreement exists.").

Both parties present evidence that could lead a reasonable trier of fact to find that the Guaranties did—or did not—create a security interest in the 1845 Account. For example, U.S. Bank asserts that it did not consider whether it had a specific right to setoff in the 1845 Account because it "would identify specific assets subject to the security interest and setoff provisions in the Guaranties only if there were a default on a loan and [Peregrine] did not fulfill its obligations under the Guaranties." U.S. Bank Brief in Support of the Resistance at 10. U.S. Bank also notes that Wasendorf was "not aware of [U.S. Bank] putting a lien [on] or encumbering [the 1845 Account] in any fashion." Wasendorf Deposition, U.S. Bank Resistance Appendix ("U.S. Bank Resistance App'x") (docket nos. 93-4 through -10) at 155. On the other hand, CFTC points to the testimony of Lara, a U.S. Bank manager, responsible, in part, for approving the Loans, who stated that as of July 13, 2012, he "assumed that [U.S. Bank] had that right [to offset against the 1845 Account] ultimately if [it] needed to." Lara Deposition, CFTC Fact App'x at 350. Although the relevant time for determining the intent of the parties is at the time the contract was entered into, a reasonable fact finder could find that U.S. Bank intended for the 1845 Account to be subject to the Guaranties based on this, and other, evidence.[6]

As the Iowa Supreme Court stated in *Fausel*, "[w]hen the meaning of an agreement depends on extrinsic evidence, a question of interpretation is left to the trier of fact" unless there is only one reasonable meaning. *Fausel*, 603 N.W.2d at 618. Both parties present admissible evidence that creates a genuine issue on whether the parties did—or did not—intend the 1845 Account to be subject to the Guaranties, which is a material fact at issue. Accordingly, to the extent that U.S. Bank requests that the court grant summary

---

[6] For example, no U.S. Bank employee understood the 1845 Account to be a customer segregated account and instead treated the 1845 Account as a commercial checking account, which supports CFTC's contention that U.S. Bank intended the 1845 Account to be subject to the Guaranties.

30

judgment with respect to Count 1 because it did not have an "ownership" interest in the 1845 Account, the U.S. Bank Motion shall be denied.

**2.      *Is merely acquiring a right of set off unlawful, or were any other actions by U.S. Bank in enforcing the Guaranties unlawful?***

**a.      *Parties' arguments***

Next, CFTC argues that the Guaranties granted a "right of set off . . . effective as of the date the loan documents and [G]uarant[i]es were executed, September 9, 2008 and August 5, 2011" and that the "Act and Regulations prohibit even potential restrictions on the liquidity of customer funds, including the *right* of set off, which U.S. Bank obtained through the . . . [G]uarant[i]es." CFTC Brief in Support of the Motion at 16-17. In the event that merely granting a right to set off of customer funds is not a violation of the Act or Regulations, CFTC contends that "U.S. Bank only refrained from setting off the debt from the [Loans] with the funds in the 1845 Account because the Peregrine bankruptcy trustee made it clear to U.S. Bank that it was not permitted to assert any security interest against the 1845 Account." *Id.* at 17.

U.S. Bank argues that, even if the 1845 Account was subject to the Guaranties, "[t]he [Act] and related legislative history show that Congress only intended Section 4d(b) to prohibit a depository from actually offsetting against or otherwise misappropriating customer funds, nothing more." U.S. Bank Brief in Support of the Resistance at 6. U.S. Bank contends that "[i]t is undisputed that U.S. Bank never actually used customer funds to offset [Peregrine's] obligations to [U.S. Bank]" and, accordingly, the court should grant U.S. Bank's Motion on Count 1. *Id.* at 7.

**b.      *Applicable law***

The Act and the Regulations prohibit a depository from "us[ing] any such money, securities, or property [in a customer segregated account] as belonging to the depositing

31

futures commission merchant or any person other than the customers of such futures commission merchant." 7 U.S.C. § 6d(b); 17 C.F.R. § 1.20(a).

When construing the meaning of federal statutes, "[t]he starting point in discerning congressional intent . . . is the existing statutory text." *Lamie v. United States Trustee*, 540 U.S. 526, 534 (2004). "It is well established that 'when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'" *Id.* (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000)); *accord Owner-Operator Indep. Drivers Ass'n v. United Van Lines, LCC*, 556 F.3d 690, 693 (8th Cir. 2009). This rule "results from 'deference to the supremacy of the Legislature, as well as recognition that Congressmen typically vote on the language of a bill.'" *Lamie*, 526 U.S. at 538 (quoting *United States v. Locke*, 471 U.S. 84, 95 (1985)). Therefore, "[w]here the plain meaning of a statute is clear, '[courts] are not free to replace it with an unenacted legislative intent.'" *Owner-Operator Indep. Drivers Ass'n*, 556 F.3d at 693 (quoting *INS v. Cardoza Fonseca*, 480 U.S. 421, 453 (1987) (Scalia, J., concurring)).

However, "judicial deference to the plain meaning of a statute is not an absolute." *Id.* "One exception consists of those 'rare cases' when a statute's plain text produces a result 'demonstrably at odds with the intentions of its drafters, and those intentions must be controlling.'" *Id.* (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982)). Another exception occurs when the language of the statute is ambiguous. If the legislature has left an ambiguity in the statute, the statutory ambiguity should be resolved by the administrative agency rather than the courts. *City of Arlington, Tex. v. FCC*, __ U.S. __, __, 133 S. Ct. 1863, 1868 (2013) (citing *Chevron U.S.A., Inc. v. Natural Res. Def. Counsel, Inc.*, 467 U.S. 837 (1984)); *see also id.* at 1874 ("Where Congress has established a clear line, the agency cannot go beyond it; and where Congress has established an ambiguous line, the agency can go no further than the ambiguity will fairly

32

allow. But in rigorously applying the latter rule, a court need not pause to puzzle over whether the interpretive question presented is 'jurisdictional.' If 'the agency's answer is based on a permissible construction of the statute,' that is the end of the matter." (quoting *Chevron*, 467 U.S. at 842)).

### c. Application

The language of 7 U.S.C. § 6d(b) is plain, so "the sole function of the court . . . is to enforce it according to its terms." *See Lamie*, 540 U.S. at 534 (quoting *Hartford Underwriters Ins. Co.*, 530 U.S. at 6) (internal quotation marks omitted). Accordingly, the court will give the term "use" its plain meaning.

As the court discussed above, a reasonable jury could conclude that the 1845 Account was part of the security interest granted to U.S. Bank in the Guaranties. Given the plain meaning of the word "use" and even accepting one of U.S. Bank's own definitions of "use" as to "avail oneself of," *see* U.S. Bank Motion at 4, the court finds that even if all U.S. Bank did was acquire a *right* to set off—and did not actually seek to enforce that right—it "used," or availed itself, of the 1845 Account when it entered into the Guaranties with Peregrine, both of which enabled U.S. Bank to collect interest on the associated Loans.

The court notes that this is not a case "when a statute's plain text produces a result 'demonstrably at odds with the intentions of its drafters, [in which case] those intentions must be controlling.'" *Owner-Operator Indep. Drivers Ass'n*, 556 F.3d at 693 (quoting *Griffin*, 458 U.S. at 571). Congress's purpose in adding subsection (b) was to ensure that depositories did not offset the debts of FCMs with customer accounts or misappropriate customer funds in any way. *See* S. Rep. No. 90-947 (1968), *reprinted in* U.S.C.C.A.N. 1673, 1679. If U.S. Bank used the 1845 Account as security on the Loans, there was a risk that U.S. Bank would encumber the customer funds and use them to offset Peregrine's debts. Eliminating this risk is precisely the result Congress was trying to achieve. *See id.*

Although not entitled to *Chevron* deference, *see Christensen v. Harris Cnty.*, 529 U.S. 576, 578 (2000), agency interpretation also supports this reading of "use," emphasizing the importance of customer funds not being restricted in any way. *See* CFTC Interpretative Letter No. 79-1, CFTC Summary Judgment Appendix ("CFTC Summary Judgment App'x") (docket no. 77-2) at 3 ("[I]t is clear that under Section 4d(2) a bank may not use customers' funds to set-off any liability of the futures commission merchant. For example, a bank may not use customers' funds as security for a loan to the futures commission merchant or subject the funds to any right, charge, security interest, lien or claim of any kind in favor of the bank . . . ."); *see also* CFTC Interpretation No. 10, CFTC Summary Judgment App'x at 28 ("[I]t has always been . . . [CFTC]'s position that customer funds deposited in a bank cannot be restricted in any way, that such funds be held for the benefit of customers and must be available to the customer and the FCM immediately upon demand."). Accordingly, the court shall deny the U.S. Bank Motion to the extent it requests that the court grant summary judgment on Count 1 based on U.S. Bank's contention that it did not actually use the customer funds in the 1845 Account to set off Peregrine's obligations under the Loans.[7]

### 3. Did U.S. Bank improperly use the customer funds in the 1845 Account to inform its decision on whether to issue the Loans?

Even if a jury were to find that the Guaranties did not grant U.S. Bank a security interest in the 1845 Account, CFTC contends that U.S. Bank violated the Act and the Regulations if it considered the customer funds in the 1845 Account when deciding whether to issue the Loans.

---

[7] The court finds that it is unnecessary to determine whether U.S. Bank "used" the customer funds in the 1845 Account by allegedly attempting to set off the outstanding debt on the Loans with the customer funds in the 1845 Account in the bankruptcy proceedings. There is no need to do so because the court has determined, as a matter of law, that if a jury finds that the 1845 Account was subject to the Guaranties, U.S. Bank "used" the customer funds in the 1845 Account unlawfully merely by acquiring a right to set off.

34

### a.  Parties' arguments

CFTC argues that "Peregrine's customer segregated funds, including the 1845 Account, were improperly used by U.S. Bank in deciding to issue, modify, and/or extend the [Construction Loan and Wasendorf Loan]." CFTC Brief in Support of the Motion at 17. CFTC claims that when determining whether to approve the Loans, U.S. Bank loan officers relied on "[s]ix[-]month average balances of Peregrine's depository accounts held at U.S. Bank, including the 1845 Account," which were listed on the SCDs. *Id.* For example, CFTC argues that the funds in the 1845 Account were considered "assets" of Peregrine and that the "metric 'return on assets' included customer segregated funds in the denominator." *Id.* at 17-18.

U.S. Bank argues that the Act "does not prohibit a lending institution from merely noting the existence of accounts containing customer segregated funds in the process of deciding whether to make a loan." U.S. Bank Brief in Support of the Resistance at 13. U.S. Bank contends that "[t]here is no reasonable construction of 'hold' or 'use' that includes 'consider' or 'describe,' and there is simply no legal or practical basis for imposing such a restriction upon banks." *Id.* And, even if banks are prohibited from considering customer funds in determining whether to issue a loan, U.S. Bank argues that "the undisputed facts demonstrate that U.S. Bank did not do so here." *Id.*

### b.  Applicable law and application

The court has discussed the applicable law pertaining to the meaning of "use" above and, accordingly, will not discuss it further.

The court finds that even if U.S. Bank considered the customer funds in the 1845 Account in making its decision to issue the Loans, such consideration does not violate the Acts or the Regulations. The purpose of the Act and the Regulations is to ensure that customer funds are not used to set off the debts of FCMs with customer accounts or misappropriated in any way. Merely considering the fact that these customer funds existed

when deciding whether to issue the Loans does not mean that U.S. Bank "used" these funds in the way that it did if the jury finds that Peregrine granted U.S. Bank a security interest in the 1845 Account. In fact, aside from the potential security interest discussed above, U.S. Bank had no more interest in the customer funds in the 1845 Account prior to issuing the Loans than they did after issuing the Loans. Again, this is unlike granting a security interest in the customer funds, which could restrict the funds, potentially in a volatile market, while the parties litigate whether the previously granted security interest is valid. Moreover, an interpretation of "use" that would prohibit a bank from considering the funds in a customer segregated account would effectively prevent an FCM from guaranteeing a loan, or, at the very least, expose banks to an inordinate amount of liability. Certainly a bank should be entitled to, for example, look at the five-year history of customer deposits of an FCM to determine whether the FCM is a growing or declining business, and this is no way restricts the customer funds. Accordingly, the court shall grant U.S. Bank's Motion to the extent it argues that it did not improperly "use" the customer funds, thereby violating the Act and the Regulations, by considering them when deciding whether to issue the Loans.

### 4. Summary

With respect to Count 1, the only issue for trial is whether the 2008 Guaranty and 2011 Guaranty granted U.S. Bank a security interest in the 1845 Account. If so, U.S. Bank violated the Act and the Regulations with respect to Count 1. If not, U.S. Bank did not violate the Act and the Regulations with respect to Count 1.

### C. Improper Holding of Customer Funds

In the CFTC Motion, CFTC argues that U.S. Bank improperly held the customer funds in the 1845 Account by "allow[ing] and facilitat[ing] Wasendorf's withdrawals of at least $35,665,995.40 from the 1845 Account for purposes that U.S. Bank knew or

36

should have known were not for the benefit of Peregrine's customers." CFTC Brief in Support of the Motion at 21.

U.S. Bank argues that the Act and the Regulations, "when applied to banks, merely prohibit[] banks from using customer funds to offset FCM liabilities to the banks or otherwise actually misappropriating the customer funds in some way—actions taken by the bank for its own benefit." U.S. Bank Brief in Support of the Motion (docket no. 93-1) at 28. U.S. Bank claims that it "did none of these things and thus did not violate the Act." *Id.*

The threshold issue in determining whether U.S. Bank improperly held the customer funds in the 1845 Account by allowing Wasendorf to withdraw money from the 1845 Account for purposes not for the benefit of Peregrine's customers is determining whether depositories have a duty to assure that customer funds, while in their possession, are not misappropriated by an FCM.

### 1. *Duty*

#### a. *Parties' arguments*

CFTC argues that "[a] bank is liable for violating Section 4d(b) and Regulation 1.20(a) if it knew or should have known of the misappropriation or intended misappropriation of customer funds." CFTC Brief in Support of the Motion at 18-19. CFTC relies on the principles of trust law in support of its position on the appropriate standard of care.

U.S. Bank contends that it did nothing prohibited by the Act in allowing Wasendorf to transfer money out of the 1845 Account, because it was not for its own benefit.[8] U.S.

---

[8] The court addressed this argument in a prior order. *See* November 5, 2013 Order (docket no. 18) at 25-26. It is undisputed that many of Peregrine's customers deposited their money into the 1845 Account at U.S. Bank and, therefore, U.S. Bank, pursuant to the plain language of 7 U.S.C. § 6d(b), was required to hold this money as belonging only

(continued…)

Bank further argues that even if the court accepts CFTC's position that U.S. Bank's duties are analogous to those of fiduciaries in trust law, it did not have actual knowledge of the impropriety of the withdrawals or otherwise act in bad faith. U.S. Bank contends that there is no support for holding a depository liable for facilitating impermissible withdrawals based on negligence principles.

### b. Applicable law

As discussed above, 7 U.S.C. § 6d(b) makes it "unlawful for . . . any depository . . . that has received any money, securities, or property for deposit in a separate account . . . to hold . . . such money, securities, or property as belonging to the depositing futures commission merchant or any person other than the customers of such futures commission merchant." 7 U.S.C. § 6d(b); *see also* 17 C.F.R. § 1.20(a) ("No person, including any . . . depository, that has received futures customer funds for deposit in a segregated account, as provided in this section, may hold . . . such funds as belonging to any person other than the futures customers of the futures commission merchant which deposited such funds."). The plain language of the Act and the Regulations contains no reference to the standard of care a depository must exercise in meeting its duties and, therefore, a depository's duties are ambiguous with respect to holding funds for the customer's benefit.

When the legislature has left an ambiguity in the statute, the statutory ambiguity should be resolved by the administrative agency rather than the courts. *City of Arlington, Tex.*, 133 S. Ct. at 1868 (citing *Chevron*, 467 U.S. 837); *see also Christensen*, 529 U.S. at 586-87 ("In *Chevron*, we held that a court must give effect to an agency's regulation containing a reasonable interpretation of an ambiguous statute."). However, when the

---

[8](…continued)
to such customers; it was not allowed to permit an FCM or Wasendorf to use the customer's money for any purpose other than the benefit of the customers. However, in exercising this authority, the question is the extent of U.S. Bank's duty to assure that these funds were not misappropriated for the benefit of someone other than the customers.

agency's decision is "not one arrived at after, for example, a formal adjudication or notice-and-comment rulemaking," but is rather an interpretation made in an opinion letter, "*Chevron*-style deference" is not warranted. *See Christensen*, 529 U.S. at 587. "Instead, interpretations contained in formats such as opinion letters are 'entitled to respect' under . . . *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), but only to the extent that those interpretations have the 'power to persuade.'" *See id.* (quoting *Skidmore*, 323 U.S. at 140) (parallel citation omitted). Interpretative letters and other similar matters "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend on the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *Skidmore*, 323 U.S. at 140.

### c.    *Application*

Interpretative Letter 79-1 is a letter on the CFTC's "views on the responsibility of banks as depositories for customers' segregated funds under [the Act]." Interpretative Letter 79-1, Comm. Fut. L. Rep. (CCH) ¶ 20,835 (May 29, 1979). The letter discusses the provisions of the Act, the legislative intent behind the provisions and the Regulations, and it comes to conclusions regarding depositories' duties with respect to an FCM's withdrawal of customer funds. The court finds that, given the systematic way in which the letter addresses the issue of a depository's duty to "assure that customer's funds are not misappropriated by futures commission merchants," it has the "power to persuade." *See* Interpretative Letter 79-1; *Skidmore*, 323 U.S. at 140. In pertinent part, the letter states the following:

> [I]t is clear that . . . a bank may not use customers' funds to set-off any liability of the futures commission merchant. For example, a bank may not use customer funds as security for a loan to the futures commission merchant or subject the funds

39

> to any right, charge, security interest, lien or claim of any kind in favor of the bank or any person claiming through the bank.
> . . . .
> There is no case law discussing whether a bank has authority to assure that customers' funds are not misappropriated by futures commission merchants. However, in our view, if a bank, with prior notice, permits or acquiesces in the withdraw or use of customers' funds by a futures commission merchant for an unlawful purpose, the bank would violate or be aiding and abetting a violation of the Act. Although the scope of the bank's responsibility in circumstances of less than actual notice appears less clear, we believe it is certainly no less than when dealing with other trust accounts.

Interpretative Letter 79-1. Thus, as the letter states, unlike using customer funds as security for a loan to an FCM, which is strictly prohibited under the Act, the question of a depository's duty to assure that customer funds are not misappropriated by the FCM is governed by some standard of care less than strict liability. Although the Act and the Regulations do not discern a different standard of care for *using* customer funds and *holding* customer funds, the court finds that a different standard of care is appropriate, at least in the context of the factual circumstances in this case. Accepting a security interest in a customer segregated account necessarily implicates taking a security interest in customer funds,[9] which is prohibited by the Act, Regulations and agency interpretation. In contrast, allowing an FCM to make withdrawals from a customer segregated account does not necessarily involve any wrongdoing, because the funds may actually be Regulation 1.23 excess funds. Therefore, a depository is not liable for such withdrawals and resulting misappropriations merely by allowing the withdrawals; something more is needed. Interpretative Letter 79-1 indicates that a bank violates the Act if it knows an FCM is withdrawing customer funds for an unlawful purpose and allows it do so anyway.

---

[9] U.S. Bank does not dispute that there were customer funds in the 1845 Account.

In the absence of knowledge, Interpretative Letter 79-1 says that a bank's responsibility "is certainly no less than when dealing with other trust accounts." Interpretative Letter 79-1. Because customer segregated accounts are functionally similar to trust accounts, the court accepts Interpretative Letter 79-1's articulation of a bank's duty with respect to customer segregated accounts as being akin to a bank's duty with respect to other trust accounts. The court now turns to address what a bank's duty is with respect to trust accounts held at such bank.

### 2.    *Trust accounts*

Having determined that trust law governs a bank's duty to monitor an FCM's withdrawals from a customer segregated account, the court must now determine what a bank's duties are with respect to other trust accounts. As an initial matter, the court agrees with the parties that because the Act and the Regulations are matters of federal law, "courts should interpret it uniformly and impose the same obligations in all jurisdictions." U.S. Bank Reply at 11; *see also* CFTC Resistance at 9 ("The CFTC brought this case in [the United States District Court for the Northern District of Iowa] under the federal Commodity Exchange Act alleging U.S. Bank's violations of federal law—the Act and Regulations. Consequently, state banking laws, especially those of other jurisdictions, do not apply."). Nonetheless, because Interpretative Letter 79-1 persuades the court that trust law should determine a bank's duties under the Act in monitoring customer funds, the court is required to examine trust law from various jurisdictions to determine the prevailing view of a bank's responsibilities to monitor fiduciary accounts and, accordingly, the standard of care that a bank must meet under the Act and the Regulations.

### a.    *Parties' arguments*

CFTC argues that principles of trust law dictate that if a bank knows or should have known that a fiduciary—i.e., Peregrine, or Wasendorf as its agent—is misappropriating funds in a fiduciary account, the bank is under a duty to investigate the misappropriation,

prevent it and is liable for losses caused after it had notice of the misappropriation. *See* CFTC Brief in Support of the Motion at 11-12. CFTC primarily relies on *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273 (2d Cir. 2006), in support of its position.

U.S. Bank contends that "[n]umerous courts have declined to follow *Lerner* and its interpretation of New York law because it deviates from 'the universal rule in this country' that, absent facts that would support the sole inference of misappropriation, a bank 'owes third parties no duty of care to monitor a customer's activities.'" U.S. Bank Brief in Support of the Resistance at 17 (quoting *Fremont Reorganizing Corp. v. Duke*, 811 F. Supp. 2d 1323, 1344-45 (E.D. Mich. 2011)). U.S. Bank argues that to the extent that CFTC argues that *Lerner* supports a negligence standard, "[s]ome courts have . . . concluded that *Lerner* stands for the proposition that a reasonably prudent person will not suspect misappropriation unless the circumstances compel the sole inference that misappropriation is intended." *Id.* at 18. U.S. Bank contends that "[t]o interpret and apply *Lerner* any other way would contravene the well-established rule in this country that a showing of bad faith is required to impose liability on banks for misappropriations of their fiduciary-customers." *Id.* In summary, U.S. Bank argues that "trust law principles dictate that U.S. Bank owed no duty to monitor transactions from the 1845 Account absent either actual knowledge of Wasendorf's wrongdoing or the presence of circumstances that give rise to the sole inference that Wasendorf was misappropriating customer funds." *Id.* at 18-19.

### b. *Applicable law*

The first issue in determining a bank's duty under the Act, in accordance with trust law, is determining what trust law to apply. Interpretative Letter 79-1 merely states that a bank's duty "is certainly no less than when dealing with other trust accounts." Interpretative Letter 79-1. Based on the context of Interpretative Letter 79-1, including that it mentions that an FCM "must put a bank on notice as to the nature of customers'

42

accounts," it appears that CFTC, when it wrote the letter, believed this duty existed based on the nature of the account itself. In other words, like other trust accounts, the bank has notice that a customer segregated account is a special type of account, which imposes upon the bank the same duties as it has with respect to other trust accounts.

The court begins its analysis by examining *Lerner*, which is the only case upon which CFTC relies for its assertion that banks are subject to a negligence standard in monitoring the potentially unlawful transactions of a customer-fiduciary.

In *Lerner*, the Second Circuit Court of Appeals applied New York law to determine whether a depository bank has a duty to monitor fiduciary accounts held at such bank to safeguard the funds from fiduciary misappropriation. *Lerner*, 459 F.3d at 287. The *Lerner* court noted that "[a]s a general matter, 'a depositary bank has no duty to monitor fiduciary accounts maintained at its branches in order to safeguard funds in those accounts from fiduciary misappropriation.'" *Id.* (quoting *Norwest Mortg., Inc. v. Dime Sav. Bank of N.Y.*, 721 N.Y.S.2d 94, 95 (N.Y. App. 2001)). Consequently, "[t]he bank has the right to presume that the fiduciary will apply the funds to their proper purpose under the trust." *Id.* (quoting *Bischoff* ex rel. *Schneider v. Yorkville Bank*, 112 N.E. 759, 760 (N.Y. 1916)) (internal quotation marks omitted).

However, the *Lerner* court noted that "a bank may be liable for participation in [such a] diversion either by itself acquiring a benefit, or by notice or knowledge that a diversion is intended or being executed." *Id.* (alteration in original) (quoting *In re Knox*, 477 N.E.2d 448, 451 (N.Y. 1985)) (internal quotation marks omitted). "Adequate notice may come from circumstances which reasonably support the sole inference that a misappropriation is intended, as well as directly." *Id.* (quoting *Bischoff*, 112 N.E. at 761) (internal quotation marks omitted). If a bank has such notice, it is "under the duty to make reasonable inquiry and endeavor to prevent a diversion." *Id.* at 288 (quoting *Bischoff*, 112 N.E. at 761) (internal quotation marks omitted); *see also Norwest Mortg., Inc.*, 721

43

N.Y.S.2d at 95 ("Facts sufficient to cause a reasonably prudent person to suspect that trust funds are being misappropriated will trigger a duty of inquiry on the part of a depositary bank, and the bank's failure to conduct a reasonable inquiry when the obligation arises will result in the bank being charged with such knowledge as inquiry would have disclosed.").

*Lerner*, however, does not appear to be the majority position. At common law, banks that held money in trust were required to exercise "the highest degree of vigilance in the detection of a fiduciary's wrongdoing." *In re Lauer*, 371 F.3d 406, 414 (8th Cir. 2004) (quoting *Trenton Trust Co. v. W. Sur. Co.*, 599 S.W.2d 481, 490 (Mo. 1980) (en banc), *superseded by statute as stated in Chouteau Auto Mart, Inc. v. First Bank of Mo.*, 55 S.W.3d 358 (Mo. 2001)). However, in 1922, the National Conference of Commissioners on Uniform State Laws adopted the Uniform Fiduciaries Act ("UFA"), which was "designed to facilitate commercial transactions . . . by relaxing some of the harsher rules." *Id.* (quoting *Trenton Trust Co.*, 599 S.W.2d at 490). Section 7 of the UFA states the following:

> If a deposit is made in a bank to the credit of a fiduciary as such,[10] the bank is authorized to pay the amount of the deposit or any part thereof upon the check of the fiduciary, signed with the name in which such deposit is entered, without being liable to the principal, unless the bank pays the check with

---

[10] *See* Marion W. Benfield, Jr. & Peter A. Alces, 42 Ala. L. Rev. 475, 485 (1991) ("In order to accommodate the more expeditious execution of the affairs of its beneficiary, a fiduciary may open a bank account, with the blessing and often at the direction of its beneficiary, into which items, payable to the fiduciary for the benefit of the beneficiary, may be deposited for collection. The fiduciary will likely have signatory authority over the account, and will therefore be able to make disbursements from the account in a manner consistent with the interests of its beneficiary. To facilitate operation of the account, it will likely be opened in the name of the 'fiduciary as such' (that is, by actually identifying the fiduciary's representative capacity on the account itself). Thereafter, items for deposit into such an account would be made payable to the 'fiduciary as such.'"). This is precisely the situation occurring in this case.

actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary in drawing the check or with knowledge of such facts that its action in paying the check amounts to bad faith.  If, however, such a check is payable to the drawee bank and is delivered to it in payment of or as security for a personal debt of the fiduciary to it, the bank is liable to the principal if the fiduciary in fact commits a breach of his obligation as fiduciary in drawing or delivering the check.

UFA § 7 (1922) (footnote added).  Notably, this section proposes a dichotomy in which banks may draw a check of the fiduciary out of the fiduciary account to another customer (e.g., to Connie Wasendorf) so long as the bank does not have "actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary . . . or with knowledge of such facts that its action in paying the check amounts to bad faith." UFA § 7.  However, if "such a check is payable to the drawee bank (i.e., U.S. Bank) and is delivered to it in payment of or as security for a personal debt of the fiduciary to it (i.e., the Loans), the bank is liable to the principal (i.e., Peregrine's customers) if the fiduciary in fact commits a breach of his obligation as fiduciary in drawing or delivering the check." UFA § 7.  Thus, under the UFA, knowledge of misappropriation or knowledge of such facts as amounting to bad faith is required to hold a bank liable to the customers in most situations, but when the fiduciary is using the funds to satisfy its debt to the bank, the bank is liable to the customers if, in fact, the fiduciary breached its fiduciary obligations, regardless of whether the bank knew the fiduciary was breaching its fiduciary obligations.

At least twenty-four states, the District of Columbia and the Virgin Islands have adopted some form of the UFA.  *See* Uniform Business and Financial Laws Locator, Legal Information Institute, http://www.law.cornell.edu/uniform/vol7#fiduc (last visited Nov. 9, 2014); Peter T. Wendel, *The Evolution of the Law of Trustee's Powers and Third Party Liability for Participating in Breach of Trust: An Economic Analysis*, 35 Seton Hall L. Rev. 971, 1018 (2005).  Many of these states have adopted the language of this particular

45

section of the UFA verbatim. *See, e.g.*, Ala. Code § 19-1-7 (2014); Ariz. Rev. Stat. Ann. § 14-7506 (2014); Colo. Rev. Stat. § 15-1-109 (2014); Minn. Stat. § 520.07 (2014). Others have adopted the language of this particular section with minor variations. *See, e.g.*, Ohio Rev. Code Ann. § 5815.06.

Courts in states that have not explicitly adopted the UFA have interpreted their state's law to repudiate the negligence standard discussed in *Lerner*. *See, e.g.*, *Old Republic Nat'l Title Ins. Co. v. Landmark Closing Co.*, No. 4:09CV00422 JLH, 2010 WL 2228436, at *3 (E.D. Ark. June 1, 2011) ("[Plaintiff] suggests that this Court could adopt the 'reasonably prudent person' standard mentioned in *Lerner*, but . . . under Arkansas law, a bank does not owe noncustomers a duty to exercise reasonable care."); *Fremont Reorganizing Corp.*, 811 F. Supp. 2d at 1345) ("Michigan law, in accord with the universal rule in this country, holds that a bank's relationship is with its customers and that the bank owes third parties no duty of care to monitor a customer's activities." (quoting *El Camino Res., Ltd. v. Huntington Nat'l Bank*, 722 F. Supp. 2d 875, 907 (W.D. Mich. 2010)) (internal quotation marks omitted)).

The court finds, given that the UFA has been adopted in the majority of jurisdictions and the court is not aware of any jurisdiction other than New York in which a negligence standard applies, the UFA establishes a bank's duties to monitor trust accounts. CFTC is "charged by Congress with the administration and enforcement of the Act and the Regulations," Complaint ¶ 7; Amended Answer ¶ 7, and 7 U.S.C. § 6d(b) makes it "unlawful for . . . any depository . . . that has received any money, securities, or property for deposit in a separate account . . . to hold . . . any such money, securities, or property as belonging to the depositing futures commission merchant or any person other than the customers of such futures commission merchant." 7 U.S.C. § 6d(b). In determining whether U.S. Bank unlawfully held the funds, the court looks to the UFA for the scope of U.S. Bank's duties, as discussed above. Therefore, if U.S. Bank acted in a

manner that would make it liable to Peregrine's customers under the UFA, which is akin to "hold[ing] . . . money, securities, or property as belonging to . . . any person other than the customers of such futures commission merchant," then, pursuant to 7 U.S.C. § 6d(b), CFTC may use its enforcement powers to remedy U.S. Bank's violation. Accordingly, the question in determining whether U.S. Bank violated the Act and the Regulations by allowing Wasendorf to withdraw funds from the 1845 Account is whether U.S. Bank violated the UFA.

### c. *Application*

Wasendorf's withdrawals from the 1845 Account can be characterized as two different types: (1) those transferred to U.S. Bank for the Loans or as fees for other accounts; and (2) those transferred to other individuals or entities, such as Connie Wasendorf and Wasendorf Construction.

### (1) *Transfers to U.S. Bank*

As the UFA states, "[i]f . . . such a check is payable to the drawee bank and is delivered to it in payment of or as security for a personal debt of the fiduciary to it, the bank is liable to the principal if the fiduciary in fact commits a breach of his obligation as fiduciary in drawing or delivering the check." UFA § 7. So, if Wasendorf transferred[11] money directly from the 1845 Account as payment for his personal debt (i.e., the Loans), and such transfer was a breach of fiduciary duty, a violation of the UFA would occur. However, in this case, Wasendorf apparently did not transfer the funds from the 1845 Account directly to U.S. Bank. Rather, the funds first went through an intermediary—the Wasendorf Construction account. Accordingly, this provision of the UFA is not applicable and U.S. Bank is not liable merely for accepting funds resulting from Wasendorf's breach of a fiduciary duty. *See Johnson v. Citizens Nat. Bank of Decatur*, 334 N.E.2d 295, 299

---

[11] "Wire transfers are treated the same as checks under the UFA." *Nations Title Ins. of N.Y., Inc. v. Bertram*, 746 N.E.2d 1145, 1150 (Ohio Ct. App. 2000).

(Ill. App. Ct. 1975) (applying Illinois's version of the UFA, which is borrowed from the UFA, and determining that the bank was not liable because it "did not receive payment in the form of the draft drawn directly on the principal's account, but as a check drawn on [another] account").  However, as discussed below, U.S. Bank may be liable for accepting this money if it acted with knowledge that Wasendorf was breaching his fiduciary duty or otherwise acted in bad faith.

Other transfers at issue are fees that were paid out of the 1845 Account for services on other accounts that Wasendorf controlled.  If one of these other accounts incurred a fee, the fee amount was automatically debited from the 1845 Account.  For example, Peregrine's "house account" incurred some of these fees.  *See* Rita Stanley Deposition, CFTC Fact App'x at 366-67.  UFA § 7 makes clear that if "a check is payable to the drawee bank and is delivered to it in payment of or as security for a personal debt of the fiduciary to it, the bank is liable to the principal if the fiduciary in fact commits a breach of his obligation as fiduciary in drawing or delivering the check."  UFA § 7.  It is also clear that whether the fiduciary is considered Peregrine, or Wasendorf as Peregrine's agent, the fiduciary "delivered . . . payment" to U.S. Bank.  *See id.*  With regard to whether the fees are a "personal debt of the fiduciary," the court does not find that there is any functional difference between a bank fee for service that is automatically deducted from a fiduciary account and money taken out of the fiduciary account to, for example, repay a loan.  In each case, the bank is owed money from the fiduciary and the fiduciary pays the money owed, i.e., its debt, from the fiduciary account.  Having found that a bank fee constitutes a "personal debt of the fiduciary" and that U.S. Bank accepted this money, U.S. Bank is responsible for this diversion if "the fiduciary in fact commits a breach of his obligation as fiduciary in drawing or delivering the check."  UFA § 7.

With respect to whether Peregrine, or Wasendorf as Peregrine's agent, breached its fiduciary duty in using funds from the 1845 Account to pay bank fees for the "house

48

account," among other accounts, the record is unclear. Even if the court were to accept CFTC's assertion that during the Relevant Period there were no excess funds in the 1845 Account, *see* CFTC Brief in Support of the Motion at 25,[12] which suggests that Peregrine used customer funds to pay bank fees for other accounts in violation of 7 U.S.C. § 6d(a) ("[An FCM] shall . . . treat and deal with all money, securities, and property received by such [FCM] to margin, guarantee, or secure the trades or contracts of any customer of such [FCM], or accruing to such customer as the result of such trades or contracts, as belonging to such customer."), the issue is further complicated. The 1845 Account was not Peregrine's only customer segregated account. Peregrine also had a customer segregated account at JPMorgan Chase, account number 5330355265 ("JPMorgan Account"). *See* Kleinrichert Expert Report, U.S. Bank Summary Judgment App'x at 332; *see also* Wasendorf Deposition, U.S. Bank Summary Judgment App'x at 294 (noting that withdrawals were made from the JPMorgan Account to the 1845 Account); McCormack Declaration, CFTC Fact App'x at 95 (noting that $94,000,000 was transferred into the 1845 Account from a customer segregated account at JPMorgan. An FCM may transfer funds between its different customer segregated accounts, *see* Kleinrichert Expert Report at 333,[13] and so as long as Peregrine had sufficient customer funds in the balance of the

---

[12] The court is unable to determine how CFTC arrived at this determination, but U.S. Bank agrees that there were no excess funds. U.S. Bank Response to Statement of Material Facts (docket no. 93-2) at 15-16. The report of CFTC's own employee, Joy McCormack, stated that 94.5% of the total deposits in the Relevant Period came from Peregrine customers, McCormack Declaration, CFTC Fact App'x at 95, and she later indicates that there was $6,522,066.19 in non-Peregrine related deposits in the 1845 Account, including $602,932 from Wasendorf himself, *id.* at 148.

[13] CFTC has not refuted U.S. Bank's statement, based on Kleinrichert's expert report, that "assuming [Peregrine] maintained a sufficient aggregate balance across all of its customer segregated accounts at other financial institutions, [Peregrine] could at any time have lawfully drawn the 1845 Account to zero." U.S. Bank Brief in Support of the
(continued...)

customer segregated accounts at U.S. Bank and JPMorgan, or any other customer segregated account, Wasendorf may not have been breaching a fiduciary duty by paying bank fees unrelated to the 1845 Account from funds out of the 1845 Account. That is, when considering the JPMorgan Account together with the 1845 Account, the fees withdrawn from the 1845 Account may have been excess funds. Based on the record before the court, there is a genuine issue of material fact on whether the JPMorgan Account, or another customer segregated account, had sufficient excess funds to cover the bank fees for Peregrine and Wasendorf's other accounts. Or, stated differently, there is a genuine issue of material fact on whether the aggregate balance of all customer

---

[13](...continued)

Motion at 17. CFTC's expert, Andrea Corcoran, does not opine on whether funds in customer segregated accounts in different depositories are fungible. *See* Andrea Corcoran Expert Report, CFTC Summary Judgment Appendix ("CFTC Summary Judgment App'x") (docket no. 77-2) at 49. Moreover, the court's own research has led it to the conclusion that funds in customer segregated accounts at different depositories are fungible. Form 1-FR, which is the form that FCMs must send to the CFTC on a monthly basis, requires certain declarations. For example, it requires the FCM to indicate the "funds in segregation for customers trading on U.S. commodity exchanges." 17 C.F.R. § 1.10. Nowhere, to this court's knowledge, do the Regulations require FCMs to report the amount of customers' funds held in each depository. Likewise, the Regulations do not indicate that an FCM needs to file a separate Form 1-FR for each depository that holds customer segregated accounts. In CFTC's instructions on how to properly fill out a Form 1-FR, there is no indication that FCMs need to indicate how much of their customers' money is in each particular depository at which the FCM has a customer segregated account. *See* Form 1-FR-FCM Instructions, CFTC (March 2010), *available at* http://www.cftc.gov/ucm/groups/public/@iointermediaries/documents/file/1fr-fcminstr uctions.pdf. Rather, it seems that CFTC's intention in requiring the Form 1-FRs is to ensure that, in the aggregate, the FCM has enough customer funds in their customer segregated accounts. The next logical conclusion is that funds in customer segregated accounts are entirely fungible, even between different depositories. If it were important for CFTC to ensure that each specific depository had sufficient customer funds on hand, it would seemingly require this in the Form 1-FR or require the FCM to provide multiple Form 1-FRs, one for each depository, neither of which the Regulations do.

segregated accounts was sufficient to cover the customer funds even after fees were paid. Accordingly, at least with respect to whether U.S. Bank improperly held the 1845 Account by allowing Peregrine to transfer money from the 1845 Account for bank fees not for the benefit of Peregrine's customers, the U.S. Bank Motion and the CFTC Motion shall be denied.

### (2)    *Transfers to other entities*

As discussed above, the transfers from the 1845 Account to other individuals or entities and withdrawals not for the benefit of Peregrine's customers are analyzed under the UFA's knowledge or bad faith standard.  That is, U.S. Bank is liable if it facilitates a transfer or withdrawal from the 1845 Account "with actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary" or with "knowledge of such facts that its action in [facilitating the transaction] amounts to bad faith."  UFA § 7.

### (a)    *Knowledge*

#### i.    *Parties' arguments*

CFTC argues that U.S. Bank facilitated "[n]umerous illegal withdrawals and transfers . . . that U.S. Bank knew . . . were not for the benefit of Peregrine's customers based on its employees discussions with Wasendorf, experience with Wasendorf's entities with U.S. Bank accounts, and review of Wasendorf's financial statements."  CFTC Brief in Support of the Motion at 21.  CFTC also points out that in September 2008, "U.S. Bank requested and received a financial statement from Peregrine dated August 31, 2004 in connection with its preparation of the loan documents that contained a line entry for [the 1845 Account] with a corresponding balance of $90,135,225" despite "the balance . . . never exceed[ing] $54 million."  *Id.* at 22.[14]  Additionally, CFTC contends that "U.S.

---

[14] There is no support in the record for the this assertion.  Although the McCormack Declaration makes clear that the 1845 Account never had a balance exceeding $54 million
(continued...)

Bank inexplicably complied with Wasendorf's mandate that all communications regarding the 1845 Account should be directed to and made with him, that no bank balance confirmations should be done on the 1845 Account, and that only Timmerman and . . . Boe should respond to inquiries regarding the 1845 Account." *Id.* Moreover, CFTC asserts that in May 2011, "Timmerman completed a bank balance confirmation form [that] she received from the [NFA] for the 1845 Account that incorrectly contained a Wasendorf-controlled post office box as U.S. Bank's Cedar Falls branch address," yet no one "questioned Wasendorf or anyone else about it." *Id.* at 23.

U.S. Bank argues that "[t]he undisputed material facts demonstrate that U.S. Bank did not have actual knowledge of Wasendorf's wrongdoing." U.S. Bank Brief in Support of the Resistance at 19. U.S. Bank notes that "[n]o person at U.S. Bank had any idea Wasendorf was misappropriating customer funds" and that Wasendorf did not "believe[] anyone at U.S. Bank was aware of his criminal activity." *Id.*

### ii. *Applicable law and application*

Although a close call, when viewing the evidence in the record in the light most favorable to CFTC, a reasonable jury could find that U.S. Bank had actual knowledge that Wasendorf was "committing a breach of his obligation as fiduciary." UFA § 7. Although U.S. Bank claims that none of its employees had actual knowledge of Wasendorf's fraud and notes that Wasendorf himself stated that he did not "believe[] anyone at U.S. Bank was aware of his criminal activity," U.S. Bank Brief in Support of the Resistance at 19, given the facts of this case as detailed in the following subsection, the court shall allow the

---

[14](...continued)
during the Relevant Period, it does not indicate what the balance was in August 2004—the date of the financial statements. *See* McCormack Declaration, CFTC Fact App'x at 93 (noting that during the Relevant Period the 1845 Account never exceeded $54 million); Peregrine Statement of Financial Condition, CFTC Fact App'x at 589 (noting the 1845 Account held $90,135,226.26 in August 2004).

52

jury to determine if and when U.S. Bank had actual knowledge that Wasendorf was "committing a breach of his obligation as fiduciary." UFA § 7. Accordingly, to the extent U.S. Bank argues that the court should grant summary judgment in its favor with respect to whether it violated Section 4d(b) of the Act and Regulation 1.20 by facilitating transactions out of the 1845 Account with actual knowledge that doing so was a breach of Wasendorf's fiduciary duty, the court shall deny the U.S. Bank Motion. The court shall also deny the CFTC Motion, because a reasonable jury could find that U.S. Bank did not facilitate transactions out of the 1845 Account with actual knowledge that doing so was a breach of Wasendorf's fiduciary duty.

### (b)      Bad faith

#### i.      Parties' arguments

U.S. Bank argues that it "can be held to have acted in 'bad faith' only if it 'suspected the fiduciary was acting improperly and 'deliberately refrained from investigating' so that the bank could avoid knowledge of the activity.'" U.S. Bank Brief in Support of the Resistance at 16-17 (quoting *Time Savers, Inc. v. LaSalle Bank, N.A.*, 863 N.E.2d 1156, 1165 (Ill. App. Ct. 2007)) (internal quotation marks omitted). U.S. Bank contends that "mere suspicious circumstances" are not sufficient for the bank to have acted in bad faith by failing to investigate. *Id.* (quoting *Crawford Supply Grp., Inc. v. LaSalle Bank, N.A.*, 2010 WL 320299, at *7 (N.D. Ill. Jan. 21, 2010)) (internal quotation marks omitted). U.S. Bank also suggests that bad faith can be shown by "the presence of circumstances that give rise to the sole inference that Wasendorf was misappropriating customer funds." *Id.* at 18-19. Under this standard, U.S. Bank contends that it "may properly assume the propriety of the transaction so long as there are 'legitimate reasons why [the fiduciary] might engage in' the practices that are claimed to be suspicious." *Id.* at 19 (alteration in original) (quoting *Johnson*, 334 N.E.2d at 300).

U.S. Bank argues that it could not "have acted in bad faith because it could not have determined whether any of the allegedly unlawful withdrawals from the 1845 Account [were] comprised of customer funds or [Peregrine's] own funds." *Id.* at 21. U.S. Bank states that "[w]hen funds held in trust are commingled with a fiduciary's own funds, the withdrawal of funds from the commingled account can never reasonably support the sole inference that a misappropriation is intended because there will always be a competing inference that the withdrawn funds belong to the fiduciary." *Id.* (internal quotation marks omitted). Moreover, U.S. Bank argues that it "had no knowledge of the deposits and withdrawals that [Peregrine] was making into and out of its customer segregated accounts at its other banks." *Id.* at 23. U.S. Bank also notes that, although it "had received certain Form 1-FRs from [Peregrine] that reported the amount of excess funds held in segregation, [U.S. Bank] would not have known about Wasendorf's wrongdoing even if [it] had reviewed those documents" because such forms "reported that [Peregrine] kept anywhere from $6 million to $20 million of excess funds in its customer segregated accounts." *Id.*

CFTC never frames its argument under a "bad faith" standard. Rather, it contends that U.S. Bank knew or should have known that Wasendorf was misappropriating customer funds. CFTC primarily argues that U.S. Bank acted in bad faith by allowing Wasendorf to transfer funds to persons and entities U.S. Bank knew were not Peregrine's customers. Apart from these transactions, CFTC points to three instances in particular that should have alerted U.S. Bank to Wasendorf's fraud.

The first involves "Wasendorf's mandate that all communications regarding the 1845 Account should be directed to and made with him, that no bank balance confirmations should be done on the 1845 Account, and that only Timmerman and . . . Boe . . . should respond to inquiries regarding the 1845 Account." CFTC Brief in Support of the Motion at 22. The second instance occurred in September 2008, when Peregrine provided a financial statement to U.S. Bank for consideration in connection with the loan

54

documents. A line entry for the 1845 Account listed a balance of $90,135,225, and CFTC claims this should have alerted U.S. Bank to Wasendorf's fraud because "the balance in the 1845 Account never exceeded $54 million." *Id.* at 22.[15] The third instance occurred "in May 2011, when Timmerman completed a bank balance confirmation form she received from the [NFA] for the 1845 Account that incorrectly contained a Wasendorf-controlled post office box as U.S. Bank's Cedar Falls branch address." *Id.* at 23. After Wasendorf learned of the balance confirmation, Timmerman sent him the form that she had received from the NFA, allowing Wasendorf to make a "correction."

In the U.S. Bank Brief in Support of the Resistance, U.S. Bank argues that "other facts, unrelated to the withdrawals themselves, should [not] have triggered an obligation on the part of [U.S. Bank] to investigate Wasendorf." *Id.* at 26. For example, when U.S. Bank reviewed Peregrine's financial records, "[o]ne of [the] 48 line-items related to the 1845 Account . . . listed a balance of approximately $90,000,000." *Id.* U.S. Bank contends that none of its employees reviewed this reference. With regard to Wasendorf's request that U.S. Bank should make all communications regarding the 1845 Account with him, U.S. Bank states that they would have done so anyway. Finally, U.S. Bank claims that even if Timmerman had known about the false address in the balance confirmation request, she would not have necessarily uncovered Wasendorf's fraud.

### ii. *Applicable law*

Section 7 of the UFA states that a bank is not liable for the misappropriation of funds by a fiduciary unless the bank has "actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary in drawing the check or with knowledge of such facts that its action in paying the check amounts to bad faith." UFA § 7. The court now turns to consider whether a reasonable jury could find that U.S. Bank acted in bad faith.

---

[15] As discussed above, this statement appears to be inaccurate.

The UFA does not define "bad faith," but it defines "in good faith" as "[a] thing . . . done . . . honestly, whether it be done negligently or not." *Id.* § 1(2). The Eighth Circuit Court of Appeals, in *Buffets, Inc. v. Leischow*, 732 F.3d 889 (8th Cir. 2013), has discussed the meaning of "bad faith" under Minnesota law, which mirrors the UFA, and the court finds that the Eighth Circuit's reasoning is persuasive. "The UFA is drawn in terms of specific transactions made in violation of certain fiduciary obligations." *Id.* at 899. "The [UFA] provides principals limited protection against a bank's knowing or bad-faith processing of a *specific* transaction that breaches a fiduciary obligation." *Id.* at 900. "Even if the bank knows that fiduciary obligations apply to some funds in the account, [potential misappropriations] may not involve those specific funds, so the bank may not be acting in bad faith in processing any particular transaction." *Id.* at 901. However, "[w]here circumstances suggestive of the fiduciary's breach become sufficiently obvious it is 'bad faith' to remain passive." *Id.* at 902 (quoting *Watson Coatings, Inc. v. Am. Express Travel Related Servs., Inc.*, 436 F.3d 1036, 1041 (8th Cir. 2006) (internal quotation marks omitted) (applying Missouri law)). "In other words, the inquiry is into whether the bank exhibited 'the deliberate desire to evade knowledge because of a belief or fear that inquiry would disclose a vice or defect in the transaction, that is to say, . . . an intentional closing of the eyes or stopping of the ears.'" *Id.* (quoting *Trenton Trust Co.*, 599 S.W.2d at 492).

### iii.     Application

As an initial matter, the court acknowledges that this is an unusual case, which may call for a modified approach to the bad faith standard articulated in *Buffets, Inc.* Although no U.S. Bank employees claims knowledge that the 1845 Account was a customer segregated account and certainly did not treat it as such, the 1992 Acknowledgment Letter, among other things, put U.S. Bank on notice that the 1845 Account was a customer segregated account. Accordingly, when considering whether U.S. Bank acted in bad faith,

56

the inquiry is whether U.S. Bank or its employees acted in bad faith assuming they knew the nature of the 1845 Account during the Relevant Period.

The court finds that there is a genuine issue of material fact on whether U.S. Bank acted with bad faith in facilitating Wasendorf's withdrawals during the Relevant Period.

For example, on December 1, 2008, Wasendorf Construction's account, the 0329 Account, had a balance of $7,109.83. On December 5, 2008, a telephonic transfer of $370,000 was made from the 1845 Account to the 0329 Account. The same day, a check cleared the 0329 Account in the amount of $371,823.96. No other deposits to the 0329 Account were made during that time. The court finds that a reasonable jury could find that the circumstances of this transaction made it "sufficiently obvious," *Buffets, Inc.*, 732 F.3d at 902 (quoting *Watson Coatings, Inc.*, 436 F.3d at 1041) (internal quotation marks omitted) to U.S. Bank and its employees that Wasendorf may be breaching his fiduciary duties, assuming they knew of the nature of the 1845 Account. Also, a reasonable jury could find that U.S. Bank and its employees "exhibited 'the deliberate desire to evade knowledge [of fiduciary misappropriation] because of a belief or fear that inquiry would disclose a vice or defect in the transaction.'" *See id.* (quoting *Trenton Trust Co.*, 599 S.W.2d at 492).

Moreover, the court finds that a reasonable jury could find that U.S. Bank acted in bad faith by facilitating the withdrawals and transfers to entities not for the benefit of Peregrine's customers after May 13, 2011. On May 13, 2011, at the request of Peregrine's compliance officer, who had no knowledge of the fraud, Timmerman sent an e-mail to the NFA confirming the balance of the 1845 Account, which accurately reported the balance as $7,181,336.36. The balance confirmation form Timmerman returned listed the 1845 Account as a "Customer Segregated Account" and listed U.S. Bank's address as P.O. Box 706, the false address that Wasendorf used to intercept mail intended for U.S. Bank. Wasendorf found out about the confirmation—either from the compliance officer

57

or from Timmerman. Wasendorf then told Timmerman that a mistake had been made in the confirmation and requested a copy of the balance confirmation form that she had received from the NFA, which Timmerman provided. The court finds that a reasonable jury could find that Wasendorf's request for a balance confirmation form that listed the 1845 Account as a "Customer Segregated Account," coupled with Wasendorf's prior admonishments not to make any account balance confirmations and the false address on the balance confirmation form, made it "sufficiently obvious," *Buffets, Inc.*, 732 F.3d at 902 (quoting *Watson Coatings, Inc.*, 436 F.3d at 1041) (internal quotation marks omitted) to U.S. Bank, through Timmerman, that Wasendorf was breaching his fiduciary duty such that continuing to facilitate transactions out of the 1845 Account amounted to bad faith. Also, a reasonable jury could find that after May 13, 2011, U.S. Bank, through Timmerman, "exhibited 'the deliberate desire to evade knowledge [of fiduciary misappropriation] because of a belief or fear that inquiry would disclose a vice or defect in the [post-May 13, 2011] transaction[s].'" *See id.* (quoting *Trenton Trust Co.*, 599 S.W.2d at 492).

With regard to other transactions, the court finds that there is a genuine issue of material fact on which transactions, if any, arose to the level of bad faith. A reasonable jury could find for either party on many of these transactions and, accordingly, the court will not invade the province of the jury.

Accordingly, to the extent U.S. Bank argues that the court should grant summary judgment with respect to whether it violated Section 4d(b) of the Act and Regulation 1.20 by acting in bad faith to facilitate transactions out of the 1845 Account to entities not for the benefit of Peregrine's customers, the court shall deny the U.S. Bank Motion. The court shall also deny the CFTC Motion, because a reasonable jury could find that U.S. Bank did not act in bad faith with regard to any of the transactions.

58

### D. Unclean Hands

#### 1. Parties' arguments

CFTC argues that the court should grant the CFTC Motion with respect to U.S. Bank's affirmative defense of unclean hands. CFTC contends:

> U.S. Bank has now completed extensive discovery, taking numerous depositions, including seven CFTC Fed. R. Civ. P. 30(b)(6) witnesses on 19 different topics, requesting and receiving almost three million documents from . . . CFTC dating back to 1992, and serving and receiving responses to 22 interrogatories, 35 document requests, and 27 requests to admit. However, U.S. Bank still has no credible evidence to support its unclean hands affirmative defense because none exists.

CFTC Brief in Support of the Motion at 26. CFTC asserts that many courts have held that the affirmative defense of unclean hands against a government agency in an enforcement action is unavailable, and when the affirmative defense of unclean hands is permitted in an enforcement action against the government, it, at a minimum, requires "that a defendant allege that the government acted in bad faith." *Id.* CFTC also contends that "courts only permit an unclean hands defense where the government's alleged misconduct is 'egregious' and results in 'extreme prejudice' that rises to the 'constitutional level' and is 'established through a direct nexus between the misconduct and the constitutional injury.'" *Id.* at 27 (quoting *SEC v. Cuban*, 798 F. Supp. 2d 783, 792 (N.D. Tex. 2011)). CFTC argues that U.S. Bank has not shown any such conduct and, therefore, the court should grant the CFTC Motion with respect to U.S. Bank's affirmative defense of unclean hands.

U.S. Bank argues that whether CFTC exhibited sufficiently "unclean hands" is a factual issue that is not appropriate to resolve on summary judgment. Specifically, U.S. Bank claims that in the late 1990s, CFTC became aware of "red flags" relating to Peregrine's conduct. *See* Eric Juzenas Deposition, U.S. Bank Resistance App'x at 49-50. Among these "red flags" was CFTC's belief that it had been misled by Peregrine with

59

regard to accounting issues.  *Id.* at 50.  U.S. Bank notes that a 1999 CFTC audit of Peregrine contained the following findings:

> In apparent violation of Section 18 U.S.C. 1001 [Peregrine] filed a March 26, 1999 Form 1-FR-FCM which included intentional misstatements and omissions.  In addition, oral responses provide by [Peregrine] appeared to be provided as an attempt to mislead the audit process.
>
> During the audit several questionable accounts were discussed with [Peregrine].  On several occasions the initial response was later altered and amended.  It appeared that [Peregrine] was in search of the best response based on capital requirements instead of the accurate or correct response.  In other cases it became apparent that [Peregrine] had no justification to support the treatment of account balances.

1999 CFTC Audit, U.S. Bank Resistance App'x at 672.  U.S. Bank argues that: (1) these findings; (2) CFTC's recommendation in the 1999 CFTC Audit that Peregrine "be issued a warning letter for the violations noted above . . . [and] that the findings of this audit be referred to the Division of Enforcement for appropriate action," *id.* at 676; (3) no action being taken against Peregrine despite Peregrine's violation of criminal law; and (4) CFTC not implementing any special procedures to monitor Peregrine or conducting another audit until 2007, which was a limited audit, demonstrate that CFTC had unclean hands with respect to this enforcement action against U.S. Bank.  U.S. Bank Brief in Support of the Resistance at 32-33.

U.S. Bank claims it was prejudiced by CFTC's inaction because "[t]he customer losses sought by . . . CFTC were incurred because . . . CFTC decided to allow [Peregrine's] conduct to continue." *Id.* at 34.  Therefore, U.S. Bank argues, CFTC's "claims against U.S. Bank . . . arose directly from its own misconduct." *Id.*

60

## 2. Applicable law

"One who seeks equitable relief must approach the court with clean hands." *Earle A. Hanson & Assocs. v. Farmers Coop. Creamery Co.*, 403 F.2d 65, 70 (8th Cir. 1968). If one comes to court "tainted with inequitableness or bad faith relative to the matter in which he [or she] seeks relief, however improper may have been the behavior of the defendant," the court may decline to provide relief. *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945). The unclean litigant's conduct "need not necessarily have been of such a nature as to be punishable as a crime or as to justify legal proceedings of any character." *Id.* at 815. Instead, "[a]ny willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause" for the court to deny relief based on a litigant's unclean hands. *Id.* However, the court has a "wide range" of discretion when considering whether to deny relief to a litigant with unclean hands. *Id.*

"It is well established that the United States is subject to general principles of equity when seeking an equitable remedy." *United States v. Wilson*, 707 F.2d 304, 312 (8th Cir. 1982) (per curiam); *see also Second Nat'l Bank of N. Miami*, 502 F.2d 535, 548 (5th Cir. 1974) ("Certainly when seeking an equitable remedy the United States is no more immune to the general principles of equity than any other litigant."). Although the United States is subject to the general principles of equity, the Supreme Court has stated that equitable principles "will not be applied to frustrate the purpose of [the United States'] laws or to thwart public policy." *Pan-Am. Petroleum & Transp. Co. v. United States*, 273 U.S. 456, 506 (1927). In announcing this principle, the Supreme Court cited numerous cases that forgave a mistake by the government—for example, failing to join a necessary party, *Heckman v. United States*, 224 U.S. 413 (1912), or failing to offer to return the consideration from an allegedly unlawful contract, *Causey v. United States*, 240 U.S. 399 (1916)—because not doing so would frustrate congressional policy. *Pan-Am. Petroleum*

61

& *Transp. Co.*, 273 U.S. at 506-10. These cases, however, did not specifically address the application of the equitable principle of unclean hands to a government enforcement action. That is, these cases, and the holding in *Pan-American Petroleum & Transportation, Co.* itself, did not consider whether the United States, acting in the public interest, was immune to an affirmative defense that it had unclean hands in relation to the dispute.

The court is aware of only one Circuit Court of Appeals—the Fifth Circuit—that has addressed whether a defendant may assert the affirmative defense of unclean hands against the government in an enforcement action in support of the public interest. In *Second National Bank of North Miami*, 502 F.2d 535 (5th Cir. 1974), the defendant asserted that the United States was not entitled to relief because the IRS agents involved in the case had unclean hands. *Second Nat'l Bank of N. Miami*, 502 F.2d at 547-48. The Fifth Circuit Court of Appeals acknowledged the principles of *Pan-American Petroleum & Transportation Co.* and cited with approval the Tenth Circuit's "good faith" standard,[16] concluding that "'unless the Government did something which in good conscience it should not have done, or failed to do something fair dealing required it to do, it comes into court

---

[16] In *Deseret Apartments, Inc. v. United States*, 250 F.2d 457 (10th Cir. 1957), the United States, acting on behalf of the Federal Housing Commissioner, sued to foreclose the mortgage of Deseret Apartments, Inc. ("Deseret"). *Id.* at 458. The district court granted the United States a deficiency judgment, and Deseret appealed, arguing that the Tenth Circuit should overturn the district court's judgment because the government came into court with unclean hands. Deseret argued that it relied on a certificate of necessity issued by the Secretary of the Army in determining whether to construct the units and that, in fact, there was no need for the units. The Tenth Circuit concluded that "[t]he record is devoid of any facts showing bad faith on the part of the Government officials in executing the certificate or facts which would support a conclusion that the Government failed to do anything it should not have done." *Id.* at 459. Accordingly, the Tenth Circuit concluded that because the Government acted in good faith, it is "absolve[d] [from] all conduct which would sully the Government's hands and prevent it from coming into a court of equity to seek an enforcement of its rights." *Id.*

62

with clean hands and is entitled to . . . equitable relief.'" *Id.* at 548 (quoting *Deseret Apartments, Inc.*, 250 F.2d at 458). The Fifth Circuit held that the "United States acted with sufficient good faith" and that its "conduct [was] insufficiently malignant" and, consequently, granted the United States equitable relief.[17]

Several federal district courts have addressed whether a party may assert the affirmative defense of unclean hands against the government in an enforcement action pursuant to the public interest, including in the Eighth Circuit. In *United States* ex rel. *Zissler v. Regents of the Univ. of Minn.*, 992 F. Supp. 1097 (D. Minn. 1998), the court suggested that an unclean hands defense may be available but stated that the government's actions did not "'transgress equitable standards.'" *Id.* at 1114 (quoting *Precision Instruments Mfg. Co.*, 324 U.S. at 815). In *EEOC v. Hibbing Taconite Co.*, 266 F.R.D. 260 (D. Minn. 2009), the Equal Employment Opportunity Commission ("EEOC") alleged that Hibbing Taconite Co. ("Hibbing") discriminated against an employee and requested, among other things, that the court require Hibbing "carry out policies, practices, and programs[] for equal employment opportunities, so as to eradicate the effects of any past or present unlawful employment practices." *Id.* at 263. The court declined to "determine whether a defense of unclean hands should be unavailable, as a matter of law, against the EEOC in its public capacity," because Hibbing did not adequately plead the elements of an unclean hands defense. *Id.* at 270. Accordingly, the court is not aware of any federal court in the Eighth Circuit that has concluded, as a matter of law, that an unclean hands

---

[17] The First Circuit Court of Appeals also equates unclean hands to bad faith and, accordingly, requires litigants to show that the government acted with bad faith when asserting the unclean hands defense. *Texaco Puerto Rico, Inc. v. Dep't of Consumer Affairs*, 60 F.3d 867, 880 (1st Cir. 1995). However, *Texaco Puerto Rico, Inc.*, as with *Deseret Apartments, Inc.*, was not in the context of a government enforcement action pursuant to a congressional mandate to serve the public interest and, therefore, these cases are less persuasive than *Second National Bank of North Miami*.

defense is unavailable against the government in an enforcement action pursuant to the public interest.

However, other federal district courts across the country are divided on the issue. Some courts cite *Pan-American Petroleum & Transportation Co.* and *Second National Bank of North Miami* for the proposition that a litigant can never invoke an unclean hands defense against the government in an enforcement action. Other courts deny motions to strike an unclean hands defense and allow the factual record to develop. *Compare, United States v. Philip Morris Inc.*, 300 F. Supp. 2d 61, 75 (D.D.C. 2004) ("When, as here, the Government acts in the public interest[,] the unclean hands doctrine is unavailable as a matter of law."), *and United States v. Am. Elec. Power Serv. Corp.*, 218 F. Supp. 2d 931, 938 (S.D. Ohio 2002) (granting the United States' motion to strike an unclean hands defense because this defense "may not be used against the United States to prevent it from enforcing its laws to protect the public interest"), *and SEC v. Hayes*, 1991 WL 236846, at *2 (N.D. Tex. July 25, 1991) (striking an unclean hands defense because it was "clearly without merit because it may not be invoked against a governmental agency which is attempting to enforce a congressional mandate in the public interest"), *with SEC v. Nacchio*, 438 F. Supp. 2d 1266, 1287-88 (D. Colo. 2006) (concluding that whether the facts in the case justify an unclean hands defense "cannot be adjudicated on the face of the pleadings, and must therefore await development of a more complete factual record"), *and SEC v. Downe*, 1994 WL 67826, at *1-2 (S.D.N.Y. Mar. 3, 1994) (same).

"Where courts have permitted equitable defenses to be raised against the government, they have required that the agency's misconduct be egregious and the resulting prejudice to the defendant rise to a constitutional level." *Cuban*, 798 F. Supp. 2d at 792 (quoting *SEC v. Elecs. Warehouse, Inc.*, 689 F. Supp. 53, 73 (D. Conn. 1988)) (internal quotation marks omitted). "Moreover, courts have permitted the defense only where the alleged misconduct occurred during the investigation leading to the suit and the

misconduct prejudiced the defendant in his defense of the action." *Id.* (quoting *Elecs. Warehouse, Inc.*, 689 F. Supp. at 73) (internal quotation marks omitted).

### 3.    Application

The court finds that an affirmative defense of unclean hands is unavailable against the government in an enforcement action in the public interest. *See Pan-Am. Petroleum & Transp. Co.*, 273 U.S. at 506 ("The general principles of equity . . . will not be applied to frustrate the purpose of [the United States's] laws or to thwart public policy."); *see also Philip Morris Inc.*, 300 F. Supp. 2d at 75 ("When, as here, the Government acts in the public interest[,] the unclean hands doctrine is unavailable as a matter of law."); *Am. Elec. Power Serv. Corp.*, 218 F. Supp. 2d at 938 (granting the United States' motion to strike an unclean hands defense because this defense "may not be used against the United States to prevent it from enforcing its laws to protect the public interest"); *Hayes*, 1991 WL 236846, at *2 (striking an unclean hands defense because it was "clearly without merit because it may not be invoked against a governmental agency which is attempting to enforce a congressional mandate in the public interest"). Although the 1999 CFTC Audit should have led CFTC to monitor Wasendorf's activities more closely, their failure to detect Wasendorf's fraud should not prevent it from enforcing potential violations of the Act and the Regulations by U.S. Bank. The public has an important interest in the enforcement of federal laws and regulations. Preventing them from being so enforced in the event that an agency fails to execute its duties would essentially absolve potential lawbreakers from liability.

Even if the court were to recognize an affirmative defense of unclean hands against the government in an enforcement action in the public interest, U.S. Bank has not shown that CFTC's actions or inactions meet the "exacting standard" and "strictly limiting circumstances" that courts have required [before finding] that the government had unclean hands. *See Cuban*, 798 F. Supp. 2d at 790, 792 (collecting cases). U.S. Bank has not

established a genuine issue of material fact as to whether the violation and the prejudice rose to a "constitutional level," *id.* at 792 (quoting *Elecs. Warehouse, Inc.*, 689 F. Supp. at 73) (internal quotation marks omitted), or whether any alleged unclean hands on the part of CFTC prejudiced U.S. Bank in its defense of this action. U.S. Bank may still argue, as it does, that it did not intend for the 1845 Account to be subject to the Guaranties and that it did not facilitate any transactions out of the 1845 Account in bad faith. Nothing CFTC has done—or did not do—limits these defenses.

Accordingly, the court shall grant the CFTC Motion to the extent it requests that the court grant summary judgment to CFTC with respect to U.S. Bank's affirmative defense of unclean hands.

### E. Remedies

#### 1. CFTC Motion

In the CFTC Motion, CFTC requests that the court grant the following remedies: (1) a permanent injunction enjoining U.S. Bank from future violations of Section 4d(b) of the Act and Regulation 1.20(a); (2) civil monetary penalties; (3) restitution to customers who have sustained losses; and (4) disgorgement of all gains U.S. Bank received in connection with alleged violations of the Act and the Regulations. Because there are genuine issues of material fact as to whether U.S. Bank violated the Act and the Regulations, the CFTC Motion shall be denied to the extent it requests that the court grant CFTC the remedies it seeks.

#### 2. U.S. Bank Motion

In the U.S. Bank Motion, U.S. Bank argues that it "is entitled to summary judgment with respect to . . . CFTC's restitution claim." U.S. Bank Brief in Support of Motion at 38. U.S. Bank contends that restitution under 7 U.S.C. § 13a-1(d)(3) may be awarded to remedy "ill-gotten gain." *Id.* (quoting *CFTC v. Wilson*, No. 12-11799-RG3, 2014 WL 1979866, at *9 n.16 (D. Mass. May 16, 2014)). U.S. Bank contends that "CFTC has

Case 6:13-cv-02041-LRR   Document 112   Filed 11/19/14   Page 66 of 69

recognized that restitution for Wasendorf's fraud is properly sought from the person who committed and benefited from the fraud—Wasendorf himself" and that it is improper to award "restitution of funds from U.S. Bank that [it] never received." *Id.* at 39. U.S. Bank does admit that it received "interest and fees it collected from the accounts maintained by Wasendorf and [Peregrine] at [U.S. Bank]" and that it received "$323,784.24 in interest from the [L]oans made to Wasendorf Construction and Wasendorf personally," but it contends that "[t]hat amount pales in comparison with the loss of $6,662,503.38 that [U.S. Bank] suffered as a result of Wasendorf's failure to repay the Wasendorf Construction loan." *Id.* at 40.[18]

CFTC argues that "U.S. Bank omits from its restitution discussion the portions of Section 6c(3)(A) of the Act that address customer losses," which was amended in 2011. CFTC Resistance at 19. CFTC asserts that this amended section makes $35,665,995.40, "Peregrine's customer losses proximately caused by U.S. Bank , . . . the appropriate amount of restitution." *Id.*

7 U.S.C. § 13a-1(d)(3) states that CFTC "may seek, and the court may impose, on a proper showing, . . . equitable remedies including—(A) restitution to persons who have sustained losses proximately caused by such violation (in the amount of such losses)." 7 U.S.C. § 13a-1(d)(3).[19]

---

[18] U.S. Bank appears to be taking inconsistent positions in the U.S. Bank Brief in Support of the Motion and the U.S. Bank Brief in Support of the Resistance. In the former, U.S. Bank states that CFTC is not entitled to restitution because U.S. Bank's losses from the Peregrine/Wasendorf relationship exceeded its gains. *See id.* However, in the latter, it says that "the [Act] make[s] clear that a defendant's gain for restitution purposes should disregard what the defendant lost after taking customer money." U.S. Bank Brief in Support of the Resistance at 39.

[19] Although the jury will determine if and when U.S. Bank violated the Act and the Regulations, the court will determine the appropriate remedy in accordance with 7 U.S.C.
(continued...)

67

Based on the plain language of the statute, CFTC is entitled to seek restitution for the customers' losses proximately caused by U.S. Bank. Accordingly, the court shall deny the U.S. Bank Motion to the extent it requests that the court grant summary judgment to U.S. Bank with respect to CFTC's request for restitution.

## VII. CONCLUSION

In light of the foregoing, Plaintiff United States Commodity Futures Trading Commission's Motion for Summary Judgment (docket no. 77) is **GRANTED IN PART** and **DENIED IN PART** as follows:

(1)     The court **GRANTS** the CFTC Motion to the extent it argues that U.S. Bank may not pursue the affirmative defense of unclean hands.

(2)     The court **DENIES** the CFTC Motion with respect to its other arguments.

Defendant U.S. Bank N.A.'s Motion for Summary Judgment (docket no. 80) is **GRANTED IN PART** and **DENIED IN PART** as follows:

(1)     The court **GRANTS** the U.S. Bank Motion to the extent it argues that U.S. Bank did not improperly "use" the customer funds, thereby violating the Act and the Regulations, by considering them when deciding whether to issue the Loans.

(2)     The court **DENIES** the U.S. Bank Motion with respect to its other arguments.

**IT IS SO ORDERED.**

---

[19](…continued)
§ 13a-1.

**DATED** this 19th day of November, 2014.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA